IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KHESI PILLOWS and<br>TIFFANY WILSON,<br><br>Plaintiffs,<br><br>v.<br><br>COOK COUNTY RECORDER<br>OF DEEDS OFFICE and<br>COOK COUNTY,<br><br>Defendants. | No. 18 C 7497<br><br>Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiffs Khesi Pillows and Tiffany Wilson are former employees of defendant Cook County Recorder of Deeds Office (the "Recorder's Office"). On November 13, 2018, plaintiffs filed a two-count complaint against the Recorder's Office and defendant Cook County, alleging that the Recorder's Office violated consent decrees entered in *Shakman v. Democratic Organization of Cook County*, No. 69 cv 2145 (N.D. Ill.) ("*Shakman* Decrees") and requesting indemnification from Cook County (doc. # 1: Compl.). On April 11, 2019, defendants moved to dismiss plaintiffs' complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) (doc. # 14: Defs.' 1st Mot. to Dismiss). On June 18, 2019, we dismissed plaintiffs' complaint, but we gave plaintiffs leave to amend their complaint by July 10, 2019 if they could do so consistent with Federal Rule of Civil Procedure 11 (docs. ## 28, 29). *See Pillows v. Cook Cty. Recorder of Deeds Office*, No. 18 C 7497, 2019 WL 2524149 (N.D. Ill. June 18, 2019).

---

[1] On April 19, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 17, 21).

Plaintiffs timely filed an amended complaint, which, like their original complaint, alleges that the Recorder's Office violated the *Shakman* Decrees and requests indemnification from Cook County (doc. # 30: Am. Compl.).[2] Defendants again move to dismiss with prejudice under Rule 12(b)(6) (doc. # 31: Defs.' 2d Mot. to Dismiss). Defendants' motion is now fully briefed (doc. # 34: Pls.' Resp.; doc. # 35: Defs.' Reply). For the reasons set forth below, we deny defendants' motion to dismiss.

## I.

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of a complaint. *Bonnstetter v. City of Chicago*, 811 F.3d 969, 973 (7th Cir. 2016). A complaint must contain enough information, in the form of "a short and plain statement of the claim," to give the defendant "fair notice" of the claim and its basis. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Notice alone, however, is insufficient to survive a motion to dismiss; a complaint must also "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *Adams v. City of Indianapolis*, 742 F.3d 720, 728-29 (7th Cir. 2014). Indeed, "the Supreme Court's decisions in *Twombly* and *Iqbal* ushered in a requirement that civil pleadings demonstrate some merit or plausibility in complaint allegations to protect defendants from having to undergo costly discovery unless a substantial case is brought against them." *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013).

---

[2] Plaintiffs' original complaint did not identify the specific defendant accused of violating the *Shakman* Decrees (Compl., ¶¶ 25-28), but plaintiffs later clarified in email correspondence with defendants that they were alleging that only the Recorder's Office violated the *Shakman* Decrees (doc. # 23: Pls.' Resp. to Defs.' 1st Mot. to Dismiss, Ex. A, at 4). Although plaintiffs did not fix this deficiency when they amended their complaint (Am. Compl., ¶¶ 52-55), we proceed on the basis that plaintiffs allege a *Shakman* violation only against the Recorder's Office (*see also id.*, ¶ 50 (alleging that the Recorder's Office terminated plaintiffs because they were not affiliated with Ms. Yarbrough); Pls.' Resp. at 14 (asserting that their *Shakman* claims are "against the Recorder's Office")).

2

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In determining the plausibility of a claim, a court must "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016). A court "must consider the complaint in its entirety," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), as well as "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013) (citation and internal quotations omitted). By contrast, a court does not consider "legal conclusions and conclusory allegations merely reciting the elements of the claim," as they "are not entitled to [the] presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The Seventh Circuit has interpreted the "plausibility" standard as requiring "a nonnegligible probability that the claim is valid[.]" *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). In applying this standard, a court must "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## II.

Plaintiffs allege the following in their amended complaint, and we accept as true all well-pleaded, non-conclusory allegations in deciding defendants' motion to dismiss. *See McCauley*, 671 F.3d at 616. Ms. Pillows began working for the Recorder's Office in February 1999 and was employed as a "Systems Analyst III" at all relevant times (Am. Compl., ¶¶ 5, 11, 13). Ms. Wilson began working for the Recorder's Office in February 2001 and was employed as a "Systems

Analyst III" and an "Administrative Assistant V" (*Id.*, ¶¶ 6, 12, 13). The Recorder's Office is divided into three different departments—Departments 130, 527, and 570—with each department having its own budget (*Id.*, ¶ 33).[3] Ms. Wilson's System Analyst III position was in Department 130, and Ms. Pillows's System Analyst III position was in Department 527 (*Id.*). At all material times, both plaintiffs performed their jobs according to their employer's legitimate expectations (*Id.*, ¶ 14).

On November 6, 2012, Karen Yarbrough was elected Recorder of Deeds, and she took office in December 2012 (Am. Compl., ¶ 17). The Recorder's Office believed that plaintiffs were politically affiliated with Eugene Moore, who preceded Ms. Yarbrough as Recorder of Deeds (*Id.*, ¶ 15). It was well known around the Recorder's Office that Mr. Moore was Ms. Pillows's godfather and that he fondly referred to Ms. Wilson as his "daughter" (*Id.*, ¶ 16). The Recorder's Office was further aware that plaintiffs were not politically affiliated with Ms. Yarbrough (*Id.*, ¶ 49).

On July 6, 2013, Ms. Wilson was transferred from her job in payroll, which she had held since April 2004 and where she had obtained the highest superiority in the department, to a newly created "training coordinator" position (Am. Compl., ¶ 18).[4] Ms. Wilson's new position "effectively" stripped her of her security clearance and gave her fewer responsibilities (*Id.*, ¶ 19). Plaintiffs allege that this transfer was significant because without her security clearance, Ms. Wilson could no longer observe or question any politically motivated timekeeping discrepancies, and the practice of the Recorder's Office was to give more timekeeping leniency to employees politically affiliated with Ms. Yarbrough (*Id.*, ¶¶ 19-20). To show this alleged practice, plaintiffs

---

[3] Plaintiffs make this allegation and other allegations upon "information or belief" or "information and belief" (*see* Am. Compl., ¶¶ 23, 27, 33, 35). This is permitted when "alleging matters peculiarly within the defendant's knowledge." *Michael v. Letchinger*, No. 10 C 3897, 2011 WL 3471082, at *16 (N.D. Ill. Aug. 5, 2011).

[4] Although it is not clear from plaintiffs' amended complaint, we assume that Ms. Wilson's payroll and training coordinator positions both fell under the umbrella of the Systems Analyst III position.

4

point to a six-month time span more than three years after Ms. Wilson's transfer (October 2016 through April 2017) where a single employee avoided discipline for repeated violations of the office's attendance policy because of her political affiliation (*Id.*, ¶ 21 & Ex. 1).

On or about August 1, 2016, Ms. Wilson was reassigned on a temporary basis to an Administrative Assistant V position (Am. Compl., ¶ 22). Ms. Wilson, however, was unaware of her title change because job titles at the Recorder's Office had little meaning or correlation with an employee's job functions (*Id.*, ¶¶ 22, 44). In August 2016, the Recorder's Office also hired a new Database Administrator to work in Department 527, the same department in which Ms. Pillows worked (*Id.*, ¶ 35).[5] The Database Administrator's salary was similar to Ms. Pillows's salary, and the tasks performed by the Database Administrator overlapped with the tasks performed by Ms. Pillows (*Id.*).

Sometime before September 6, 2016, the Budget Office notified the Recorder's Office about potential countywide budget cuts for fiscal year 2017 (Am. Compl., ¶ 23).[6] On September 6, 2016, Chief Deputy Recorder Cedric Giles, with the agreement of the Budget Office, emailed the Deputy Recorders who each headed a department within the Recorder's Office and asked them to identify positions that could be eliminated with the least disruption to core operations (*Id.*, ¶

---

[5] Plaintiffs' allegation is ambiguous as to whether the new Database Administrator was hired in August or October of 2016: "In August and October 2016, the Recorder's Office hired Shani Audain as a Special Assistant – Community Affairs, as well as a new Database Administrator, in Department 527, the same department as Pillows" (Am. Compl., ¶ 35). Nonetheless, the Fourteenth Report of the *Shakman* Compliance Administrator for the Cook County Recorder of Deeds, which plaintiffs refer to in paragraphs 43 and 44 of their amended complaint, states that the Recorder's Office hired the Database Administrator in August 2016 and Ms. Audain in October 2016 (*see Shakman v. Democratic Org. of Cook Cty.*, No. 69 cv 2145 (N.D. Ill.), doc. # 4818, at 11). Thus, we use those dates. *See Phillips*, 714 F.3d at 1019-20 (explaining that a court considers "documents that are critical to the complaint and referred to in it" when deciding a motion to dismiss) (internal quotations omitted).

[6] We read plaintiffs' allegations regarding the "Budget Office" or the "Office of Budget" as referring to Cook County's Department of Budget and Management Services. *See* CookCountyIL.gov, Budget and Management Services, available at https://www.cookcountyil.gov/agency/budget-and-management-services (last visited Oct. 30, 2019) ("The Department of Budget and Management Services (DBMS) prepares, manages and executes the County budget").

5

24). The Deputy Recorders had the most intimate knowledge of and familiarity with the active positions in each department (*Id.*).

Around the same time—but before receiving the requested input from all the Deputy Recorders—Mr. Giles and Carolyn Wilhight (Deputy Recorder – Finance) met with the Budget Office and provided it with a list of positions to potentially eliminate (Am. Compl., ¶ 26). Plaintiffs allege that the positions on this list were based on political affiliation, as Mr. Giles and Ms. Wilhight had yet to receive any input about which active positions were tied to non-essential functions and could be eliminated with the least disruption to core functions (*Id.*, ¶ 27). Both Ms. Wilson's permanent System Analyst III position and Ms. Pillows's System Analyst III position were on the list (*Id.*, ¶¶ 28, 31).

On September 23, 2016, the Budget Office adopted the workforce reduction proposal submitted by Mr. Giles and Ms. Wilhight and requested that layoff plans be finalized by September 30, 2016 (Am. Compl., ¶ 28). The same day (September 23), the Budget Office emailed its adoption of the proposal to Chief of Human Resources Erwin Acox, Jr. (*Id.*, ¶ 29).[7] As a Deputy Recorder, Mr. Acox was one of the individuals who was to have provided input on non-essential job functions in his department (*Id.*). On October 12, 2016, and despite the workforce reduction decision having already been finalized by the Budget Office, Mr. Acox recommended eliminating Ms. Wilson's Systems Analyst III position (*Id.*). At this time, however, Ms. Wilson was still working in her temporary Administrative Assistant V assignment, and neither she nor anybody else occupied the role of Systems Analyst III within the Human Resources Department (*Id.*, ¶ 32).

On October 19, 2016, the Deputy Recorder – Communications recommended that Ms. Pillows's System Analyst III position be eliminated along with other positions (Am. Compl., ¶

---

[7] Plaintiffs do not identify any other recipients of the Budget Office's September 23 email.

30). Like Mr. Acox's recommendation, this recommendation was submitted after the Budget Office already had adopted the workforce reduction proposal submitted by Mr. Giles and Ms. Wilhight on September 23 and after the Budget Office's requested September 30 deadline for finalized layoff plans (*Id.*, ¶¶ 28-30).

The Recorder's Office also made some new hires in October 2016. The Recorder's Office hired Jeanette Soto to fill the newly created position of Director of Human Resources in Department 130, the same department in which Ms. Wilson worked (Am. Compl., ¶ 34). At this time, the Recorder's Office had already decided to eliminate Ms. Wilson's position, yet Ms. Soto's salary was comparable to Ms. Wilson's salary and her tasks extensively overlapped with Ms. Wilson's tasks (*Id.*). The Recorder's Office also hired a Special Assistant – Community Affairs, Shani Audain (*Id.*, ¶ 35). Ms. Audain worked in Ms. Pillows's department and received a salary similar to Ms. Pillows's salary (*Id.*).

On November 28, 2016, Mr. Acox notified Ms. Wilson that her temporary assignment as Administrative Assistant V had come to an end, and that she would return to work as a Systems Analyst III (Am. Compl., ¶ 36). The same day, however, Mr. Acox then notified Ms. Wilson that her position as Systems Analyst III was eliminated; thus, Ms. Wilson was terminated (*Id.*, ¶ 37). Around this time, Mr. Acox instructed Ms. Soto, the newly-hired Director of Human Resources, not to mention to the *Shakman* Recorder Compliance Administrator ("RCA") Ms. Wilson's relationship with Mr. Moore (who "fondly" referred to Ms. Wilson as his "daughter") (*Id.*, ¶¶ 16, 39). Ms. Pillows was also notified on November 28, 2016 that her position was eliminated (*Id.*, ¶ 38). Ultimately, fifteen employees were laid off, and plaintiffs allege that nine of them had no political affiliation with Ms. Yarbrough and had worked together on Mr. Moore's political campaign (*Id.*, ¶ 41).

7

Moreover, plaintiffs' jobs at the time Ms. Yarbrough was elected and sometime thereafter were more essential to core operations than the jobs of other employees who were not laid off (Am. Compl., ¶ 42). The *Shakman* RCA, who investigates and oversees the Recorder's Office and monitors its compliance with the *Shakman* Decrees, also concluded that "it was impossible . . . to conclude whether the positions ultimately selected for elimination were selected based on operational concerns" (*Id.*, ¶¶ 10, 43).

The Recorder's Office later fired Ms. Soto (Am. Compl., ¶ 45). An investigation by the Cook County Office of the Independent Inspector General ("OIIG") found that Ms. Soto "was the victim of retaliation for her attempts to issue discipline against [a Recorder's Office] employee who shares a political affiliation with the Recorder of Deeds" (*Id.*, ¶ 45 & Ex. 2). The RCA also concluded that Ms. Soto was terminated in retaliation for her role in assisting the RCA with the early stages of an inquiry into irregularities with the Director of Compliance hiring process (*Id.*, ¶ 46).

Plaintiffs allege they were terminated because they were politically affiliated with Mr. Moore and not politically affiliated with Ms. Yarbrough and that it has been the pattern and practice of the Recorder's Office to make politically motivated decisions regarding hiring and firing throughout Ms. Yarbrough's tenure (Am. Compl., ¶¶ 47, 50, 53, 54). Plaintiffs also allege that the Recorder's Office's stated reason for plaintiffs' layoffs—budgetary reasons—"was false and merely pretext for illegal discrimination" (*Id.*, ¶¶ 34, 48). As the 2016 reduction in workforce was the first "sanctioned" layoffs since Ms. Yarbrough took office, it was the first opportunity for the Recorder's Office to eliminate those employees it perceived to not be politically affiliated with Ms. Yarbrough (*Id.*, ¶ 40). Furthermore, plaintiffs allege that many of the actions leading up to plaintiffs' layoffs were meant to feign compliance with the *Shakman* Decrees or to avoid an

appearance of non-compliance; specifically, Mr. Giles's September 6 email to the Deputy Recorders, followed by his proposal of positions to be eliminated before receiving the requested feedback from all the Deputy Recorders; the recommendations from Mr. Acox and the Deputy Recorder – Communications, which were provided weeks after the Budget Office adopted the proposal for positions to be eliminated and the deadline to finalize these positions; and Mr. Acox's instruction to Ms. Soto to not inform the *Shakman* RCA about Ms. Wilson's connection to Mr. Moore (*Id.*, ¶¶ 24-30, 39).

Plaintiffs filed a complaint with the OIIG and received a decision from the OIIG (Am. Compl., ¶ 4). Plaintiffs' amended complaint does not disclose the results of the OIIG investigation. Plaintiffs also completed the OIIG's settlement procedure with the Recorder's Office, but the parties did not come to a resolution (*Id.*).

### III.

Count I of plaintiffs' amended complaint alleges that the Recorder's Office violated the *Shakman* Decrees by terminating plaintiffs' employment based on their non-affiliation with Ms. Yarbrough, who was elected Recorder of Deeds in 2012, and their perceived affiliation with the previous Recorder of Deeds, Mr. Moore (Am. Compl., ¶¶ 15, 17, 52-55). Count II seeks indemnification from Cook County for damages, fees, and costs resulting from the *Shakman* Decree violations committed by the Recorder's Office (*Id.*, ¶¶ 56-59). We address defendants' arguments for dismissal of each claim in turn.

### A.

To plead a *Shakman* claim, a plaintiff "must allege that a political reason or factor was the cause of [an] adverse employment action." *Bonnstetter*, 811 F.3d at 973.[8] The termination of

---

[8] We discussed the *Shakman* Decrees and their application to the Recorder's Office more fully in our prior ruling. *See Pillows*, 2019 WL 2524149, at *3.

plaintiffs' employment is an adverse employment action addressed by the *Shakman* Decrees, and defendants do not dispute that plaintiffs' non-affiliation with Ms. Yarbrough and their perceived affiliation with Mr. Moore constitute political considerations. Thus, the dispositive question is whether plaintiffs' complaint, as now amended, sufficiently alleges facts making it plausible that these political considerations caused plaintiffs' terminations. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). Indeed, as defendants put it, "the crux of [their] motion is whether [p]laintiffs sufficiently allege facts making it plausible that inappropriate political considerations *caused* [p]laintiffs' termination" (Defs.' 2d Mot. to Dismiss at 5 (emphasis in original)).

Viewing the amended complaint as a whole, we find that plaintiffs' factual allegations do "enough to nudge [their *Shakman*] claim . . . over the line to plausible." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010). One might reasonably infer that if the Chief Deputy Recorder (Mr. Giles) truly intended to make workforce reduction decisions based on operational considerations, he would have waited until he received feedback from all the Deputy Recorders, who had the most intimate knowledge of and familiarity with the active positions of each department (Am. Compl., ¶ 24). Instead, Mr. Giles and Ms. Wilhight proposed eliminating the positions held by Ms. Pillows and Ms. Wilson more than two weeks *before* receiving any input (*Id.*, ¶¶ 26-30). This timing contributes to the plausible inference that operational considerations were not the motivation for placing plaintiffs' positions on the chopping block.

In addition, plaintiffs' allegation that nine of the fifteen laid-off employees were not affiliated with Ms. Yarbrough and had worked together on Mr. Moore's political campaign makes it a "nonnegligible probability" that political affiliation was the cause of plaintiffs' terminations

(Am. Compl., ¶ 41). *See In re Text Messaging Antitrust Litig.*, 630 F.3d at 629.[9] So does the subsequent firing of Ms. Soto for attempting to discipline an employee who shares a political affiliation with Ms. Yarbrough (Am. Compl., ¶ 45), which suggests that the Recorder's Office was making employment decisions based on political affiliation more than four years after Ms. Yarbrough took office. *Cf. Manuel v. City of Chicago*, 335 F.3d 592, 596 (7th Cir. 2003) ("Other-acts evidence may be relevant and admissible in a discrimination case to prove, for example, intent or pretext"); *O'Sullivan v. City of Chicago*, No. 01 C 9856, 2007 WL 671040, at *8 (N.D. Ill. Mar. 1, 2007) (characterizing "discriminatory acts directed at employees other tha[n] the plaintiff" as "other-acts evidence" that may be relevant and admissible to prove intent or pretext in a discrimination case).

We also note two additional allegations as they pertain to Ms. Wilson. *First*, Ms. Wilson alleges that Mr. Acox, the person who recommended her termination, told her that the temporary assignment as Administrative Assistant V ended and she could return to the Systems Analyst III position—only to find it had been eliminated and so she was out of a job (Am. Compl., ¶¶ 29, 36-37). That timing might suggest that the Recorder's Office ended Ms. Wilson's temporary assignment so that she could be fired, as the position to which she was to return (Systems Analyst III) no longer existed. *Second*, Ms. Wilson alleges that Mr. Acox also instructed the Director of Human Resources not to inform the *Shakman* RCA of Ms. Wilson's relationship with Mr. Moore (*Id.*, ¶ 39). A reasonable inference is that Mr. Acox did so because he knew that Ms. Wilson was

---

[9] Defendants contend that this allegation shows political affiliation did not come into play because the other six employees were affiliated with Ms. Yarbrough (Defs.' 2d Mot. to Dismiss at 3; Defs.' Reply at 2-3). We disagree. The allegation says that nine employees had no political affiliation with Ms. Yarbrough *and* had worked together on Mr. Moore's political campaign (Am. Compl., ¶ 41). Perhaps the other six employees had not worked on Mr. Moore's campaign but were still not politically affiliated with Ms. Yarbrough. Moreover, even if some of the fired employees were affiliated with Ms. Yarbrough, that does not negate the possibility that the other employees were fired because of their non-affiliation with Ms. Yarbrough. In other words, firing employees *despite* their political affiliation does not foreclose the firing of other employees *because* of their political affiliation.

terminated for an impermissible political reason, *i.e.*, her relationship with Ms. Yarbrough's predecessor. *See Kubiak*, 810 F.3d at 480-81 (on a motion to dismiss, we "draw all reasonable inferences in favor of the plaintiff").

These additional allegations make the four-year gap between the start of Ms. Yarbrough's administration in 2012 and plaintiffs' terminations in 2016 less adverse to plaintiffs' allegations than it was when we assessed plaintiffs' original complaint. *See Pillows*, 2019 WL 2524149, at *4. So, too, does plaintiffs' assertion that the mandate in the fall of 2016 to reduce positions due to budgetary concerns offered the Recorder's Office its "first opportunity to eliminate employees perceived not to be politically affiliated with [Ms.] Yarbrough" (Am. Compl, ¶ 40).

True, plaintiffs have not alleged the existence of evidence that expressly attributes their terminations to their political affiliation. But even after *Twombly* and *Iqbal*, the Seventh Circuit has found that "[p]laintiffs' pleading burden should be commensurate with the amount of information available to them." *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015) (internal quotations omitted). Here, evidence of the reason(s) for plaintiffs' terminations is largely, if not solely, in the possession of the Recorder's Office. At this stage of the litigation—with no discovery yet taken—plaintiffs do not have to allege the existence of "smoking gun" evidence showing that their political affiliation caused them to be fired. *See id.* ("It is unreasonable to require plaintiffs to plead the specific statements with more particularity when they have no knowledge of the specific falsehoods and can learn of them only through discovery"); *In re Text Messaging Antitrust Litig.*, 630 F.3d at 629 ("The plaintiffs have conducted no discovery. Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability").[10] Rather, plaintiffs must allege "enough details about the subject-

---

[10] Indeed, such evidence may not even exist. *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) ("Direct evidence—an overt admission of discriminatory intent—is rare"); *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir.

matter of the case to present a story that holds together[.]" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826-27 (7th Cir. 2014) (internal quotations omitted). Plaintiffs' amended complaint has done so.

In sum, plaintiffs' amended complaint sets forth allegations demonstrating "a nonnegligible probability" that their *Shakman* claim is valid. *See In re Text Messaging Antitrust Litig.*, 630 F.3d at 629. Thus, we deny defendants' motion to dismiss Count I.

**B.**

Defendants also argue that Count II, which seeks indemnity from Cook County, should be dismissed because plaintiffs have not pled a viable *Shakman* claim against the Recorder's Office (Defs.' 2d Mot. to Dismiss at 9). Because we find otherwise, we deny defendants' motion to dismiss Count II as well.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (doc. # 31) is denied. Defendants have until November 21, 2019 to answer plaintiffs' amended complaint (doc. # 30).

**ENTER:**

/s/ Sidney I. Schenkier

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: October 31, 2019**

---

2012) ("Of course, 'smoking gun' evidence of discriminatory intent is hard to come by"). But that does not automatically mean plaintiffs' *Shakman* claim is meritless; circumstantial evidence may show that plaintiffs' political affiliation caused their terminations. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) ("In the Title VII retaliation context, causation can be established by circumstantial evidence"); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (explaining, in the context of employment discrimination actions, that "no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect'"); *see also Elliott v. Thomas*, 937 F.2d 338, 345 (7th Cir. 1991) ("[T]here is no principled difference between direct and circumstantial evidence").