

Transcript of the Deposition of:
# Khesi Pillows

**Date:** September 25, 2020
**Volume:**

**Case:** Khesi Pillows and Tiffany Wilson v. Cook County Recorder of Deeds Office and Cook County

Printed On: October 20, 2020

VIDEO INSTANTER INCORPORATED
134 North LaSalle Street
Suite 1400
Chicago, IL 60602
Phone: 312-641-3605
Fax: 312-641-1147

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KHESI PILLOWS and TIFFANY WILSON,  )
                                  )
      Plaintiffs,           )
                                  )
      vs.                   )  No. 18 CV 7497
                                  )
COOK COUNTY RECORDER OF DEEDS    )
                                  )
OFFICE and COOK COUNTY,          )
                                  )
      Defendants.           )

VIDEOTAPED DEPOSITION

Deposition of KHESI PILLOWS, taken by the Defendants herein, pursuant to notice and the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions, before SAM KOHLHAAS, a Notary Public within and for the County of Cook and State of Illinois, on the 25th day of September, 2020, at the hour of 10:00 a.m., by video conference within the state of Illinois, whereupon the deponent was located in Flossmoor, Illinois.

Electronically signed by Sam Kohlhaas (401-140-193-8254)

85868bdb-5468-4737-9390-0be9d9bb67f0

1

2

3                    A P P E A R A N C E S

4

5

6    ASSISTANT STATE'S ATTORNEY

7    50 West Washington Street

8    Suite 500

9    Chicago, Illinois 60602

10   BY: MS. KATHLEEN ORI

11       MS. JAYLAAN SLAUGHTER

12

13       Appeared by video conference on behalf of the

14             Defendants.

15

16

17   ED FOX & ASSOCIATES, LTD.

18   300 West Adams Street

19   Suite 330

20   Chicago, Illinois 60606

21   BY: MS. JACLYN N. DIAZ

22

23       Appeared by video conference on behalf of the

24             Plaintiff.

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1                    INDEX OF WITNESSES

                                                     PAGE
2

  KHESI PILLOWS:
3
  Examination by: MS. ORI............................5
4

5   Examination by: MS. DIAZ.........................164
6

7

                    INDEX OF EXHIBITS
8
  Defendants' Deposition Exhibit No. 1...............51
9
  Defendants' Deposition Exhibit No. 2..............108
10
  Defendants' Deposition Exhibit No. 3..............120
11
  Defendants' Deposition Exhibit No. 4..............122
12
  Defendants' Deposition Exhibit No. 5..............128
13
  Defendants' Deposition Exhibit No. 6..............130
14
  Defendants' Deposition Exhibit No. 7..............135
15
  Defendants' Deposition Exhibit No. 8..............135
16
  Defendants' Deposition Exhibit No. 9..............137
17

18  Defendants' Deposition Exhibit No. 10............140

19

20  Defendants' Deposition Exhibit No. 11............146

21

22  Defendants' Deposition Exhibit No. 12............152

23

24  Defendants' Deposition Exhibit No. 13............156

1          THE REPORTER:  For the record, my name

2     is Sam Kohlhaas of Video Instanter.  I'm the video

3     recording device operator and officer for this

4     deposition.  My business address is 134 North

5     LaSalle Street, Suite 1400, Chicago, Illinois

6     60602.  This deposition is being video recorded

7     and will be transcribed by nonstenographic means,

8     pursuant to Federal Rule 30(b) and all other

9     applicable state and local rules.  Ms. Pillows,

10    would you please state your location for the

11    record?

12         THE WITNESS:  Flossmoor, Illinois.

13         THE REPORTER:  Thank you.  And how do

14    you pronounce your first name?

15         THE WITNESS:  Khesi.

16         THE REPORTER:  Khesi.  This is the video

17    recorded, remote video-conferenced deposition of

18    Khesi Pillows in the matter of Khesi Pillows vs.

19    Cook County Recorder of Deeds Office, et al., Case

20    No. 18 CV 7497 in the United States District Court

21    for the Northern District of Illinois, Eastern

22    Division.

23         Today's date is September 25, 2020, and

24    the time is 10 a.m.  This deposition is being

1  taken on behalf of the defendant and is being

2  video recorded at the instance of the defendant.

3          Would the parties present please

4  introduce themselves for the record.

5          MS. DIAZ:  Jaclyn Diaz on behalf of the

6  plaintiff, Ms. Pillows.

7          THE WITNESS:  Khesi Pillows.

8          MS. ORI:  Kathleen Ori on behalf of

9  Defendants.

10         MS. SLAUGHTER:  Jaylaan Slaughter on

11  behalf of Defendants.

12         THE REPORTER:  Khesi, would you please

13  raise your right hand?.

14                         (WHEREUPON, the witness

15                          was duly sworn.)

16              E-X-A-M-I-N-A-T-I-O-N

17  BY MS. ORI:

18     Q.   Ms. Pillows, we just swept through the

19  case name and everything, and as I just said, my

20  name is Kathleen Ori.  This deposition will be

21  conducted pursuant to notice and in accordance

22  with the Federal Rules of Civil Procedure.  Did

23  you receive a copy of the notice deposition?

24     A.   Yes.

1      Q.   Do you have any objections?

2      A.   No.

3      Q.   Okay.  Can you please state your name

4   and spell it for the record?

5      A.   Khesi Pillows, K-H-E-S-I.  Last name

6   Pillows, P-I-L-L-O-W-S.

7      Q.   Is it okay if I call you Ms. Pillows?

8      A.   Sure.

9      Q.   Okay.  Have you ever been deposed

10  before?

11     A.   No.

12     Q.   So I'm going to explain how it works.

13     A.   Okay.

14     Q.   I ask you questions and you answer them

15  and it must done in that order.  The court

16  transcriber cannot take down two answers at once

17  if we're talking over each other, so I'll ask that

18  you wait to answer my question before you begin

19  answering, and I'll do my best to wait for you to

20  finish answering before I ask another question.

21  Is that fair?

22     A.   Okay.

23     Q.   It's also important, while I can see you

24  on the video, that your answers are out loud so

1    they can be taken down --

2         A.    Okay.

3         Q.    -- so no shaking of the head or -- that

4    won't work.

5         A.    Because this is a habit, okay, yes.

6    Okay.

7         Q.    If there's anything you don't

8    understand, if my question's not clear, ask me to

9    repeat it --

10        A.    Okay.

11        Q.    -- and I'll do my best to make the

12   question make sense to you.

13        A.    Okay.

14        Q.    If you answer the question, I will

15   presume that you understood what I was asking.  Is

16   that fair?

17        A.    Yes.

18        Q.    Okay.  If you have to take a break at

19   any time, that is fine.  I just ask that you

20   answer the question that I've asked before we take

21   a break.

22        A.    Okay.

23        Q.    Is that okay?

24        A.    Yes.

1      Q.   Is there anything today that will

2    prevent you from fully and completely answering

3    the questions I'm asking you?

4      A.   No.

5      Q.   And there's -- You're not under any --

6    This is a weird question, but it's a typical

7    question.  You're not under any sort of medication

8    that causes your memory to be hazy or anything.

9    Correct?

10     A.   No.

11     Q.   Okay.  Ms. Pillows, do you go by any

12   other names besides Khesi?

13     A.   No.

14     Q.   Okay.  What is your date of birth?

15     A.   2/05/1978.

16     Q.   What are the last four digits of your

17   social security number?

18     A.   7812.

19     Q.   Where did you grow up?

20     A.   Should I tell both places?  I grew up in

21   Maywood, Illinois, as well as Oak Park.

22     Q.   All right, but always in Illinois.

23   Correct?

24     A.   Yes.

1      Q.    Okay.  What is your current address?

2      A.    1705 Pinehurst Lane, Flossmoor, Illinois

3   60422.

4      Q.    Who lives with you?

5      A.    My husband, my two sons.

6      Q.    Okay.  How old are your sons?

7      A.    One is 14 and one is 9.

8      Q.    Okay.  Is your husband working?

9      A.    Yes.

10      Q.    Where does he work?

11      A.    The United States Post Office.

12      Q.    Okay.  How long has he worked there?

13      A.    I want to say 2015.

14      Q.    Okay.  Where did he work before then?

15      A.    Let me think, sorry.  Cash America.

16      Q.    Has he ever worked for the county?

17      A.    No.  The Forest Preserve.

18      Q.    Okay.  When did he work for the Forest

19   Preserve?

20      A.    I don't know.  I don't know the exact

21   dates.

22      Q.    Do you know how long he worked for the

23   Forest Preserve?

24      A.    It was like a temporary summer type of

1   position.

2       Q.   Do you know about how long ago that was?

3       A.   It was over five years ago.

4       Q.   Okay.  And was he just there for the

5   summer?

6       A.   Right.  It was just a temporary

7   position, so I want to say like up until like

8   September and maybe from April or May, but, again,

9   I'm not a hundred percent sure.

10      Q.   Okay.  Did you have any involvement in

11  him getting that temporary position?

12      A.   No.

13      Q.   Okay.  Have you ever been involved in

14  any other lawsuits?

15      A.   No.

16      Q.   Have you ever filed for bankruptcy?

17      A.   No.

18      Q.   How did you prepare for the deposition

19  today?

20      A.   I spoke with my lawyer and I reviewed

21  the documents that she sent.

22      Q.   Okay.  And just to be clear, I'm not

23  asking for any -- about any conversation you had

24  with your attorney, but what documents did you

1   review?

2      A.   Can I pull them up to give you the exact

3   name?

4      Q.   You can just describe them to me.

5      A.   They were the legal documents with what

6   we -- like what we -- like my reason for filing

7   the case and the case number.  It was two of those

8   documents.

9      Q.   Okay.  And to be clear right now, so

10  we're in separate rooms so I can't see what's

11  before you.  Do you have anything before you right

12  now that you can see?  Like so right now I have --

13  like I have some documents in front of me.  Do you

14  have any documents in front of you?

15     A.   I mean, I have this notepad.

16     Q.   What is that?

17     A.   It's -- It has Jaclyn's number, it has

18  the number Sam gave, and it just -- it's giving me

19  instructions that I need to pause before

20  answering --

21        MS. DIAZ:  I'm going to object.  This is

22  stuff that we discussed, attorney-client

23  privilege.

24        MS. ORI:  Well, these are notes that she

1   has before her right now, and so I want to make

2   sure -- and I'm not asking for communications that

3   you gave her, but I want to make sure that -- so I

4   don't think that there's any privilege here.

5          MS. DIAZ:  You can answer, Ms. Pillows.

6          THE WITNESS:  Oh, okay.  So it's just --

7   It's Jaclyn's number, it's a statement for me to

8   if I don't remember things, don't try to figure --

9   you know, don't try to make up anything, just say

10  I don't remember, and then to pause before I

11  answer, and then it has her number and Sam's

12  information that he just gave us.

13  BY MS. ORI:

14      Q.   Is that all?

15      A.   Mm-hmm.

16      Q.   Okay.  Is that the only thing in front

17  of you?

18      A.   I mean, I have sticky notes on my

19  computer for work.  They are -- You can read them.

20      Q.   That's okay.  I'm just going to read it

21  out loud.  If you can just read it out loud just

22  because -- We, me, God will carry me through, be

23  always humble, gentle, and patient.  Show your

24  love by being tolerant with one another.  From the

1  Ephesians or --

2     A.   Right.  Do you want me to read all of

3  them to you?

4     Q.   Is there anything relating to this case

5  that you have in front of you?

6     A.   No.

7     Q.   No.  And I know I talked to your

8  attorney about printing out your first amended

9  complaint and your answers to interrogatories.  Do

10  you have those in front of you?

11     A.   Say that one more time.

12     Q.   The first amended complaint and your

13  responses to the interrogatories, do you have

14  those?

15     A.   No.

16     Q.   No, okay.

17          MS. ORI:  So Jaclyn, you didn't have her

18  print them out beforehand?

19          MS. DIAZ:  I did send them to her, but I

20  don't know if she printed them out.

21          THE WITNESS:  She sent them, I didn't

22  print them.

23  BY MS. ORI:

24     Q.   Okay.  Do you have anything else in

1    front of you?

2         A.   I mean, again, I have a lot of stickers

3    on my computer.  I can read to you what they say,

4    but for the case, no.

5         Q.   Actually, you know what, just so we have

6    a clean record, can you please read everything

7    just so we --

8         A.   Okay.  God has not given us the spirit

9    of fear, but one that is powerful, loving, and

10   self controlled, 2 Timothy 1:7.  Our -- This is

11   for work; our competitors COMEXUS, supplier .IO,

12   supplier Gateway Northbound LLC, Proximo, our

13   spend quarters are first January through March,

14   second April through June, third July through

15   September, fourth October through December.  God

16   is with her.  She will not fail Psalms 46:5.

17   Trust in the Lord with all your heart.  Never rely

18   on your own understanding. Remember the Lord in

19   all you do and He will show you the right way

20   Proverbs 3:5-6, and God, You are our provider.

21        Q.   Okay.  Thank you.  Do you have your

22   phone nearby?

23        A.   Yes.

24        Q.   Okay.  I would ask if you could turn it

1   over so we're not distracted or turn it off so

2   that way we're not distracted by that.  I turn my

3   phone off because it's easy to get distracted.

4          Besides talking to your attorney, did

5   you talk to anyone else about your deposition

6   today?

7       A.   I told my mother, my sister, and my best

8   friends to pray for me, yes.

9       Q.   Okay.  Did you tell them about what your

10  testimony was going to be?

11      A.   No.

12      Q.   Okay.  Just -- You just asked them to

13  pray for you?

14      A.   Yes.

15      Q.   Okay.  So nothing substantive.  Correct?

16      A.   Nothing?

17      Q.   Substantive, nothing about -- about the

18  facts of the case?

19      A.   No.

20      Q.   Okay.  And I received documents that you

21  provided to your attorney.  Did you ever take --

22  Did you ever have a journal and write notes about

23  anything relating to this case or a diary?

24      A.   Not necessarily.

1     Q.   What do you mean not necessarily?

2     A.   Like I don't have a diary, but I have

3  written stuff and I've put stuff in my phone about

4  the case, like not about the case, but just about

5  what happened during the whole like once when I

6  got fired and stuff.

7     Q.  Have you provided that information to

8  your attorney?

9     A.  No.

10    Q.  I would ask that after this deposition

11  is over that you do that.  And, Jaclyn, if there's

12  something in need to follow up with, I presume you

13  have no objection to that?

14     MS. DIAZ:  Right.

15  BY MS. ORI:

16    Q.  Okay.  So after this -- after this

17  deposition, I'll ask that you gather that

18  information and provide that to your attorney who

19  will then provide it to me.

20    A.  Okay.  Now, I will say this, I will have

21  to look in my phone to make sure that I have not

22  deleted it.

23    Q.  Okay.

24    A.  I might have, but you asked if I have

1   done that and I have, so if it's still there, yes,

2   I will provide it.

3        Q.   And as you know, you're under oath right

4   now, so the truth is the right way to go.

5        A.   Absolutely.  Yeah, I wouldn't -- Yeah,

6   absolutely.

7        Q.   So did you take any notes in preparation

8   for today, besides the ones we reviewed?

9        A.   Did I take any notes in preparation?

10  No.

11       Q.   Okay.  Did you ever email anyone about

12  this case?

13       A.   No.

14       Q.   Do you have Facebook?

15       A.   Yes.

16       Q.   Did you ever post anything about this

17  case on Facebook?

18       A.   No.

19       Q.   Do you have Twitter?

20       A.   Yes.

21       Q.   Did you ever Tweet about this case on

22  Twitter?

23       A.   No.

24       Q.   Do you ever blog?

```
1        A.   No.
2        Q.   Did you ever post messages online about
3   this case?
4        A.   No.
5        Q.   Do you have any written statements or
6   affidavits from witnesses regarding this case?
7        A.   No.
8        Q.   Besides the documents -- Besides what's
9   on your phone, have you give your attorney
10  everything that you have about this case?
11       A.   Yes.
12       Q.   I want to talk about your employment
13  history.
14       A.   Okay.
15       Q.   Prior to you working at the Recorder of
16  Deeds, where did you work?
17       A.   Nordstrom.
18       Q.   Okay.  How long did you work there for?
19       A.   I believe I started summer of '97, so I
20  was doing summer work while I was at school, and
21  then when I graduated in 2000, I worked there for
22  a year.
23       Q.   Okay.  And then you went to the Recorder
24  of Deeds?
```

1        A.    Correct.

2        Q.    What was your relationship to Eugene

3    Moore?

4        A.    He was my godfather.

5        Q.    Okay.  Did you speak with -- And I'm

6    sorry, is he still alive?  I'm not sure.

7        A.    No, he passed away.

8        Q.    Okay.  Did he help you get the position

9    at the Recorder of Deeds?

10       A.    I would say probably yes.

11       Q.    Do you know how that process worked?

12       A.    No.

13       Q.    Okay.  Do you remember what position you

14   applied to at the Recorder of Deeds?

15       A.    A Systems Analyst III.

16       Q.    Okay.  And that's the position that you

17   remained, a Systems Analyst III the entire time of

18   your career?

19       A.    Yes.

20       Q.    Okay.  Do you -- You said that you

21   believed Mr. Eugene Moore had some impact on you

22   getting the job.  What's your basis for that

23   belief?

24       A.    He told me about the position and it was

1  in the IT department, what I just got my degree

2  in, and so he told me about the position and I

3  applied for it.

4      Q.  Okay.  Do you remember who you

5  interviewed with?

6      A.  If I'm not a hundred percent sure, but

7  kind of think, should I say it or -- I don't want

8  to say something and then it's not right.

9      Q.  Okay.  So it's fair that you don't

10 remember?

11     A.  Right, I don't remember.

12     Q.  Did you -- And I don't want you to guess

13 or speculate, just like your attorney told you.

14     A.  Okay.

15     Q.  Did you interview with Eugene Moore as

16 part of the interview process?

17     A.  No.

18     Q.  Okay.  Were you promised a position

19 because of you're relationship with Eugene Moore?

20     A.  No.

21     Q.  Had you ever -- How long -- Do you know

22 how long Eugene Moore was the recorder of deeds?

23     A.  I want to say -- I'm not sure.

24     Q.  Okay.  Did you ever volunteer on any of

1  his campaigns?

2      A.   Yes.

3      Q.   Okay.  What was your -- what was your

4  role in his campaigns?

5      A.   I didn't have a role like with a title

6  or anything.  I would just go to the campaign

7  office and help and pick up food and deliver to

8  like the people that would stand outside and pass

9  out flyers.

10     Q.   Did you ever donate to his campaign?

11     A.   No.

12     Q.   No.  Do you know what party Mr. Eugene

13 Moore was, what political party?

14     A.   Democrat.

15     Q.   Okay.  And what political party are you

16 affiliated with, if any?

17     A.   The Democrat.

18     Q.   Okay.  When you applied for the position

19 at the Recorder of Deeds, were you aware of what a

20 Shakman exempt position was?

21     A.   No.

22     Q.   Okay.  Do you know what a Shakman exempt

23 position is now?

24     A.   I believe so, but could you tell me?

1      Q.   So this is the way the deposition

2   works --

3      A.   Oh, I can't ask you a question.

4      Q.   Right.

5      A.   I'm sorry, I'm sorry.

6      Q.   What is your understanding of what

7   Shakman exempt is?

8      A.   That you can -- Like if you're -- have

9   an exempt position, you can get fired at any time.

10  No?  Okay.  I'm not a hundred percent sure.

11     Q.   Do you know whether your role as a

12  Systems Analyst III was Shakman exempt?

13     A.   I don't know.

14     Q.   Okay.  Do you know if your role as a

15  Systems Analyst III was part of a union?

16     A.   It was not part of the union.

17     Q.   Okay.  Were you ever part of a union at

18  the Recorder of Deeds?

19     A.   No.

20     Q.   Did you ever seek to be part of a union

21  at the Recorder of Deeds?

22     A.   Could you repeat that one?

23     Q.   Did you ever ask to be part of a union?

24     A.   No.

1    Q.   Okay.  Are you aware that members of a

2  union have a collective bargaining agreement?

3    A.   Yes.

4    Q.   Okay.  Have you looked at a collective

5  bargaining agreement for the Recorder of Deeds?

6    A.   Have I ever -- Can you repeat --

7    Q.   Have you ever looked or reviewed the

8  collective bargaining agreement with employees at

9  the Recorder of Deeds?

10    A.   I don't recall.

11    Q.   Okay.  So would it be fair to say that

12  you don't know whether the collective bargaining

13  agreement would provide rights to union members?

14    A.   No, because I've heard union members

15  talk about it, so I wouldn't say that just because

16  I didn't read it I don't know.

17    Q.   Maybe that question wasn't great, but

18  you would agree that since you were not a member

19  of the union, that the collective bargaining

20  agreement did not apply to you.  Correct?

21    A.   Correct.

22    Q.   Okay.  Can you tell me about your role

23  as a System Analyst III?

24    A.   Sure.  So I was in the IT department,

1    supported the day-to-day functions of the CCR

2    staff downtown, as well as at the satellite

3    locations.  I maintained like hardware, software.

4    Like if -- And like if our users had issues, they

5    would either call or email and then we would have

6    to respond accordingly.  I created and maintained

7    accounts for the CCRD website.  I also provided

8    technical support to the users of the CCRD website

9    via phone and email.  I generated and emailed out

10   spreadsheets that had real estate transfers, so it

11   was called the real estate transfer list.  I

12   created training documents and provided training

13   to all of our employees on the different systems

14   and programs that we had.  Desktop support, which

15   contained like imaging of the hardware and

16   software installation and maintenance for the

17   systems, and then I assisted with coordinating the

18   installation and -- the installation of the

19   software in computer systems, and I also created

20   user -- user accounts and computer accounts using

21   our active directory.  I also sometimes would

22   assist with certain -- like doing different things

23   with our servers.

24        Q.   Okay.  When did you begin your role as a

1   System Analyst III?  Do you know when you started

2   your job?

3        A.   Yeah, in 2001.

4        Q.   Okay.  And when were you laid off?

5        A.   2016, December of 2016.

6        Q.   Okay.  Did you role as a System Analyst

7   III stay the same while you were working at the

8   Recorder of Deeds?

9        A.   No, I gradually built up like more and

10  more.  When I first started, our systems weren't

11  even as vast as they were when I left, so no.

12       Q.   Okay.  Were there any other System

13  Analyst III that worked with you in IT?

14       A.   I don't believe so.

15       Q.   Okay.  And so who did -- who did you

16  work with?  Did you handle this all by yourself or

17  were there other individuals who did some other

18  work?

19       A.   Some of the items in the list I handled

20  myself and then some items were joint efforts for

21  our department.

22       Q.   Okay.  What did you handle by yourself?

23       A.   Creating the -- Well, handling of the

24  website, so answering all telephone calls, emails

1    for the Recorder of Deeds website, that was

2    totally me.  Doing the transfer list, that was

3    totally me.  Doing training and creating

4    documents, the documents for the training, was me.

5    That was all that like I did myself and so

6    everything else was a joint effort.

7         Q.    Okay.  How many other people were part

8    of this joint effort?

9         A.    It was a total of four of us.

10        Q.    Okay.  Do you know what the other names

11   of those individuals, the other three individuals?

12        A.    Yes, Kevin, Paul, and Joe.

13        Q.    Do you know their last names?

14        A.    Yes.  Kevin Hayes, Paul Silic, and Joe

15   Ruiz.

16        Q.    Do you know if Kevin, Paul, and Joe were

17   members of a union?

18        A.    They were not.

19        Q.    They were not.  Do you know what their

20   job titles were?

21        A.    I do not.

22        Q.    Okay.  Did you tell Kevin, Paul, and Joe

23   that Eugene Moore was your godfather?

24        A.    I don't remember.

1      Q.   Okay.   Did you tell anyone in the IT

2 department that Eugene Moore was your godfather?

3      A.   I don't remember.

4      Q.   Okay.   Would there be anything that

5 would refresh your recollection about whether you

6 told someone?

7      A.   Because I kind of feel like I did, but

8 because I'm not a hundred percent sure, I don't

9 want to say I did and I didn't, so --

10      Q.   Do you recall ever talking about Eugene

11 Moore at work, about your relationship with him?

12      A.   I'm -- I don't remember.

13      Q.   Okay.   Did you ever see Eugene Moore

14 while you were at work?

15      A.   Yes.

16      Q.   Okay.   How many times did you see him, a

17 lot or a little?

18      A.   Okay, thank you.   A lot.

19      Q.   Okay.   Did you work in the same building

20 as Eugene Moore?

21      A.   Yes.

22      Q.   Okay.   Did you ever go out to lunch with

23 him?

24      A.   Yes.

1    Q.   Okay.  Did people see you leave

2   together?

3    A.   Yes.

4    Q.   Did Eugene Moore go out with other

5   employees in the IT department?

6    A.   I don't know.

7    Q.   Did you ever hug Eugene Moore when you

8   saw him at work?

9    A.   Yes.

10   Q.   Okay.  Did anyone ask you why you hugged

11  him?

12   A.   I -- No.

13   Q.   Okay.  Where was your office, what

14  building?

15   A.   118 North Clark.

16   Q.   Okay.  Was Eugene Moore in that same

17  building?

18   A.   Yes.

19   Q.   Were you on the same floor?

20   A.   Yes.

21   Q.   Okay.  Would you see him almost every

22  day?

23   A.   Yes.

24   Q.   Okay.  Did you ever talk about -- So

1    when you say he's your godfather, can you -- can

2    you explain what that means?

3         A.   When I was born, my parents like

4    selected him.  So in the Baptist church, they have

5    like ceremonies when your kids are about like six

6    months where they bless the kids and they get

7    godparents, so my parents selected Eugene Moore as

8    one of my godparents.

9         Q.   Do you know how your parents knew Eugene

10   Moore?

11        A.   Him and my dad were friends.

12        Q.   Okay.  Do you know how they became

13   friends?

14        A.   They both grew up in Maywood.

15        Q.   Okay.  Did you have any -- Did you ever

16   have any difficulties at work that you brought to

17   Eugene Moore's attention?

18        A.   I don't believe so.

19        Q.   Did you ever think that you would not

20   have gotten the job as System Analyst III but for

21   your relationship with Eugene Moore?

22        A.   Can you repeat that?

23        Q.   Sure.  I like to use but for, but --

24        A.   Because you see that confused me.

1      Q.    I apologize.  I realize -- Do you think

2   if you didn't know Eugene Moore that you would not

3   have gotten the job?  Like do you think that you

4   were qualified for the position that you had?

5      A.    Yes.

6      Q.    Do you think that you would have gotten

7   it even if you didn't know Eugene Moore?

8      A.    I don't know.

9      Q.    Okay.  Did anyone ever -- Did you ever

10  get the impression that people thought that you

11  were not qualified for your job?

12     A.    No.

13     Q.    Okay.  Did you ever get the impression

14  that people thought you had connections?

15     A.    No.

16     Q.    Okay.  Do you know why Eugene Moore left

17  the Recorder of Deeds?

18     A.    Because he retired.

19     Q.    Did he share with you why he wanted to

20  retire?

21     A.    Not necessarily.

22     Q.    What do you mean not necessarily?

23     A.    I assumed why he retired.  He did not

24  necessarily tell me.

1      Q.   Why did you assume?

2      A.   Because he was sick.

3      Q.   Okay.  When he decided to retire, did

4   you have concerns about your employment?

5      A.   Yes.

6      Q.   What were your concerns?

7      A.   That the next recorder that came in

8   would be Karen Yarbrough.

9      Q.   That's two questions.

10      A.   Okay.

11      Q.   So why were you concerned that the next

12   recorder would be Karen Yarbrough?

13      A.   Because there were talks of it.

14      Q.   What were the talks?

15      A.   That Karen Yarbrough was running for

16   Recorder of Deeds.

17      Q.   Okay.  Who was having these discussions?

18      A.   Just the office, people in the office.

19      Q.   Why did that make you concerned?

20      A.   Because I knew her and Eugene did not

21   get along.

22      Q.   Okay.  And so why did that cause you

23   concern?

24      A.   Because as an administrator you can come

1  in and kind of do what you want to do and that's

2  why.

3      Q.   Okay.  Do you know what political party

4  Karen Yarbrough is?

5      A.   I don't.

6      Q.   Okay.  Did you vote for Karen Yarbrough?

7      A.   I did not.

8      Q.   Who did you vote for?

9      A.   I don't remember.

10      Q.   Okay.  Is it fair to say you didn't

11  volunteer on a political campaign for Karen

12  Yarbrough?

13      A.   It's fair to say that I did not.

14      Q.   Okay.  Did Karen Yarbrough know that

15  Eugene Moore was your godfather?

16          MS. DIAZ:  I'm going to object.  That

17  calls for speculation, but Ms. Pillows, you can

18  answer.

19  BY MS. ORI:

20      Q.   Let me rephrase it.  Thank you, Jaclyn.

21          Did you ever tell Karen Yarbrough that

22  Eugene Moore was your godfather?

23      A.   No.

24      Q.   Did you ever tell Cedric Giles that

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1    Eugene Moore was your godfather?

2         A.    Who did you say?

3         Q.    Cedric Giles?

4         A.    Oh, Cedric, no.

5         Q.    Cedric, sorry.

6         A.    Oh, that's okay.

7         Q.    Did you ever -- Who was your supervisor

8    when you were a System Analyst III?

9         A.    When Karen -- Okay, I can't answer that.

10        Q.    Oh, that's great.  Thank you for

11   correcting my question.  When you started as a

12   System Analyst III, who was your supervisor?

13        A.    Ray Wolverton.

14        Q.    Okay.  So we're going to go one by one.

15        A.    Okay.

16        Q.    Did you tell Ray Wolverton that Eugene

17   Moore was your godfather?

18        A.    I don't remember.

19        Q.    Okay.  Who was your next supervisor?

20        A.    Curtis Strong.

21        Q.    Okay.  Did you ever tell Curtis Strong

22   that Eugene Moore was your godfather?

23        A.    I'm going to say yes.

24        Q.    Okay.  And why are you going to say yes?

1          A.   Because we were closer and we may have

2    had that conversation.

3          Q.   Okay.

4          A.   So I don't want to say no and then it

5    did happen.

6          Q.   But it sounds like you're not sure one

7    way or the other?

8          A.   I'm kind of leaning towards yes.  I'm

9    sorry.

10         Q.   Okay.  Who was your next supervisor?

11         A.   Like I'm sorry, I'm not doing this

12   right.  Okay, you said my next supervisor, John

13   Lindsey.

14         Q.   Okay.  Did you ever tell John Lindsey

15   that Eugene Moore was your godfather?

16         A.   I don't remember with him.

17         Q.   All right.  Who was your next

18   supervisor?

19         A.   Alex Kantas.

20         Q.   Okay.  Did you ever tell -- Let me ask

21   the whole question.  Did you ever tell Alex Kantas

22   that Eugene Moore was your godfather?

23         A.   No.

24         Q.   Okay.  And I never worked at the

1    Recorder of Deeds, so, you know, my understanding

2    of how things work.  Do you know if Alex Kantas

3    reported to John Mirkovic?

4         A.   I believe so.

5         Q.   Okay.  Did you ever tell John Mirkovic -

6    - Do you know John Mirkovic?

7         A.   Yes.

8         Q.   Did you have conversations with John

9    Mirkovic?

10        A.   Yes.

11        Q.   Okay.  Did you ever tell John Mirkovic

12   that Eugene Moore was your godfather?

13        A.   No.

14        Q.   Okay.  Do you know who Carolyn Wilhight

15   is?

16        A.   Yes.

17        Q.   Did you ever have any conversations with

18   her?

19        A.   Yes.

20        Q.   Okay.  Did you ever tell Carolyn

21   Wilhight that Eugene Moore was your godfather?

22        A.   No.

23        Q.   Okay.  Did you ever tell Carolyn

24   Wilhight that you did not vote for Karen

1    Yarbrough?

2        A.   No.

3        Q.   Did you ever tell John Mirkovic that you

4    did not vote for Karen Yarbrough?

5        A.   No.

6        Q.   Did you ever tell Alex Kantas that you

7    did not vote for Karen Yarbrough?

8        A.   No.

9        Q.   Okay.  Cedric Giles, you already said

10   you didn't tell him that Eugene Moore was your

11   godfather.  Did you tell him that you did not vote

12   for Karen Yarbrough?

13       A.   No.

14       Q.   Okay.  Did you ever have any

15   conversations with Erwin Acox?

16       A.   Yes.

17       Q.   Did you ever tell him that Eugene Moore

18   was your godfather?

19       A.   No.

20       Q.   Did you ever tell him that you did not

21   vote for Karen Yarbrough?

22       A.   No.

23       Q.   Okay.  So for Alex Kantas, John

24   Mirkovic, Carolyn Wilhight, and Cedric Giles, did

1    you ever tell them that you were not politically

2    affiliated with Karen Yarbrough?

3         A.   Can you repeat that?

4         Q.   Did you ever tell, all these names,

5    you're testing me, Alex Kantas, John Mirkovic,

6    Carolyn Wilhight, Cedric Giles, did you ever --

7    and Erwin Acox, did you ever tell them that you

8    were not politically affiliated with Karen

9    Yarbrough?

10        A.   No.  Did you ever tell them -- Well, I

11   guess I didn't ask this question.  Would you

12   consider yourself politically affiliated with

13   Eugene Moore?

14        A.   Would I -- Okay, because I can't ask you

15   a question.  Can you -- Like currently?

16        Q.   So if you don't understand the

17   question --

18        A.   I don't.

19        Q.   -- do you have an understanding of what

20   it means to be politically affiliated?

21        A.   Yes.

22        Q.   What is your understanding?

23        A.   That you are kind of connected to that

24   person politically.

1      Q.    Okay.  Did you ever tell Alex Kantas,

2   John Mirkovic, Carolyn Wilhight, Erwin Acox, or

3   Cedric Giles that you were politically affiliated

4   with Eugene Moore?

5      A.    Possibly.

6      Q.    Okay.  So we'll go one by one.

7      A.    Okay.

8      Q.    Did you tell Alex Kantas that you were

9   politically affiliated with Eugene Moore?

10     A.    Yes.

11     Q.    Okay.  When did you -- Just to be clear,

12  you previously said that you didn't tell Alex

13  Kantas that Eugene Moore was your godfather.

14  Correct?

15     A.    Correct.

16     Q.    Okay, but you believe you told him that

17  you were politically affiliated with Eugene Moore?

18     A.    Not using those words, but I'm not

19  saying, hey, Alex, me and -- I'm politically

20  affiliated with Eugene Moore, but I believe that I

21  have had conversation with Alex saying that maybe,

22  you know, I used to work with him on campaigns,

23  but I wouldn't have said like politically

24  connected.

1     Q.   Okay.  Do you remember when you had

2  conversations with Alex Kantas about working on

3  Eugene Moore's campaigns?

4     A.   No.

5     Q.   Can you recall any conversation you had

6  with Alex Kantas about working on Eugene Moore's

7  campaigns?

8     A.   Can you repeat that one?

9     Q.   Can you recall any conversation you had

10  with Alex Kantas about you telling him that you

11  worked on Eugene Moore's campaigns?

12     A.   No.

13     Q.   Do you have any documents that would

14  show that you told Alex Kantas that you worked on

15  Eugene Moore's campaigns?

16     A.   No.

17     Q.   Okay.  Did you ever tell John Mirkovic

18  that you were politically affiliated or worked on

19  Eugene Moore's campaigns?

20     A.   No.

21     Q.   Did you ever tell Carolyn Wilhight that

22  you were politically affiliated or worked on

23  Eugene Moore's campaigns?

24     A.   No.

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1     Q.  Did you ever tell -- I'm sorry, is it

2  Cedric?

3     A.  Cedric.

4     Q.  Cedric.  You know, when you read things,

5  it's hard to -- Did you ever tell Cedric Giles

6  that you were politically affiliated or worked on

7  Eugene Moore's campaigns?

8     A.  No.

9     Q.  Did you ever tell Erwin Acox that you

10  were politically affiliated or worked on Eugene

11  Moore's campaigns?

12     A.  No.

13     Q.  Okay.  And I covered everyone, I

14  believe.  I think I went through everyone's name.

15     A.  I think so, yeah.

16     Q.  Okay.  Did your job duties change when

17  Karen Yarbrough became the recorder of deeds?

18     A.  No.

19     Q.  Okay.  Were you ever disciplined after

20  Karen Yarbrough became the recorder of deeds?

21     A.  Can you -- When you say disciplined -- I

22  don't understand the question.

23     Q.  Okay.  Did you ever receive -- I mean, I

24  understand there's different types of discipline.

1      A.    Right.

2      Q.    Any sort of writeup?

3      A.    No.

4      Q.    Did you ever receive -- I mean, I know

5   there's different like -- Did anyone ever come to

6   you -- So who was the supervisor?  Was Alex Kantas

7   the supervisor when Karen Yarbrough became

8   recorder of deeds or was John Lindsey?

9      A.    I don't recall if there was an overlap.

10     Q.    Okay.

11     A.    If John Lindsey was there, he wasn't

12  there long, so -- but I'm not a hundred percent

13  sure.

14     Q.    Okay.  Did John Lindsey or Alex Kantas

15  ever come talk to you about something you were

16  doing wrong after Karen Yarbrough -- that they

17  perceived as wrong after Karen Yarbrough became

18  recorder of deeds?

19     A.    No, but -- What was his name, the chief

20  deputy had some things to say to me.

21     Q.    Okay.  Do you know who the chief deputy

22  was?

23     A.    Let me think -- Let me try to think of

24  his name.  I cannot think of his name.

1     Q.   Okay, but it was a man?

2     A.   Yes.

3     Q.   Okay.  He was the chief deputy?

4     A.   Yes, he was -- he was I believe fired

5  and then Cedric came -- Cedric became the chief,

6  so whoever was prior to Cedric.

7     Q.   Okay.

8     A.   I cannot think of his name.

9     Q.   What did he say to you?

10    A.   Well, it was in an email and he

11 basically said that he should get rid of the

12 weaker staff because we couldn't -- we couldn't

13 get this letterhead that he wanted.  I was one of

14 the people working on the letterhead and he told

15 Kevin Hayes in an email that he should get rid of

16 the weaker staff, and the weaker staff was me and

17 George Moss that was working on his letterhead for

18 him.

19    Q.   George Moss?

20    A.   Mm-hmm.

21    Q.   Okay.  Was his name William Valazquez,

22 the chief deputy?

23    A.   Yes.

24    Q.   Okay.

1      A.   Yes.

2      Q.   Do you believe that William Valazquez

3   talked about weaker staff -- Was he implying, to

4   your understanding, people who were politically

5   affiliated with Eugene Moore?

6      A.   Can you repeat that?

7      Q.   When -- when -- Do you know -- I guess,

8   let me break down these questions.

9      A.   Okay.

10     Q.   George Moss, was he -- Does he have any

11  special relationship with Eugene Moore?

12     A.   I believe he's his cousin or was his

13  cousin.

14     Q.   Okay.  Do you know if he volunteered on

15  Eugene Moore's campaigns?

16     A.   I don't know.

17     Q.   Okay.  Do you know if William Valazquez

18  knew that George Moss was Eugene Moore's cousin?

19     A.   I don't know.

20     Q.   Okay.  Do you know if William Valazquez

21  knew that Eugene Moore was your godfather?

22     A.   I don't know.

23          MS. DIAZ:  Objection.  That's fine.  I

24  was going to say calls for speculation.

Electronically signed by Sam Kohlhaas (401-140-193-8254)

85868bdb-5468-4737-9390-0be9d9bb67f0

1    BY MS. ORI:

2         Q.   Did you ever tell William Valazquez that

3    Eugene Moore was your godfather?

4         A.   No.

5         Q.   Did you ever tell William Valazquez that

6    you volunteered for political campaigns for Eugene

7    Moore?

8         A.   No.

9         Q.   Okay.  When William Valazquez, from your

10   understanding, stated weaker staff, when you saw

11   that email, did you think he was meaning people

12   who were politically affiliated with Eugene Moore?

13        A.   I don't know.

14        Q.   Okay.  How did you see that email?

15        A.   How did I see it?

16        Q.   Yes.

17        A.   Like how did I receive it or --

18        Q.   Yes.

19        A.   I received it as -- and when I say them

20   because they get directives from the recorder, I

21   saw it as them wanting to get rid of anyone that

22   was not in Karen Yarbrough's camp.

23        Q.   Okay.  How did you -- What was the basis

24   for that?  Why did you think that?

1      A.    Because when they came in, it just

2    seemed like things were going to shift, things

3    were not going to be the same.  They asked for

4    stuff that was very weird and then wanted to get

5    rid of people for those little things, so --

6      Q.    When you say they asked for stuff that

7    was weird, what do you mean?

8      A.    William Valazquez wanted a -- us to stop

9    working doing work for the rest of the county or

10   the rest of the recorder's office and work solely

11   on a letterhead for him that had his name on it

12   and he wanted that to be the -- He wanted his name

13   to be kind of like hard-coated into the letterhead

14   so it couldn't be shifted, and in our opinion,

15   everyone in the technical services department,

16   thought that that was absolutely crazy when -- and

17   it went on for two weeks and he -- every day he

18   kept coming back, no, this isn't right; no, this

19   isn't right.  In my opinion, that's not important

20   when you're looking at the IT department and other

21   things that needs to get done, so that's why I

22   said that.

23     Q.    Okay.  You said that William Valazquez

24   left the recorder's office?

1    A.    I believe he got fired.  I'm not a

2    hundred percent sure.

3    Q.    Okay.  Do you know when he got fired?

4    A.    No.

5    Q.    No, but Cedric Giles replaced William

6    Valazquez.  Correct?

7    A.    I believe so.  I believe it went in that

8    order.

9    Q.    Okay.  And to your knowledge, besides

10   this letterhead issue, you never were disciplined

11   because of this letterhead issue, were you?

12   A.    No.

13   Q.    Okay.  Do you remember what year this

14   letterhead issue was an issue?

15   A.    I don't because I don't remember when

16   they started, so I'm not a hundred percent sure.

17   Q.    Okay.  And I apologize.  If you hear a

18   screaming toddler, he is going to go down for a

19   nap momentarily.

20   A.    I understand.  I have kids.

21   Q.    My husband's on it, but that's -- that's

22   what the sound is.  No one's being hurt.

23   A.    Yeah, no problem.

24   Q.    You said that it seemed that William

1   Valazquez wanted to get rid of weaker staff.  To

2   you knowledge, was anyone terminated based on

3   William Valazquez's opinion?

4       A.   I believe that George Moss was sent back

5   to the Bureau of Technology because of William

6   Valazquez.

7       Q.   Okay.  Did William Valazquez have any

8   impact on your job -- Or you said your duties

9   remained the same when Karen Yarbrough became

10  recorder.  Correct?

11      A.   Say that one more time.

12      Q.   You previously testified that your job

13  duties remained the same when Karen Yarbrough

14  became Recorder of Deeds.  Correct?

15      A.   Correct.

16      Q.   Okay.  Did William Valazquez affect your

17  job at all?

18      A.   I don't understand.

19      Q.   Okay.  So --

20      A.   Like because, yes, he did affect me

21  because he made it very stressful, so that's why

22  I'm trying to understand.

23      Q.   You remained employed after William

24  Valazquez was fired.  Correct?

1     A.    Yes.

2     Q.    Okay.  And you remained a System Analyst

3  III.  Correct?

4     A.    Yes.

5     Q.    And your salary never decreased.

6  Correct?

7     A.    No.

8     Q.    And your job duties remained the same.

9  Correct?

10     A.    Yes.

11     Q.    Okay.  And right now, as you sit here,

12  you don't know when William Valazquez was fired?

13     A.    No.

14     Q.    Do you know who fired him?

15     A.    No.

16     Q.    Okay.  Do you know why he was fired?

17     A.    I believe, but I'm not a hundred percent

18  because I did not see his papers.

19     Q.    What do you believe?

20     A.    I believe he got fired because he talked

21  to the staff very -- very bad, I'll just say that.

22     Q.    Do you know William Valazquez's

23  political affiliation?

24     A.    No.

1    Q.   Did he -- Was he working there when

2  Eugene Moore worked as the recorder?

3    A.   No.

4    Q.   Okay.  Do you remember what your salary

5  was when you started at the Recorder of Deeds?

6    A.   Yes, it was $50,000.

7    Q.   When you started at the recorder, were

8  Kevin, Paul, and Joe there?

9    A.   Some of them were and some of them were

10  not.

11    Q.   Do you know what their salaries were?

12    A.   No.

13    Q.   Okay.  Do you know what your salary was

14  at the end when you were laid off?

15    A.   Yes.

16    Q.   What was your salary?

17    A.   $92,000.

18    Q.   $92,000, and so you started in 2001?

19    A.   Yes.

20    Q.   Okay.  How often did you get raises?

21    A.   We got countywide raises yearly and then

22  we like got 3 percent, so we got a cost of living

23  and some other kind of raise.  We would get like

24  kind of two every year, but then that kind of

1    stopped.  I want to say it stopped maybe like for

2    budgetary reasons.  It maybe stopped -- I don't

3    remember the year it stopped, but it would -- it

4    would fluctuate -- it would depend on like

5    budgetary if we would get it and then if not, we

6    would get like a retro check a few years later,

7    so.

8        Q.   Okay.  Did you ever get performance

9    raises?

10       A.   Say that one more time.

11       Q.   So I know your job title stayed the

12   same, System Analyst III.  Did you ever receive a

13   raise based on your performance?

14       A.   No.

15       Q.   No?  Okay.  Do you -- And so Karen

16   Yarbrough, do you remember when she became

17   recorder of deeds?

18       A.   I don't.

19       Q.   Okay.  So sadly, I was hoping that you

20   would have that complaint in front of you, but you

21   don't, so I'm going to have my trusty assistant,

22   Jaylaan Slaughter, share her screen --

23       A.   Okay.

24       Q.   -- but it will be a little more

1   difficult only because you can't go through it,

2   you know, so this will be Exhibit No. 1. This is

3   the complaint, the first amended complaint, that

4   you filed on July 10, 2019. Okay?

5       A.  Okay.

6       Q.  Have you see this before?

7       A.  I'm going to have to adjust my screen.

8   Yes.

9       Q.  Okay. Did you review it?

10      A.  Yes.

11      Q.  Do you believe everything in this

12   complaint is accurate?

13      A.  Yes.

14      Q.  Okay. I'm going to go through a couple

15   of paragraphs that I have questions about.

16      A.  Okay.

17      Q.  Paragraph 15 states Plaintiffs allege

18   that the recorder's office had a belief that

19   Plaintiffs are politically affiliated with Eugene

20   Moore, the recorder of deeds who held office prior

21   to the current recorder, Karen Yarbrough.

22         So as you know, the recorder's office is

23   not a person, so I'm trying to figure out who you

24   allege in the recorder's office had a belief.

1    When you say the recorder's office, who do you

2    mean by that?

3        A.    I mean Karen Yarbrough and what was her

4    security guy's name, Tim Curry.

5        Q.    Okay.

6        A.    And then -- So because of them knowing,

7    I feel like all of the staff, all of her

8    administrative staff, knew.

9        Q.    How do you know that Karen Yarbrough

10   knew about your political affiliation with Eugene

11   Moore?

12       A.    Because, and I'm not sure if you're

13   familiar with Maywood, but Maywood is a small

14   town.  Karen Yarbrough and Eugene Moore were both

15   high-ranking political officials in Maywood and I

16   worked on Moore's campaigns.  Again, because

17   Maywood is not big, you see everyone kind of in

18   the streets and on election days where they're

19   working, who they're working with, so I believe

20   that she knew that, and then the reason I said for

21   Tim Curry is because one day he asked me if I was

22   Eric King's daughter and I was like yeah, but, I

23   mean, I know he's from Maywood as well, but it was

24   just odd that he asked me if Eric King was my

1   father.

2       Q.   Okay.  Did you ever have a conversation

3  with Karen Yarbrough about Eugene Moore?

4       A.   No.

5       Q.   Did you ever tell Karen Yarbrough that

6  Eugene Moore was your godfather?

7       A.   No.

8       Q.   Did you ever tell Karen Yarbrough that

9  you did not vote for her?

10      A.   No.

11      Q.   Did you ever tell Karen Yarbrough that

12  you campaigned for Eugene Moore?

13      A.   No.

14      Q.   Have you ever had any conversations with

15  Karen Yarbrough?

16      A.   Yes.

17      Q.   About how many conversations, more than

18  10?

19      A.   I don't remember.

20      Q.   Okay.  What were the conversations

21  about?

22      A.   Me assisting her with her computer

23  needs.

24      Q.   Did you ever talk about politics?

1      A.    No.

2      Q.    When she asked for you to assist her

3  with computer needs, did you assist her?

4      A.    Yes.

5      Q.    Did she seem satisfied with your

6  assistance?

7      A.    Yes.

8      Q.    Okay.  For Tim Lurry, I'm sorry, is it

9  Curry?

10     A.    Tim Curry, yeah.

11     Q.    Did you ever tell him that Eugene Moore

12  was your godfather?

13     A.    No.

14     Q.    Okay.  Did you ever tell him that -- Did

15  you ever tell Tim Curry that you were politically

16  affiliated with Eugene Moore?

17     A.    No.

18     Q.    Did you tell Tim Curry that you didn't

19  vote for Karen Yarbrough?

20     A.    No.

21     Q.    Okay.  And what was Tim Curry's

22  position?

23     A.    I believe he was chief of security.

24     Q.    Do you know what his role was?  When you

1    say chief of security, to me it sounds like he's

2    kind of a like a bodyguard to Karen Yarbrough.  Is

3    that accurate or is that not something that -- I

4    don't know what that job is.

5         A.   I don't know what his job was, I'll just

6    leave it at that.

7         Q.   So when you say, going back to paragraph

8    15, when you alleged that the recorder's office

9    had a belief that Plaintiffs were politically

10   affiliated with Eugene Moore, you're talking about

11   Karen Yarbrough and Tim Curry.  Correct?

12        A.   Well, so what I said was because of

13   their knowledge of it, I believe it was discussed

14   amongst the administrative staff of the recorder's

15   office.

16        Q.   Are you aware of any conversations that

17   occurred?

18        A.   No.

19        Q.   What is the basis for your belief?

20        A.   I just have a feeling that that's what

21   happened.

22        Q.   Is there anything to support that

23   feeling?

24        A.   I mean, I feel that way because the way

1   that I was laid off.  If it was just a budgetary

2   cut, I don't think some of the things that

3   happened to me would have happened.

4        Q.   Okay.  So I think my question is a

5   little bit different and I just want to make sure

6   that my question is clear.  You're not aware of

7   any conversation that Tim Curry or Karen Yarbrough

8   had about your political affiliation.  Correct?

9        A.   Correct.

10        Q.   And you have no documents to support

11   that Karen Yarbrough or Tim Curry told anyone

12   about your political affiliation.  Correct?

13        A.   Correct.

14        Q.   In fact -- And also you've never had a

15   conversation with Karen Yarbrough or Tim Curry

16   about your political affiliation.  Correct?

17        A.   Correct.

18        Q.   Okay.  If you go down to paragraph 23,

19   based on information or belief before September 6,

20   2016, the recorder's office was notified by the

21   budget office about the potential for countywide

22   budget cuts for fiscal year 2017.  Do you see that

23   paragraph?

24        A.   Yes.

1    Q.   Okay.  When you say based on information

2  or belief, what do you mean by that?

3    A.   That we had information on the -- before

4  September 6th.

5    Q.   When you say we, who do you mean?

6    A.   Employees in the Recorder of Deeds

7  office.

8    Q.   What employees?

9    A.   So I know for sure Tiffany Wilson.  I

10  believe -- I'll just stick with Tiffany Wilson

11  because I'm a hundred percent sure she had

12  information.

13    Q.   Okay.  What information -- Do you know

14  what information she had?

15    A.   She actually had the budget sheet.

16    Q.   Okay.  So I'm going to shift gears for a

17  second.  How do you know Tiffany Wilson?

18    A.   She's my friend.

19    Q.   Okay.  How did you meet?

20    A.   At the recorder's office.

21    Q.   Okay.  When did you meet her?  Do you

22  remember what year?

23    A.   In 2001.

24    Q.   Okay.  Did you know her before working

1    at the recorder's office?

2         A.    No.

3         Q.    Okay.  So going back to paragraph 23,

4    you -- Is it fair to say you were not someone that

5    the budget office reached out to.  Correct?

6         A.    Am I someone that the budget office

7    reached out to?  No.

8         Q.    Okay.  And so you're saying that this

9    happened before September 6, 2016, but you're

10   basing that on a conversation you had with Tiffany

11   Wilson?

12        A.    Okay.  Ask you question again.

13        Q.    I'm trying to understand this paragraph.

14        A.    Okay.

15        Q.    So based on information or belief,

16   before September 6, 2016, the recorder's office

17   was notified by the budget office.  Do you see

18   that?

19        A.    Mm-hmm.

20        Q.    Okay.  So you say the recorder's office.

21   That's not you, correct?  You were not notified?

22        A.    Right.

23        Q.    And so when you say based on information

24   or belief, that is based on a conversation you had

1    with Tiffany Wilson?

2          A.    Okay.  Let me read this one second.

3          Q.    Okay, yes.  Take your time.

4          A.    So it's saying that before September

5    6th, the recorder's office was notified by the

6    budget office about the potential for countywide

7    budget cuts for fiscal year, okay.  So your

8    question is, is my information or belief because

9    of Tiffany.  Is that what you're asking me?  Okay,

10   yes, so she -- Yes, she is the one who told me

11   about the budget cut.

12         Q.    Okay.  Do you remember when she told

13   you?

14         A.    No.

15         Q.    Do you remember where you were when she

16   told you?

17         A.    At work.

18         Q.    Was anyone else part of this

19   conversation?

20         A.    I don't remember.

21         Q.    What did she -- To the best of your

22   memory, what did she tell you and what did you

23   tell her?

24         A.    I don't remember.

1    Q.   Okay.  And when you say before September

2  6, 2016, was it September 5th, was it a month

3  before?  When you say before September 6, what do

4  you mean by that?

5    A.   That it was prior to September 6th.  I

6  don't remember like a specific day or how many

7  days before.

8    Q.   Was it short in time or far away in

9  time?

10    A.   I would probably say shortened.

11    Q.   Okay.  And I don't want to put words in

12  your mouth, when you say before September 6th, is

13  it likely -- because this is, you know, your

14  complaint, do you mean less than a month before

15  September 6th?

16    A.   Less than a month before, I'm not a

17  hundred percent sure of the date or time frame.

18    Q.   Okay.  Did you ever work with the budget

19  office?

20    A.   No.

21    Q.   Okay.  Do you know why they would need

22  countywide budget cuts for fiscal year 2017?

23    A.   I would not know.  I don't know

24  necessarily why, no.

1      Q.    Okay.  Paragraph 23, same paragraph, do

2    you believe that there was a need for budget cuts

3    or do you have no knowledge?

4      A.    I do not believe there was a need for

5    budget cuts.

6      Q.    Okay.  And what is the basis for that?

7      A.    Because the recorder's office hired, I

8    believe, four people during the time they were

9    saying that there were budget cuts, and then I

10    believe they promoted two people, so meaning

11    giving them more money.  So if there's budget

12    cuts, that would mean there's no room for hiring

13    or promotion.

14      Q.    Do you know if the budget office has --

15    Is there a more formal term for budget office?

16    I'm sorry, is the budget office part of the

17    Recorder of Deeds or is it part of Cook County?

18      A.    Cook County

19      Q.    Okay.  So Cook County Budget Office and

20    Cook County Recorder of Deeds are two separate

21    places, correct, two separate entities?

22      A.    Correct.

23      Q.    Okay.  Do you know if the budget office

24    had anything to do with these four hirings and two

1   promotions?

2       A.   Did the budget office have anything to

3   do with it?  I doubt it.

4       Q.   Okay.  And so the basis for your belief

5   that there was not a need for countywide budget

6   cuts, that's because the recorder's office hired

7   more people and promoted two people?

8       A.   Correct.

9       Q.   Okay.  You don't know what the

10  countywide budget was for fiscal year 2017.

11  Correct?

12      A.   I don't.

13      Q.   Okay.  And you have nothing to dispute

14  that the budget office notified the recorder's

15  office about a need for countywide budget cuts.

16  Correct?

17      A.   Correct.

18      Q.   Let's look at paragraph 24.  You can

19  just scroll up a little bit.  Perfect.  On

20  September 6, 2016, Chief Deputy Recorder Cedric

21  Giles, upon agreement with the budget office, in

22  an attempt to feign compliance with Shakman --

23  We'll just stop right there.  When you state on

24  September 6, 2016, what is the basis for your

1    support that date that Cedric Giles acted?

2        A.    That he did what?

3        Q.    He -- I guess we'll break it down

4    because I didn't read the whole paragraph to you.

5    I'm curious about your term feign compliance with

6    Shakman.  What do you mean by that?

7        A.    That he was trying to comply with

8    Shakman.

9        Q.    But you used the word feign compliance.

10   What does feign mean to you?

11       A.    I'm not a hundred percent sure.

12       Q.    Okay.  Do you think that he was not

13   complying with Shakman?

14       A.    Do I believe that Cedric Giles was not

15   compliant?

16       Q.    Because you say in an attempt to feign

17   compliance --

18       A.    Right, so I'm --

19       Q.    -- so you think he was unsuccessful in

20   complying with Shakman?

21       A.    Right, I do not believe they were in

22   compliance with Shakman.

23       Q.    And what is your basis to support that?

24       A.    The way the office was ran.

1    Q.    What do you mean by that?

2    A.    Things that -- When I say they, I am

3  speaking of the administrative staff in the

4  Recorder of Deeds Office.  So when they do hiring

5  or firing or anything of that sort, it was not

6  done properly, I would say, according to how

7  Shakman says that it should be done.

8    Q.    Okay.  How does Shakman say it has to be

9  done?

10    A.    Well, I mean there's different --

11  different levels of it, but I was just giving an

12  overall general -- because you asked how I felt

13  about it or why I thought that, so I'm just giving

14  an overall of how I thought it.  I mean, there's

15  different -- there's several different things that

16  they did that just, I mean, in my opinion wasn't

17  right, and I believe in Shak because there's been

18  tons of Shakman reports as well to support that.

19    Q.    Okay.  So I'm not clear with what you're

20  saying.

21    A.    Okay.

22    Q.    Do you know what the -- what Shakman

23  requires?

24    A.    What do you mean what they require?

1     Q.   Well, it says, paragraph 24, to feign

2  compliance with Shakman?

3     A.   Right, they would like the recorder's

4  office to be in compliance --

5     Q.   So I'm not finished.

6     A.   Oh, I'm sorry.

7     Q.   We want to make sure we're not talking

8  over each other.  What do you believe Shakman

9  requires?

10    A.   They require for the recorder's office

11 to not hire and fire based on political

12 affiliation.

13    Q.   Okay.  Now, I'm going to break -- I'm

14 going to stop you there.

15    A.   Okay.

16    Q.   Were you done with that?  I don't want

17 to interrupt.  Sorry.

18    A.   Sure, yeah, let's go.

19    Q.   And so you earlier said that you believe

20 that Eugene Moore helped you get hired as a System

21 Analyst III.  Correct?

22    A.   Yeah, I believe he had something to do -

23 - He actually sent me the job -- the job, so --

24    Q.   Do you believe your being hired violated

1   the Shakman Decree?

2       A.   No, because I was qualified for the

3   position.

4       Q.   And so when it says you can't hire or

5   fire for political reasons, how did -- Going back

6   to in an attempt to feign compliance for Shakman,

7   how was reaching out to each department head and

8   asking them to identify positions that could be

9   eliminated with the least disruption to core

10  operations --

11      A.   Oh, I'm sorry, I didn't know you were

12  reading on.  I'm so sorry.  Okay, let me read with

13  you.  Can you start that over?  I'm sorry.

14      Q.   So on September 6, 2016, Chief Deputy

15  Recorder Cedric Giles, upon agreement with the

16  budget office and in an attempt to feign

17  compliance with Shakman, emailed the deputy

18  recorders who each headed a department within the

19  recorders office and asked them to identify

20  positions that could be eliminated with the least

21  disruption to core operations.  Do you see that?

22      A.   Uh-huh.

23      Q.   And the next sentence says the deputy

24  recorders had the most intimate knowledge and

1   familiarity in the active positions of each

2   department.  Okay.  So we talked about paragraph

3   23, just the previous paragraph, that said the

4   budget office told the recorders office that there

5   was a potential for countywide budget cuts.

6   Correct?

7       A.    Mm-hmm.

8       Q.    Okay.  And you agree with that, that the

9   budget office told the recorder's office that

10  there was a need for countywide budget cuts?

11      A.    Yes.

12      Q.    Okay.  And as we said earlier, the

13  budget office is different from the Recorder of

14  Deeds.  Correct?

15      A.    Yes.

16      Q.    Okay.  And then in the next paragraph,

17  which we just read, Cedric Giles then reached out

18  to the deputy recorders and asked them to identify

19  positions that could be eliminated with the least

20  disruption to core operations.  Do you see that?

21      A.    Correct.

22      Q.    How does that not comply with Shakman?

23      A.    So this part, we will say that it does,

24  but we need to go a little bit further in saying

1    that when they gave the list to the budget office,

2    they did that prior to the -- who was it -- the

3    deputy recorder is giving their list of people.

4         Q.   Okay.  So just -- We're going go -- This

5    is a big complaint.  So you would agree that

6    paragraph 24, Chief Deputy Recorder Cedric Giles

7    reaching out to the deputy recorders to ask them

8    who could be eliminated with the least disruption

9    to core operations, you would agree that that

10   complies with Shakman.  Correct?

11        A.   Yes.

12        Q.   Okay.

13             MS. DIAZ:  And, Katie, before we move

14   on, are you done with 24 because I need a washroom

15   break when you have a second.

16             MS. ORI:  You know, can you give me like

17   three more minutes and I'll just finish paragraph

18   24 and then we'll move on to a whole new

19   paragraph?

20             MS. DIAZ:  Sure.

21             MS. ORI:  Okay.

22   BY MS. ORI:

23        Q.   You would agree that the deputy

24   recorders have the most intimate knowledge and

1    familiarity in the active positions of each

2    department?

3         A.   Do I agree with that?

4         Q.   Yes.

5         A.   No.

6         Q.   Okay.  So you allege that and so I --

7    What don't -- what don't you agree?  So this is

8    not true?

9         A.   Well, that's what they said.  That's

10   that what they said they did.  They reached out to

11   them because the deputy recorders have or they

12   should have the most knowledge.  Now, these new

13   deputy recorders did not.

14        Q.   Okay.  So, now -- Sorry, Jaclyn.  Now

15   I'm confused about this paragraph.  You're saying

16   that Cedric Giles should have not have reached out

17   to the deputy recorders?

18        A.   Are you asking Jaclyn or me?

19        Q.   I'm asking you.

20        A.   Oh, okay, because you said Jaclyn.

21        Q.   I said, sorry, Jaclyn, because she wants

22   to go to the bathroom.  I just wanted to finish

23   this paragraph.

24        A.   Oh, okay, okay, okay.  So what was your

1   question?

2      Q.   So -- And I'm confused.  You're saying

3   that Cedric Giles should not have reached out to

4   the deputy recorders.

5      A.   Well, I'm not saying he should or he

6   shouldn't have.  I'm just saying that as an

7   employee, I did not work with the deputy

8   recorders.  In my opinion, they should have

9   reached out to our supervisors who we directly

10  worked with on a daily basis.

11     Q.   Okay.  We can take a break.

12     A.   Okay.

13          THE REPORTER:  Going off the record.

14  The time is 11:18 a.m.

15                          (WHEREUPON, a brief

16                          recess was taken.)

17          THE REPORTER:  Back on the record.  The

18  time is 11:26 a.m.

19  BY MS. ORI:

20     Q.   Okay.  Ms. Pillows, we were going

21  through the complaint.  In the roughly 5-minute

22  break that we had, did you speak with your

23  attorney?

24     A.   Yes.

1      Q.   Did -- What was the -- What did you talk

2    about?

3           MS. DIAZ:  I'm going to object to that

4    based on attorney-client privilege.  That's

5    privileged conversation.

6    BY MS. ORI:

7      Q.   Did she provide any guidance into how

8    you should testify?

9      A.   No.

10     Q.   Okay.  Did you talk about the facts of

11   the case?

12          MS. DIAZ:  I'm also going to object.

13   You're still asking about privileged

14   conversations.

15          MS. ORI:  Right, but during the

16   deposition, you're not supposed to have

17   conversations.

18          MS. DIAZ:  You are allowed to confer

19   with you client in the middle of a deposition and

20   it's still attorney-client privileged.

21   BY MS. ORI:

22     Q.   Did Ms. Diaz tell you you should change

23   any of your testimony?

24     A.   No.

1    Q.   Let's look back at the complaint.   If we

2  look at paragraph 26, in or around September 2016,

3  prior to receiving the requested input from all

4  deputy recorders, Chief Deputy Recorder --

5    A.   Oh, wait, it's getting super big.   Okay,

6  yeah, that's better because then I couldn't see it

7  all.

8    Q.   Okay.   So, I'll do my reading it again

9  just so it's clear for the record.

10    A.   Okay.

11    Q.   Paragraph 26: In or around September

12  2016, prior to receiving the requested input from

13  all deputy recorders, Chief Deputy Recorder Cedric

14  Giles and Deputy Recorder Finance Carolyn Wilhight

15  met with the Office of Budget and provided them

16  with a lost of positions proposed for reduction in

17  force.   Do you see that?

18    A.   Yes.

19    Q.   Okay.   Now, the paragraph has in

20  parentheses prior to receiving the requested input

21  from all deputy recorders.   Do you see that?

22    A.   You said it has in parentheses?

23    Q.   Italics, italics.

24    A.   Oh, okay, yes, yes.

1    Q.   Okay.  What is the basis to support this

2  assertion that prior to receiving the requested

3  input from all deputy recorders they provided this

4  information?

5    A.   You said where did I get this

6  information?

7    Q.   How do you know that Cedric Giles and

8  Carolyn Wilhight had not received information from

9  the --

10    A.   I believe it was in the OIG report.

11    Q.   So that's the basis to support it, the

12  OIG report?

13    A.   Yes.

14    Q.   Do you have any independent information

15  to support that?

16    A.   What do you mean?

17    Q.   So you're saying you read it in OIG

18  report.  Correct?

19    A.   Mm-hmm.

20    Q.   Do you have anything else besides this

21  OIG report?

22    A.   No.

23    Q.   Okay.  When did you receive the OIG

24  report?

1    A.    I don't recall.

2    Q.    Okay.  And it's fair to say that you

3  were not part of any conversations between Cedric

4  Giles, Carolyn Wilhight, and the deputy recorders.

5  Correct?

6    A.    Can you repeat that?

7    Q.    You were not part of any conversation

8  between Cedric Giles, Carolyn Wilhight, and the

9  deputy recorders about who should be laid off.

10  Correct?

11    A.    Was I a part of their conversation?

12    Q.    Yeah.

13    A.    No.

14    Q.    So you have no firsthand knowledge as to

15  when the deputy recorders provided the information

16  to Cedric Giles and Carolyn Wilhight.  Correct?

17    A.    Can you repeat that one more time?

18    Q.    Yes, I'm going to ask -- actually ask

19  the wonderful Sam, the videographer, to play it

20  back.

21    A.    Okay.

22         THE REPORTER:  Stand by.  Sorry.  I just

23  had some technical difficulty.  Just give me one

24  moment, please.

1          THE WITNESS:  Okay.

2          THE REPORTER:  I'm sorry, I'm just

3     having some technical difficulty. with my program

4     to play back.  Just give me one more moment.

5          MS. ORI:  It's a good test, right

6     everyone, that we know that it's being recorded.

7          THE REPORTER:  I might have to go off

8     the record in order to play the question, so I

9     just wanted to say that for the record.  Going off

10    the record.  The time is 11:32 a.m.

11                              (WHEREUPON, a brief

12                              recess was taken.)

13         THE REPORTER:  Okay.  I'm going to play

14    back the question.

15                              (WHEREUPON, the record

16                              was played back.)

17         THE REPORTER:  Back on the record.  The

18    time is 11:33 a.m.

19    BY MS. ORI:

20       Q.   That question was just read back to you.

21       A.   Okay.

22       Q.   Do you understand the question?

23       A.   So, no, I don't know.

24       Q.   Okay.  And do you recall who your deputy

1   recorder was at the time?

2        A.   John Mirkovic.

3        Q.   Okay.  Do you know when John Mirkovic

4   provided recommendations to Cedric Giles and

5   Carolyn Wilhight?

6        A.   No.

7        Q.   Okay.  If we look at paragraph 27, upon

8   information and belief, Cedric Giles and Carolyn

9   Wilhight provided a list of positions to be

10  eliminated to the Office of Budget based on

11  political affiliation, as they did not wait and

12  had yet to receive any input regarding active

13  positions tied to nonessential functions that

14  could be eliminated with the least disruption to

15  core functions.  Do you see that?

16       A.   Yes.

17       Q.   Okay.  What is the basis for this

18  allegation?

19       A.   The OIG report.

20       Q.   Only the OIG report?

21       A.   I'm sorry?

22       Q.   Is the OIG report the only basis to

23  support this assertion?

24       A.   Yes.  You can't hear me?

1      Q.    No.

2      A.    Okay.

3      Q.    Is the OIG report the only basis to

4    support this assertion?

5      A.    Yes, I believe so.

6      Q.    Paragraph 28: On September 23, 2016, the

7    Office of Budget adapted the proposal referencing

8    the previous paragraph on positions to reduce in

9    force and requested that layoff plans be finalized

10   by September 30, 2016.  Both Wilson's permanent

11   position and Pillows' System Analyst III positions

12   were on the list.  Do you know how many positions

13   were identified to be laid off?

14      A.    No.  I mean, I saw a list, but I don't

15   recall -- I don't how many.

16      Q.    Do you believe the Office of Budget had

17   any -- Do you know if they took the

18   recommendations from Cedric Giles and Carolyn

19   Wilhight?

20      A.    Do I believe that they took the

21   recommendations?  Yes.

22      Q.    Okay.  So paragraph 30; on October 19,

23   2016, the deputy recorder communications -- Was

24   that John Mirkovic?

1    A.   Yes.

2    Q.   Okay.   Provided his recommendation for

3  positions to be eliminated, which included

4  Pillows' System Analyst III position.   Do you see

5  that?

6    A.   Yes.

7    Q.   Okay.   The paragraph goes on this

8  recommendation again was submitted after a

9  proposed list for reduction in force was already

10  determined and past the due date for the finalized

11  layoff plan.   This was also in an attempt to feign

12  compliance with Shakman because it would also

13  appear he was provided the input on nonessential

14  job functions.   Do you see that?

15    A.   Yes.

16    Q.   Okay.   How do you know that John

17  Mirkovic provided his recommendations on October

18  19, 2016?

19    A.   Because of the report.

20    Q.   I couldn't understand you.

21    A.   Oh, I'm sorry, because of the report.

22    Q.   Okay.   The OIIG report.   Correct?

23    A.   Yes.

24    Q.   Do you know if John Mirkovic provided a

1  recommendation prior to October 19, 2016?

2      A.   No.

3      Q.   You have no knowledge one way or the

4  other?

5      A.   Well, you're asking me if I know off of

6  anything other than the OIG report?

7      Q.   Yes.

8      A.   Right, other than the OIG report, no.

9      Q.   Okay.  And if you go to paragraph 31,

10  both plaintiffs were then placed on the list for

11  the proposed reduction in force without any

12  meaningful input regarding their job functions or

13  operational impact as requested by the chief

14  deputy recorder.  Do you see that?

15     A.   Yes.

16     Q.   What is the basis to support this

17  allegation?

18     A.   The basis is that if John Mirkovic was

19  the person who was supposed to give the

20  recommendation and he did not do that until after,

21  then number 31.

22     Q.   It's fair to say you do not have any

23  personal knowledge as to what conversations John

24  Mirkovic had regarding who should be laid off.

1   Correct?

2       A.   Correct.

3       Q.   You don't know if he reached out to your

4   supervisor, Mr. Kantas, regarding who should be

5   laid off.  Correct?

6       A.   I do know that he did not reach out to

7   my supervisor.

8       Q.   And who was your supervisor?

9       A.   Alex Kantas.

10      Q.   So your -- Is it my internet?  I think I

11  just got a notice saying my internet is unstable.

12      A.   Oh, yeah, because I'm like I'm talking

13  as clear as I can.  I don't know.

14      Q.   Hopefully we're okay.  How do you know

15  that John Mirkovic did not talk to Alex Kant --

16  Kant -- Kantas?

17      A.   Kantas.  Because Alex Kantas did not

18  even know about me being fired or even -- He knew

19  nothing about me being laid off.

20      Q.   Do you know if -- Do you have any

21  firsthand knowledge whether John Mirkovic reached

22  out to Alex Kantas regarding job duties in the

23  department?

24      A.   I don't know that.

1          Q.    If you go to paragraph 34 -- Actually,

2    I'm sorry, we want to go to paragraph 33 first, I

3    apologize, and kind of go in order but skip around

4    when I can to make this move as quickly as

5    possible.

6               Paragraph 33: Upon information and

7    belief, the recorder's office is divided into

8    three different departments, department 130, 527,

9    and 570, each with their own budget.  Wilson's

10   System Analyst III position was in Department 130

11   and Pillows' System Analyst III position was in

12   527.  Do you see that?

13   A.    Yes.

14        Q.    Okay.  What is the basis to support this

15   allegation?

16        A.    What do you mean?

17        Q.    How do you know that there are three

18   different departments with their own budget?

19        A.    Because Tiffany Wilson used to do

20   budgets.  She used to look at the budgets and

21   stuff, so she -- Tiffany Wilson told me this.

22        Q.    And is that the only basis to support

23   this that Tiffany told you?

24        A.    Well, I mean, and these are the

1    departments in the recorder's office, so --

2        Q.    Okay.  Now, Tiffany Wilson was a System

3    Analyst III as well?  So you had the same job

4    title.  Correct?

5        A.    Correct.

6        Q.    Okay.  Do you know if you had the same

7    salary?

8        A.    I believe we ended with the same salary.

9        Q.    Okay.

10       A.    We were around the same when we ended.

11       Q.    Did you have the same job duties?

12       A.    No.

13       Q.    Okay.  Do you know what her relationship

14   was with Eugene Moore?

15       A.    I mean, she was a friend.  She didn't

16   have like a relationship.

17       Q.    I'm sorry, I couldn't hear you.  It

18   could be my Internet, so I don't know what I can

19   do about that, but can you repeat that?

20       A.    Yes.  She was a just like family friend.

21   You didn't hear me?

22       Q.    No.  I'm wondering if I can get out of

23   my other computer Internet to see if that would

24   make a difference.  It just happened all of a

1   sudden.

2           THE REPORTER:  Counsel, can you hear me

3   now?  Can you hear me?

4           MS. ORI:  I can hear you.

5           THE REPORTER:  It might be your

6   location.  Are you -- are you just using a Wi-Fi

7   setup?

8           MS. ORI:  Yes.

9           THE REPORTER:  So it could just be

10  location.  If you want to move to a part of

11  your --

12          MS. ORI:  But I haven't moved -- I

13  haven't moved at all.  I literally have stayed

14  right here.  Is it -- Could it be multiple devices

15  being on?  Could that be a problem?

16          THE REPORTER:  Are you saying taking up

17  other Wi-Fi?

18          MS. ORI:  Yeah.

19          THE REPORTER:  Perhaps.  It's worth

20  trying.  I mean, sometimes it's just finicky, you

21  know, it's technology, so even though it's working

22  completely fine this moment, the next  moment it

23  might not.

24          MS. ORI:  Well, I will resort to

1   plugging my computer into that ethernet as the

2   last resort, so hopefully --

3          MS. DIAZ:  Katie, off the record as

4   well.  I've had a situation come up a few times

5   and you can call in on your cell phone and mute

6   the cell phone.

7          MS. ORI:  So I'll see how it goes.

8   We'll try it again.  Thank you, Jaclyn --

9          THE REPORTER:  Yeah, there's a couple

10  different solutions we can do.  Let us know if you

11  want to do that and I'll unlock the room for you.

12         MS. ORI:  Okay.  So we'll try this for a

13  few more minutes and otherwise I will call in

14  because it's hard when I can see that you're

15  talking and it's like, yeah, no, I can't get it.

16  BY MS. ORI:

17     Q.   Okay.  So we're back.  We were talking

18  about paragraph 33.  Oh, we were talking about

19  Tiffany Wilson and what was her relationship with

20  Eugene Moore?

21     A.   She was a family friend.

22     Q.   Okay.  Do you know if she campaigned on

23  Eugene Moore's political campaigns?

24     A.   Yes.

1    Q.   She did?

2    A.   Yes.

3    Q.   Okay.  Did she volunteer or support

4  Karen Yarbrough?

5    A.   I don't believe so.

6    Q.   Do you have firsthand -- Do you have

7  personal knowledge one way or the other?

8    A.   I said I don't believe she did.

9    Q.   Okay.  You don't believe so, okay.

10    A.   Right.

11    Q.   So when you say -- When this paragraph

12  says that it's divided into three different

13  departments, each with their own budget, does that

14  mean that money from one -- What does that mean?

15  I don't understand.

16    A.   It means Department 130 has its own

17  budget, 527 has its own budget, and 570 has its

18  own budget.

19    Q.   Do you know whether all of the

20  departments had to cut positions?

21    A.   When you say departments, are you

22  meaning 130, 527, and 570?

23    Q.   Yes.

24    A.   Did they have to -- Did each department

1   have to cut their own budget?

2       Q.   Based on the September 6 -- When the

3   budget office reached out to the recorder's office

4   around September 6, 2016, did the budget office

5   require cuts from each budget or could the

6   recorder's office have done it differently?  Do

7   you know?

8       A.   From prior budget cuts that happened at

9   the recorder's office, it was an overall for all

10  three and the recorder's office can pick and

11  choose where they want to move the money and how

12  the money is allocated.  Like if they wanted to

13  take some money, if they had extra money from 570

14  and move it over to 130 to keep someone's job,

15  they could do that.

16      Q.   Okay.  And when you say you were

17  involved in other budget cut processes, when --

18  when did the other budget cuts happen?

19      A.   I wasn't involved.  I just know of them

20  and they happened during -- one budget cut, I

21  believe, happened while Eugene Moore was the

22  recorder.  I don't remember the exact date.

23      Q.   Okay.  So there was only one other

24  budget cut that you're aware of from your

1    employment from 2001 to 2016?

2       A.   Correct, I believe so.

3       Q.   Okay.  Paragraph 34: The defendant's

4    stated reasons for Plaintiffs' layoffs was based

5    on budgetary reasons, however, in October 2016,

6    the recorder's office hired Jeanette Soto to fill

7    the newly created position of director of human

8    resources in Department 130, the same department

9    as Wilson.  Do you have -- Were you part of any

10   discussions about hiring Jeanette Soto?

11      A.   No.

12      Q.   Okay.  And to be clear, you did not have

13   a similar -- You're not alleging that you had a

14   similar role as Jeanette Soto.  Correct?

15      A.   Correct.

16      Q.   Do you know what Jeanette Soto's salary

17   was?

18      A.   It was 90 something, I know that.

19      Q.   Okay.  Do you know what the job -- Have

20   you ever seen her job description?

21      A.   No, but I had worked with her and I know

22   she worked in human resources.

23      Q.   Do you know what her job duties

24   entailed?

1      A.   I don't know for -- No.

2      Q.   Paragraph 35: In August and October of

3   2016, the recorders office hired Shani Audain as

4   special assistant community affairs as well as a

5   new database administrator in Department 527, the

6   same as Pillows.  We'll stop there.  What was --

7   Do you know what Shani -- Is it Shani?

8      A.   I think it's Shani.

9      Q.   Shani.  Do you know what Shani Audain's

10   job entailed?

11      A.   What it entailed?

12      Q.   Yeah.

13      A.   She did outreaches for the Recorder of

14   Deeds office.

15      Q.   Who did she report to?

16      A.   I don't know.

17      Q.   Do you know if she reported to Alex

18   Kantas?

19      A.   She did not.

20      Q.   Okay.  Is it fair to say that you and

21   Shani Audain had different job duties?

22      A.   Yes.

23      Q.   Okay.  And you say there was a new

24   database administrator?

1    A.    Correct.

2    Q.    Do you know who that database

3    administrator was?

4    A.    Yes.

5    Q.    Who?

6    A.    Joe Ruiz.

7    Q.    Do you know when he was hired?

8    A.    I believe it -- I believe it was October

9    or it was one -- No, I'm not a hundred percent

10   sure, but I was there when he was hired.

11   Q.    Okay.  Do you know what his job duties -

12   - Did you ever see a copy of his job description?

13   A.    Possibly.

14   Q.    Okay.  Do you know who he reported to?

15   A.    Alex Kantas.

16   Q.    Okay.  Do you know if Joe Ruiz was hired

17   before or after positions were identified to be

18   eliminated?

19   A.    I'm not a hundred percent.  I was there

20   when he was interviewing, but I can't remember if

21   it was before or after.

22   Q.    Did you and Joe Ruiz have the same job

23   duties?

24   A.    I trained him on the things that I did

1  alone when I left.

2       Q.   Do you know if Joe Ruiz was doing duties

3  in addition to the ones that you were doing?

4       A.   In addition?  I mean -- Well, when I

5  told you about the IT office, we all have some --

6  most of the duties are overlapped and then we have

7  some duties that we do, but I was able to do what

8  Joe did; Joe was able to do what I did once I

9  trained him on it.

10      Q.   Okay.  When he was hired as a database

11 administrator, was he replacing someone who was

12 previously a database administrator?

13      A.   Himself.  It was little trick.  So he

14 worked for the Bureau of Technology, but he worked

15 in our office, so the Bureau of Technology was

16 paying him, but he worked at our office.

17      Q.   Okay.  So now I'm confused.  So you're

18 saying that Joe Ruiz actually worked for the

19 Bureau of Technology?

20      A.   He got paid through the Bureau of

21 Technology.  He worked in the Recorder of Deeds

22 Office.

23      Q.   Okay.  So when you say in paragraph 35

24 that it was a new database administrator in

1   Department 527, what you're -- just so I'm -- make

2   sure I'm clear, what you're really saying is that

3   Joe Ruiz was being paid by the Bureau of

4   Technology.  Correct?

5       A.   Well, what I'm saying in 35 is now Joe

6   was not being paid by the Bureau of Technology and

7   the Recorder of Deeds Office decided to pay him.

8       Q.   Okay.  So now I'm understanding that, I

9   think, a little bit better.  So I'm going to ask

10  you back the questions and make sure I understand.

11           So you're saying prior to September

12  2016, August or October, he was working in the

13  Bureau of Technology and getting paid by the

14  Bureau of Technology and then he was getting paid

15  by -- No?  Okay.

16      A.   No, so prior to he was working for the

17  Recorder of Deeds Office, getting paid by the

18  Bureau of Technology.  So he worked in our office,

19  I saw Joe every single day, he sat right next to

20  me.  Then the Recorder of Deeds Office decided

21  that they wanted to pay him.  He's still going to

22  sit in our same office right next to me, but now

23  instead of the Bureau of Technology paying him,

24  the Recorder of Deeds is going to pay him.

1    Q.   Okay.  And that happened in August or

2  October of 2016?

3    A.   Right, correct, somewhere in between

4  there.

5    Q.   Okay.  And his job duties stayed the

6  same?

7    A.   Yes.

8    Q.   Okay.  Were you part of any discussions

9  about why the Recorder of Deeds wanted to pay him

10  rather than the Bureau of Technology?

11    A.   No.

12    Q.   So you have no firsthand knowledge why

13  Joe Ruiz was -- his pay changed from being paid by

14  the Bureau of Technology to the Recorder of Deeds?

15    A.   Well, when he -- I'm guessing when he

16  came to the Recorder of Deeds Office they gave him

17  more money so that he would come and work for us -

18  - well, not work for us because he was working for

19  us, so they just offered him more money to be

20  under the Recorder of Deeds Office umbrella

21  instead of BOT.

22    Q.   So -- But Joe Ruiz was already working

23  in the Recorder of Deeds Office?

24    A.   Correct.

1      Q.    Sitting right next to you prior to

2   August or October of 2016?

3      A.    Correct.

4      Q.    Okay.  Do you know when he started

5   working for the Recorder of Deeds?

6      A.    I feel like it was like a little bit

7   before the layoff.

8      Q.    Okay.  So my question was bad.

9      A.    Okay, sorry.

10      Q.    When he was working at the Bureau of

11   Technology, working next to you in the Recorder of

12   Deeds, do you know when he started working there?

13      A.    When did he start working for the Bureau

14   of Technology?

15      Q.    Getting paid by the Bureau of Technology

16   but working with you in the Recorder of Deeds?

17      A.    Okay, because now it's going to get a

18   little bit more difficult, and so I hate to do

19   this to you, but I'm going to, so that I can tell

20   the truth, so Joe was originally hired at the

21   Recorder of Deeds Office I want to say maybe 2005,

22   2006, somewhere in there.  So he was hired at the

23   Recorder of Deeds Office and he worked at the

24   Recorder of Deeds Office.  Then I would say a

1    little bit before Eugene Moore left, Joe went

2    under the BOT umbrella, but he was still working

3    at the Recorder of Deeds Office.  Then fast

4    forward, they put a database administrator

5    position available at the Recorder of Deeds

6    office, Joe applied for it, interviewed for it,

7    while he was still under BOT, but worked for the

8    recorder, and then he worked for the recorder and

9    got paid by the recorder.

10        Q.    Okay.  Was Joe Ruiz politically

11    affiliated with Eugene Moore?

12        A.    I don't know.

13        Q.    Okay.  Did Joe Ruiz's job duties change

14    from when he was working at BOT to when he became

15    a database administrator at the Recorder of Deeds?

16        A.    Can you repeat that?

17        Q.    Yes.  Did Joe Ruiz's job duties change

18    from when he was working and getting paid by the

19    Bureau of Technology to when he started getting

20    paid again by the Recorder of Deeds in 2016?

21        A.    No.

22        Q.    No, his job duties stayed the same?

23        A.    Correct.

24        Q.    Okay.  And so it's fair to say, and I

1    don't want to put words in your mouth, it's fair

2    to say that while the Recorder of Deeds hired a

3    new database administrator, really those job

4    duties were already being performed prior to

5    August and October 2016.  Correct?

6        A.    The job duties, yes.

7        Q.    They were being performed by Joe Ruiz,

8    the same person.  Correct?

9        A.    Correct.

10       Q.    Okay.  So if you go to paragraph 38, on

11   November 28, 2016, Pillows was also notified that

12   her position was eliminated.  Who notified you

13   that your position was eliminated?

14       A.    Well, there was like a meeting.  So I

15   want to say -- I want to say Jeanette called me

16   into a meeting and then Erwin Acox, John Mirkovic,

17   I believe he was there, I'm not hundred percent

18   about John Mirkovic, Alex Kantas, and I believe

19   someone from the Shakman's office was there.

20       Q.    Okay.  When you were notified on

21   November 28, 2016, were you surprised that you

22   were selected?  How did you feel when you were

23   notified on November 28, 2016?

24       A.    How did I feel?  I felt a lot of things.

1    I felt angry, I felt sad, I felt hurt, I felt --

2    Yeah, but it's not that I was shocked because it

3    kind had been -- had been in the talkings, but no

4    one ever told us, so we never -- like we didn't

5    know for sure one way or the other if we were

6    going to be let go, whereas say the union people,

7    they got 30 days, but, yeah, we -- they just gave

8    us a couple of days.

9         Q.   Okay.  You said there was a Shakman

10   person at the meeting?

11        A.   Yes.

12        Q.   Did you tell the Shakman person that you

13   thought that this layoff was illegal?

14        A.   Did I tell the Shakman person -- In that

15   meeting?

16        Q.   Yes.

17        A.   I don't know that I used illegal.

18        Q.   Did you -- did you complain -- Did you

19   have any conversations with the Shakman person?

20        A.   Not in that meeting, no.

21        Q.   And earlier you testified that the basis

22   for your belief that -- that the deputy recorders

23   didn't comply with Shakman was that they provided

24   the recommendations prior to getting input from --

1    I'm sorry.  I used a lot of theys.

2              So earlier you testified that Carolyn

3    Wilhight and Cedric Giles told the budget office

4    who to lay off before getting input from John

5    Mirkovic and the other deputy recorders.  Correct?

6        A.   Correct.

7        Q.   And in this meeting in November, you

8    didn't know one way or the other how the decision

9    was made.  Correct?

10       A.   Well, did I have a feeling about it or

11   are you saying did I have concrete evidence?

12       Q.   Well, I mean, earlier you said the basis

13   is what you read in the OIG report?

14       A.   Correct.

15       Q.   And so now are you telling me that there

16   was something else because you didn't get that

17   report until later, so I'm just wondering to make

18   sure I understand.

19             THE REPORTER:  I heard -- I missed that

20   last part.

21             THE WITNESS:  Yeah, I did, too.

22             MS. ORI:  Is it my internet?

23             THE REPORTER:  No, no, Jaclyn, did you

24   say something?

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1          MS. DIAZ:  I did not.

2          THE REPORTER:  No, okay.  Never mind.

3   It was -- Yeah, your internet might have slipped a

4   little bit.  Could you repeat your question?

5          MS. ORI:  Sure.

6   BY MS. ORI:

7      Q.   Earlier when I asked you why, I think we

8   were talking about paragraphs 26 and 27 of the

9   complaint, we can scroll up, if you don't mind,

10  Jaylaan.  Earlier I asked you what the basis for

11  your beliefs were in paragraphs 26 and 27, that it

12  was the OIIG report?

13     A.   Correct.

14     Q.   Okay.  And you didn't get the OIIG

15  report until after you were laid off.  Correct?

16     A.   Correct.

17     Q.   Okay.  So we can go back down to

18  paragraph 38.  So when you were notified that your

19  position was eliminated, at that time you had no

20  basis to believe that you were being laid off for

21  any illegal reason.  Correct?

22     A.   I felt that I was being laid off because

23  I was affiliated with Eugene Moore.

24     Q.   Okay.  Did you say that at the meeting

1    on November 28th?

2         A.    No.

3         Q.    Okay.  Why not?

4         A.    I just -- That's just not something I

5    felt that I should have said, but I did let them

6    know that I didn't think that what they did was

7    fair because I did not receive a 30-day notice.

8    My thing is if this is a layoff just like anybody

9    else is being laid off, even if I'm not a union

10   employee, give me the courtesy of just letting me

11   know since it's just a layoff.  If -- I also told

12   them this, that they -- they could have allowed us

13   to use our time because at the county, you can't -

14   - you can't like get paid out for sick time, so I

15   had a lot of sick time.  I said if you had given

16   me 30 days, like you did everybody else, we would

17   have -- I would have been able to use up some of

18   my sick time.  Again, if it was just a layoff like

19   you are saying, then we should have been able to

20   use everything.  We should have gotten a 30-day

21   notice just because you're like, hey, I'm going to

22   be a nice person because this person has been here

23   for 15 years and they need at least a 30-day

24   notice would help them a little bit, but I felt

1   that day that it wasn't just a layoff.  I felt

2   that it was kind of done maliciously because why

3   would you or like how in anyone's mind think that

4   oh, you know what, we're going to give them a

5   four-day notice that they're going to be laid off

6   on Friday.  And oh no, everyone else got 30 days,

7   but just these two specific people, no, we're not

8   going to give them that because they're not in the

9   union.  In my opinion, that was -- that wasn't

10  cool either, but I did tell them that.

11       Q.   Okay.  Did you say anything else at the

12  meeting?

13       A.   No, I don't believe so.

14       Q.   If we can go to paragraph 39:

15  Furthermore, in or around the time of layoffs at

16  the recorders office, the newly hired director of

17  human resources, Jeanette Soto, was instructed by

18  Acox not to mention to the Shakman recorder of

19  complaints administrator, RCA, that Wilson was

20  related to Moore.  This was an attempt to avoid

21  Shakman compliance red flags.  Do you see that?

22       A.   Yes.

23       Q.   Do you have any knowledge about this

24  paragraph?

1    A.    Do I -- Yes, I have knowledge about it.

2    Q.    What is the basis for your knowledge?

3    A.    What is the basis for my knowledge?

4    Q.    Did Jeanette Soto tell you that Erwin

5    Acox told her this?

6    A.    No, she did not specifically tell me

7    this, no.

8    Q.    Did Erwin Acox tell you this?

9    A.    No.

10   Q.    Do you have personal knowledge about

11   this conversation?

12   A.    No.

13   Q.    Okay.  Paragraph 41: Plaintiffs allege

14   that 9 out of the 15 employees that were laid off

15   had no political affiliation with Yarbrough and

16   had worked together on Moore's political campaign.

17   Do you see that?

18   A.    Correct, yes.  God bless you.

19   Q.    Thank you.  Do you know who the

20   individuals were that were laid off?

21   A.    Back then I did, yes.

22   Q.    And we'll go through.  I'll go through

23   that document.  I think I have a document that

24   could help --

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1      A.    Okay.

2      Q.    -- but here right now without referring

3   to anything, do you know who they were?  The

4   answer is no, correct?  You'd have to refer to

5   another document?

6      A.    Yes.

7      Q.    Okay.  Let's go to paragraph 45: Shortly

8   after Plaintiffs' politically motivated layoffs,

9   the recently hired director of human resources,

10  Jeanette Soto, was also fired.  An investigation

11  into her firing was done by the Office of the

12  Inspector -- Independent Inspector General, OIIG,

13  Investigation IIG17-0163 found that Soto was,

14  quote, a victim or retaliation for her attempts to

15  use -- issue discipline against the ROD employee

16  who shares a political affiliation with the

17  Recorder of Deeds.  Do you see that?

18     A.    Yes.

19     Q.    Okay.  Do you know what Jeanette Soto's

20  political affiliation was?

21     A.    No.

22     Q.    Okay.  Was she affiliated with Eugene

23  Moore?

24     A.    No.

1      Q.   Okay.

2      A.   I don't believe so.  Let me take that

3  back.  I don't believe so.

4      Q.   Was Jeanette Soto hired before or after

5  Eugene Moore left the Recorder of Deeds?

6      A.   After.

7      Q.   Do you have any firsthand knowledge

8  about why Jeanette Soto was fired?

9      A.   When you say firsthand knowledge, did I

10  hear about --

11      Q.   So other than the OIIG report, do you

12  have any other knowledge about why Jeanette Soto

13  was fired?

14      A.   I heard -- So is it's okay to say I

15  heard something?  Okay.  So, yes, I did hear that

16  Jeanette Soto was trying to -- it was something

17  with timekeeping and she was raising a red flag

18  about it because that person wasn't doing whatever

19  it was on the timesheet that they were saying and

20  she brought it to someone's attention and she got

21  in trouble for it.

22      Q.   Do you know who you heard this from?

23      A.   You know what, everybody was talking

24  about it, so it could've -- it could've come from

1    several different people.  I know Tiffany and I

2    had a discussion about it.  Other people's

3    specific names, I'm not a hundred -- I can't -- I

4    don't remember back then -- back to then.

5         Q.   So when you say that you and Tiffany

6    were having a discussion about it, did Tiffany

7    know about -- I mean, I'm trying to figure out how

8    -- how you know this.

9         A.   How did we find out?

10        Q.   Yes.

11        A.   I mean, it was in the newspaper.

12        Q.   So you read a newspaper article about it

13   and then talked about it?

14        A.   I didn't personally.  It was sent to me

15   and then there was discussion about it.

16        Q.   Okay.  When you were laid off -- When

17   was your layoff date?

18        A.   I believe it was December 2, 2016.

19        Q.   Okay.  So you learned you were being

20   laid off on November 28th.  Correct?

21        A.   Right.  I believe that was that Monday.

22        Q.   Okay.  Did you try to take sick time

23   after you were being notified that you were being

24   laid off?

1       A.   Yes, I did.

2       Q.   Were you sick at the time?

3       A.   No.

4       Q.   Okay.  Were you granted any sick leave?

5       A.   Granted --

6       Q.   Were you permitted to take sick leave

7    from when you were notified that you were being

8    laid off to when you were laid off?

9       A.   I was not permitted.  I was told that I

10   couldn't, but I took it anyway.

11      Q.   Okay.  And just you were not sick,

12   correct?

13      A.   No.

14      Q.   Okay.  When did you get your next job

15   after being laid off?

16      A.   I worked temporarily -- 2016, 2017 --

17   2018 for six months.  I believe it was April

18   through I believe November of 2018.  I had a

19   temporary job, and then after that, I got a

20   full-time permanent position October 2019.

21      Q.   Okay.  What are the damages you're

22   seeking in this case?

23      A.   I would like my pay, back pay, because I

24   was not -- Well, I'm not going to say I was not

1  able to work.  I was, I was applying for jobs, I

2  just didn't get a job until more recently, but

3  back pay, as well as like the emotional part of

4  it.  This was like -- So, of course, I told you

5  already like basically when I got out of college,

6  I started working there and it was a career that I

7  went to school for, so I'm thinking, okay, this is

8  a great job, it's a government job, I'll be able

9  to work this job, you know, until retirement

10 because, you know, why not, it was a great job,

11 and to have that just taken away just because

12 someone didn't like someone that you were

13 affiliated with was hurtful.

14         Me and my husband had just literally

15 just purchased a house and so I was the primary --

16 and I won't say primary breadwinner, but because I

17 had had so many years at the county, I made more

18 money than he did at the time because he had just

19 recently started at the post office, so to say

20 that more than 60 percent, maybe more, of our

21 household income was slashed, sleepless nights.

22 Like I don't know that money can give you back all

23 of that stuff, but it was a lot.  It -- Yeah, it

24 was very stressful trying to figure out, you know,

1  how your kids are going to eat, how your kids are

2  going to go to school because I had one child in

3  public school, one child was in a private school,

4          So, you know, it was a lot and I know,

5  you as a mother, you know if your job was totally

6  taken away, your mentality in how you -- like what

7  state of mind you're going to be in.  So, you

8  know, it's a lot and to say the least of getting

9  back pay would begin to assist with some of the

10 issues that we incurred throughout -- after my

11 layoff.

12    Q.   Did you ever see a therapist regarding

13 the layoff?

14    A.   No.

15    Q.   Did you ever see a doctor about trouble

16 sleeping because of the layoff?

17    A.   And that's -- Okay, as far as

18 therapists, I want to back track one.  I did talk

19 to -- so she's a friend, but she is a therapist,

20 she is a certified therapist, I did talk to her,

21 but I did not talk to necessarily a doctor about

22 sleeping.  I mean, I knew what the problem was, so

23 I don't think that a doctor would have been able

24 to -- I mean, I wasn't going -- Also, I didn't

1  want any medication or anything, so yeah, no.

2      Q.   When you said you spoke to a friend who

3  is a therapist, what is your friend's name?

4      A.   Tiffany Bellamy.

5      Q.   Did you have -- Were you talking to her

6  as a friend or were you having like a

7  doctor/patient relationship?

8      A.   Right.  That's why I was saying, I was

9  talking to her as a friend, but she is a

10  therapist, so --

11      Q.   Okay.  Now I would like you to turn what

12  we marked as Exhibit 2, Plaintiff Pillows'

13  responses to Defendants' interrogatories.  Do you

14  recognize this, Ms. Pillows?

15      A.   Yes.

16      Q.   Did you review these?

17      A.   It just looks like the first one, but

18  can you scroll so I can see the actual -- because

19  this looks like what --

20          MS. DIAZ:  These aren't her answers.

21  BY MS. ORI:

22      Q.   Plaintiff's responses.  Yeah, these are

23  your answers.  Right?

24          MS. DIAZ:  On the screen it's

1 Defendants' responses to our Plaintiffs'

2 interrogatories.

3    MS. ORI: Okay. So this is -- You know

4 what? Maybe this would be a good time to break

5 for lunch so we can get the right exhibit up. Do

6 you want to take 30 minutes?

7    THE WITNESS: Are you asking me?

8    MS. ORI: Yeah, I'm asking you and --

9    THE WITNESS: I'm like I don't know.

10 I'll sit here until we're done because I don't

11 want to make this forever.

12    MS. ORI: Can I take a minute to get the

13 right document just to make -- So we can take like

14 a 30-minute break so we can get something to eat

15 and then I have maybe another hour and a half to

16 two hours and we'll be done, or we can power

17 through it now and take a break, or do you just

18 want to power through and we'll get the right

19 exhibit up?

20    THE WITNESS: So do you think powering

21 through is going to make it go quicker? I'm okay

22 about powering through because I'm probably not

23 about to eat, but it's totally up to you all. I'm

24 open to either one.

1          MS. ORI:  What about you, Jaclyn?

2          MS. DIAZ:  I'm open to powering through.

3          MS. ORI:  Okay, so then we've got to get

4    the right -- we need to get the right document.

5          THE WITNESS:  So do you want to take

6    five minutes?

7          MS. ORI:  Let's take 10 minutes just to

8    make sure we get the right document.  Okay?

9          THE WITNESS:  Sounds good.  Thank you.

10          THE REPORTER:  Going off the record.

11   The time is 12:19 p.m.

12                          (WHEREUPON, a brief

13                          recess was taken.)

14          THE REPORTER:  Back on the record.  The

15   time is 12:30 p.m.

16   BY MS. ORI:

17      Q.   All right.  Ms. Pillows, I believe now

18   what you'll see is what we are going to mark as

19   Exhibit 2, and just for the record, all of our

20   exhibits will be Defendants' Exhibit 2, you know,

21   I'll just say Exhibit 2 now.  And, Jaclyn, for our

22   deposition on Tuesday, I'm just going to do

23   running exhibits so that whatever number we finish

24   today, I will start whatever the last number is.

1          MS. DIAZ:  Sounds good.

2    BY MS. ORI:

3          Q.   So Plaintiff Pillows' responses to

4    Defendants' interrogatories.  Ms. Pillows, have

5    you see these before?  You're muted.

6          A.   I'm like she can't hear me.  Yes, I

7    have.

8          Q.   Okay.  And I believe, it's not attached

9    here, but you signed a verification that

10   everything is true.  Correct?

11         A.   Correct.

12         Q.   Okay.  So I just want to go over a

13   couple of these answers.  So if we can go to

14   number 9.  Identify all facts that support your

15   claims or upon which you intend to rely or do rely

16   to contend that you were terminated for political

17   reasons and all evidence to support your claim.

18   Jaylaan, if you could just scroll down a little

19   bit more.  That way Ms. Pillows can read her whole

20   answer in one -- Perfect.  So please read it and

21   then look up or tell me when you're done reading

22   it.

23         A.   Okay.

24         Q.   Okay.  Your answer to number 9, are

1    there any additional reasons that are not

2    identified in your answer?

3         A.   I don't believe so.

4         Q.   Okay.  I just have a couple of questions

5    about your answer.  You state that Karen Yarbrough

6    believed you were Eugene Moore's goddaughter.  I

7    believe earlier you said you never told Karen

8    Yarbrough that you were Eugene Moore's

9    goddaughter.  Correct?

10        A.   Correct.

11        Q.   So what is the basis for your belief

12   that she believed you were Eugene Moore's

13   goddaughter?

14        A.   I believe that she knows who I am and

15   that she knows that I am affiliated with Eugene

16   Moore and that I am his goddaughter and I -- I

17   don't have anything that can like say I told her

18   on this date.  I don't have anything to say that,

19   so --

20        Q.   Okay.

21        A.   -- but I do believe that and I do --

22   like I a hundred percent believe it.

23        Q.   Okay.  And then you state that you were

24   terminated -- you were chosen for the list for

1   proposed reduction in force prior to her deputy

2   providing any input.  Do you see that?

3       A.   Yes.

4       Q.   We talked about that earlier and your

5   basis for that is the OIIG report.  Correct?

6       A.   Correct.

7       Q.   And nothing else.  Correct?

8       A.   No -- Correct.

9       Q.   Thank you.  The next sentence says,

10  furthermore, around the time of Plaintiff's

11  layoff, the defendants hired four individuals and

12  promoted two more employees.  So the four

13  individuals, I just want to make sure we have

14  everyone, we have Jeanette Soto, who we talked

15  about.  Correct?

16      A.   Correct.

17      Q.   Shani Audain we talked about?

18      A.   Correct.

19      Q.   And then we have Joe Ruiz.  Correct?

20      A.   Correct.

21      Q.   Okay.  Who is the fourth?

22      A.   I don't recall.

23      Q.   Okay.  We have not talked about a

24  fourth, correct, today?

1      A.   I don't think so.

2      Q.   Okay.  And then you say that the

3  defendants promoted two more individual employees.

4  Who were these two employees that were promoted?

5      A.   I don't recall their names either.

6      Q.   Okay.  Do you know what positions they

7  were promoted into?

8      A.   I don't remember.

9      Q.   Okay.  If you do remember this

10  additional individual that the defendants hired or

11  these two employees who were promoted, please

12  reach out to your attorney who can -- because I

13  don't know who they are either, and so if you can

14  recall, please supplement with identifying the

15  names.  Okay?

16      A.   Okay, yeah, I'm writing it down.  Just

17  one second.

18          MS. DIAZ:  Well, any information about

19  internal hires or promotions would be within

20  Defendants' custody and control.

21          MS. ORI:  I'm just saying if Ms. Pillows

22  recalls who she was referring to in her answer.

23  BY MS. ORI:

24      Q.   Later on, in that same answer, you say

1    additionally the OIIG later found unlawful

2    political discrimination relating to Shani Audain

3    and her position as the special assistant

4    community affairs.  What do you mean by that?

5         A.   You said additionally -- Well, it was

6    something in the OIG report.

7         Q.   Okay.  That's the only basis to support

8    that.  Correct?

9         A.   Yes.

10        Q.   Okay.  As we discussed earlier, your job

11   duties were very different from Shani Audain's.

12   Correct?

13        A.   Yes.

14        Q.   Okay.  And you reported to a different

15   supervisor.  Correct?

16        A.   Yes.

17        Q.   And we talked about your use of sick

18   time.  Correct?

19        A.   Yes.

20        Q.   Is there anything else you want to add?

21        A.   About me using sick time?

22        Q.   Yes.

23        A.   No.

24        Q.   Okay.  You also talk about receiving a

1    30-day notice.  As we talked earlier, you're aware

2    that other individuals that were laid off were

3    part of a union.  Correct?

4         A.   Correct.

5         Q.   And you're aware that the collective

6    bargaining agreement provided a 30-day notice for

7    being laid off?

8         A.   Correct, I said yes.

9         Q.   If you can look at number 10.  Please

10   specify any and all adverse actions you believe

11   were taken against you by Defendant.  Please look

12   at your answer, and when you're done, please let

13   me know.

14        A.   Okay.

15        Q.   Okay.  Is that answer complete?

16        A.   Yes.

17        Q.   Okay.  Number 11, identify any and all

18   comparable employees or prospective employees who

19   were similarly situated to you but were not

20   adversely treated or treated more favorably.

21   Please look at your answer and when you're done,

22   please let me know.

23        A.   Okay.

24        Q.   Okay.  So I think perhaps we have found

1    the fourth position, Senior Accountant IV.

2    Correct?

3          A.    Correct.

4          Q.    Okay.  Do you know who was in that role?

5          A.    I can't think of the name.

6          Q.    Okay.  Is it fair to say that the person

7    who was a Senior Accountant IV had different

8    duties than you?

9          A.    I don't know.

10         Q.    Okay.  So you do not know what the job

11   duties were of the Senior Accountant IV?

12         A.    No.

13         Q.    Okay.  And then the two employees who

14   were promoted prior to the layoff, mail recording

15   and process supervisor -- So I don't know, there's

16   a lot of ands.  Is it mail recording and process

17   supervisor, is that one job?

18         A.    Yeah.

19         Q.    And then Property Fraud Investigator II,

20   a second job?

21         A.    Correct.

22         Q.    For the mail recording and processing

23   supervisor, do you know who was in that job?

24         A.    Not a hundred percent right now.  I'm

1    sure I did, but.

2        Q.    What about the Property Fraud

3    Investigator II?

4        A.    I think it was Jamica, but I can't a

5    hundred percent say, so I'll say I'm not sure.

6        Q.    Okay.  Did either of these positions,

7    were they in IT?

8        A.    No.

9        Q.    Is it fair to say that they did not

10   report to your same supervisor?

11       A.    Yes.

12       Q.    And also John Mirkovic was not in that

13   chain of command either.  Is that correct?

14       A.    I'm not a hundred percent sure about

15   that one.

16       Q.    Okay.

17       A.    He might have been.

18       Q.    But as you sit here right now, you don't

19   know one way or another?

20       A.    Correct.

21       Q.    Okay.  Is there anything else you want

22   to add to your answer to number 11?

23       A.    No.

24       Q.    Okay.  Do you know how job positions

1    that are recalled how that works?

2        A.    Can you repeat that?

3        Q.    If you look at your answer to number 14?

4        A.    Okay.

5        Q.    Do you know how job recalls work?

6        A.    Job recalls, oh, that's what you said.

7    I just didn't know what you said.  I believe so.

8        Q.    What is -- what is your understanding of

9    how job recalls work?

10       A.    When -- In my opinion, when money

11   becomes available and they can hire back, that's

12   what they would do.

13       Q.    Okay.  Do you know if anyone was hired

14   to by a System Analyst III in IT?

15       A.    Do I know if anybody hired?  I don't

16   believe so.

17       Q.    Okay.  Do you know if anyone was hired

18   in IT -- rehired in IT?

19       A.    No one was let go in IT.

20       Q.    Weren't you in IT?

21       A.    Oh, well I thought you meant other than

22   me.

23       Q.    Other than you.

24       A.    Other than me?

1      Q.    Yes.

2      A.    Right, so no one other than me was laid

3   off.

4      Q.    You were the only person in IT to be

5   laid off.  Is that correct?

6      A.    Correct.

7      Q.    Okay.  And do you know if your position

8   was filled as part of these rehires?

9      A.    I don't know.

10     Q.    Okay.  I'm finished with this one, and

11  so if you can go back to your full screen again,

12  Jaclyn -- Not Jaclyn, Jaylaan, I'm sorry.

13           So now we're going to go through a

14  couple of documents one by one, and so, Jaylaan,

15  if you can pull up Exhibit 3, which is Bates

16  stamped Pillows and Wilson 000221 through 224.

17  This will be Exhibit 3.  Ms. Pillows, have you

18  seen this standard job description before?

19     A.    This specific one?

20     Q.    Yes.

21     A.    It looks like Tiffany's old -- So I

22  haven't seen on -- Like no one has sent it to me,

23  no, but --

24     Q.    My bigger question is I was looking for

1  a job description for your job and I couldn't find

2  one.  Do you have a job description?

3      A.   I probably did a long time ago.

4           MS. ORI:  And off the record, Jaclyn,

5  are you aware of the job description for Ms.

6  Pillows' job?

7           MS. DIAZ:  If it wasn't in the documents

8  we turned over, then no.

9           MS. ORI:  Okay.

10  BY MS. ORI:

11      Q.   So it's fair to say that Exhibit 3 is

12  not your job.  Is that correct?

13      A.   Correct.

14      Q.   And we talked earlier about what

15  generally you did, correct, as a System Analyst

16  III?

17      A.   Correct.

18      Q.   Okay.  And you reported when you were

19  laid off you reported to Alex Kantas?

20      A.   When I was laid off?

21      Q.   Yes, he was your supervisor?

22      A.   When -- Okay, can you re-ask the

23  question?

24      Q.   Alex Kantas was your supervisor when you

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1    were laid off.  Is that correct?

2         A.   Oh, prior to, yes.

3         Q.   Okay.  And did he supervisor Kevin

4    Hayes, Paul Silic, and Joe Ruiz?

5         A.   Yes.

6         Q.   Jaylaan, you can pull out of this

7    exhibit.  We don't need to see it anymore.  Did he

8    supervise anyone else besides you four?

9         A.   I don't believe so, but I'm not a

10   hundred percent sure.

11        Q.   Okay.  If we can now look at Exhibit 4,

12   which will be ROD000011 through 14.  This is an

13   email chain.  Jaylaan, if you can go down to the

14   last page.

15             THE REPORTER:  Counsel, did you say this

16   was Exhibit 4?

17             MS. ORI:  This is Exhibit 4, yes.

18             THE REPORTER:  Thank you.

19   BY MS. ORI:

20        Q.   Have you seen this document before, Ms.

21   Pillows?  The bottom email chain is from Jimmy

22   Rayan, R-A-Y-A-N, to Cedric Giles and Carolyn

23   Wilhight.  Do you see that?

24        A.   Yes.

1      Q.   Date is September 6, 2016.  Have you see

2  this email before?

3      A.   No.

4      Q.   Okay.  And then if you scroll up a

5  little bit from September 13th, it's an email from

6  Carolyn Wilhight to Jimmy Rayan copying Tanya

7  Anthony and Cedric Giles.  Have you seen this

8  email before?

9      A.   No.

10     Q.   Okay.  So the email from Carolyn to

11  Jimmy says, second sentence -- Oh, it says

12  morning, Jimmy.  We're in the process of

13  finalizing our list of positions which can be

14  potentially eliminated in order to comply with the

15  budget office request.  I will be meeting with our

16  chief of HR this morning for his stamp of approval

17  with hopes to send you the list by mid afternoon.

18  Thank you for your patience in this matter.  Do

19  you see that?

20     A.   Yes.

21     Q.   Is it fair to say that you were not

22  being consulted between September 6, 2016, and

23  September 13, 2016?

24     A.   I was not being consulted?

1    Q.   Regarding who should -- which positions

2    could be eliminated?

3    A.   No.

4    Q.   Okay.  Are you aware of any

5    conversations that were going on between the

6    deputy recorders and the chief of HR and the

7    deputy recorder of finance about positions that

8    could be eliminated?

9    A.   I don't remember.

10   Q.   Okay.  Do you have any firsthand

11   knowledge regarding conversations that were taking

12   place between the deputy recorders about positions

13   to be eliminated?

14   A.   And when you say firsthand knowledge,

15   meaning I was in the --

16   Q.   You were in the room?

17   A.   So no.

18   Q.   Okay.  You don't know if they were --

19   You don't know if there were meetings, for

20   example.  Correct?

21   A.   Do I know that they were meeting about

22   this?

23   Q.   You don't know one way or the other

24   whether there were meetings about laying off

1    positions.  Correct?

2        A.    I mean, I wouldn't say that, but I

3    didn't -- I wasn't in the meetings.

4        Q.    When you say you wouldn't say that, what

5    do you mean by that?

6        A.    Because there was talk around the

7    recorder's office that there were layoffs -- there

8    was going to be layoffs, so that's why I'm saying

9    I wouldn't say that I didn't hear anything, but I

10   didn't specifically know about these specific

11   meetings.

12       Q.    Okay.  And you don't know if the deputy

13   recorders were having discussions about who should

14   be laid off.  Correct?

15       A.    Correct.

16       Q.    You're not aware of meetings that they

17   had or communications they had about who should be

18   laid off.  Correct?

19       A.    Because I feel like you keep asking me

20   the same thing over, so can you say that one more

21   time?

22       Q.    Okay.  So there's an email September 6,

23   2016, from Jimmy Rayan to Cedric Giles and Carolyn

24   Wilhight, and then I guess it's a week later,

1    September 13th, from Carolyn Wilhight to Jimmy

2    saying we are in the process of finalizing our

3    list of positions which can be potentially

4    eliminated.  Correct?  Do you see that?

5         A.    Correct.

6         Q.    Okay.  You're not aware of meetings that

7    were taking place with the deputy recorders

8    regarding who -- which positions could be

9    eliminated.  Correct?

10        A.    Correct.

11        Q.    You were not on any communications

12   regarding which positions could be eliminated.

13   Correct?

14        A.    Correct.

15        Q.    Okay.  And then if you scroll up to the

16   email from Carolyn dated September 14, 2016, so

17   this is one day later.  Correct?  Would you agree

18   with that, September 13th is one day before

19   September 14th?

20        A.    Correct.

21        Q.    Okay.  And Carolyn sent an email to

22   Jimmy Rayan, copying Cedric Giles, Erwin Acox, and

23   Tanya Anthony.  Do you see that?

24        A.    Correct, yes.

1      Q.   Okay.  And in that email, she states:

2   Sorry for the delay.  Attached is the

3   recommendation from CCRD for potential position

4   layoffs to comply to the FY27 budget request.  Do

5   you see that?

6      A.   Yes.

7      Q.   Okay.  You were not consulted about

8   which positions should be laid off.  Correct?

9      A.   Was I consulted?

10     Q.   Yes.

11     A.   No.

12     Q.   And you were not -- This email is being

13  -- copying Cedric Giles, Erwin Acox, and Tanya

14  Anthony.  Do you see that?

15     A.   Yes.

16     Q.   You don't know if, one way or the other,

17  whether Carolyn had a meeting with Cedric Giles,

18  Erwin Acox, or Tanya Anthony, correct, about the

19  layoffs?

20     A.   Well, she said it her previous email or

21  are you talking about before that?

22     Q.   I'm asking you if you if --

23     A.   Did I know?

24     Q.   Yes, did you know?

1     A.   No.

2     Q.   Okay. And you don't know whether they

3 had -- whether Carolyn Wilhight, Cedric Giles,

4 Erwin Acox, and Tanya Anthony had conversations

5 about which positions should be laid off.

6 Correct?

7     A.   Correct.

8     Q.   Okay. Okay. We can set this exhibit

9 aside. That was 4. Okay. Now I'm going to turn

10 to Defendants Exhibit 5, which is Bates stamped

11 ROD00000660. The title of this document is Cook

12 County Recorder of Deeds IT Department

13 Tasks/Skills Map. Do you see that?

14     A.   Yes.

15     Q.   Have you ever seen this document before?

16     A.   No.

17     Q.   Okay. Do you know who created this

18 document?

19     A.   No.

20     Q.   Okay. It looks like -- And I'm going to

21 -- My understanding of this document is there's a

22 list of tasks. It says task group and then IT

23 team. Do you see that on the top?

24     A.   Yes.

1    Q.   It says JR, KH, PS, KP, and TT.  Do you

2  see that?

3    A.   Yes.

4    Q.   Assuming that these -- that this is the

5  IT team at the Recorder of Deeds, I would guess

6  that KP is you?

7    A.   Correct.

8    Q.   JR, would that be Joe Ruiz?

9    A.   I'm guessing if this is the IT team,

10  yes.

11    Q.   Okay.  And then KH would be Kevin Hayes?

12    A.   Yes.

13    Q.   What -- PS would be Paul Silic?

14    A.   Correct.

15    Q.   And then who would TT be?

16    A.   That's Tondalaya Thomas.

17    Q.   I'm sorry, can you say that name again?

18    A.   Tondalaya Thomas.

19    Q.   Okay.  We have not talked about

20  Tondalaya Thomas?

21    A.   We have not.  I forgot she was in our

22  department for a little bit, and they have me at

23  the same level as her and she knew nothing about

24  IT, but okay.

1    Q.   Okay.  Who is Tondalaya Thomas?

2    A.   Tondalaya was a cashier.  I believe she

3    was in the cashiering department, but then I

4    believe she had a system analyst title, so then

5    they moved her to our office and she was in the IT

6    department.

7    Q.   Okay.  Do you know what her salary was?

8    A.   I don't.

9    Q.   Do you know if she was in the union or

10   not?

11   A.   I don't.

12   Q.   Do you know if she was more senior or

13   less senior than you in terms of experience at the

14   Recorder of Deeds?

15   A.   She had been there longer, yes.

16   Q.   Okay.  I don't think I have any further

17   questions on this document.

18        We can move on to Exhibit 6, Defendants'

19   Exhibit 6, which is a two-pager.  It's going to be

20   Bates marked ROD00000658 to 659.  If you look at

21   the first page, Ms. Pillows, it is -- it looks

22   like a memo dated September 8, 2016, from John

23   Mirkovic to Erwin Acox and Carolyn Wilhight.  Do

24   you see that?

1       A.   Yes.

2       Q.   Okay.  Have you ever seen this document

3   before?

4       A.   No.

5       Q.   Okay.  So the email that the memo is --

6   You have no reason to doubt its authenticity,

7   though.  Correct?

8       A.   I didn't say that.

9       Q.   Okay.  That wasn't a great question.

10  Scroll down to the bottom of this first page.  Do

11  you recognize that signature?

12      A.   No.

13      Q.   Okay.  And so as you just said, you've

14  never seen this document before.  Correct?

15      A.   Correct.

16      Q.   Okay.  And then if you go to the next

17  page, it's -- it looks a little bit different, but

18  it's still from John Mirkovic.  Do you see at the

19  bottom?  You don't recognize that signature,

20  correct, but you see his name just above that,

21  John Mirkovic?

22      A.   Correct.

23      Q.   Okay.  And it's dated 10/19/2016?

24      A.   You said it's dated 10/19, so yes.

1     Q.  But it still looks like it's

2  recommending the same two positions, System

3  Analyst III and Clerk IV-CNTY CLK/ROD/SHERIFF. Do

4  you see that?

5     A.  Yes.

6     Q.  Okay.  What was Clerk IV-CNTY

7  CLK/ROD/SHERIFF.  Do you know?

8     A.  I don't.

9     Q.  Okay.  Do you know someone who is in

10  that position?

11     A.  I possibly could, but the thing is,

12  people have titles that went to different things.

13  So just like Tiffany was a System Analyst III and

14  I was -- and we were in two totally different

15  departments, so, yeah, I could have known someone

16  who was that.

17     Q.  Okay.  And if you look at System Analyst

18  III, that was your position.  Correct?

19     A.  Correct.

20     Q.  And it states this position based on a

21  prior review of the roles and responsibilities

22  chart created by Director Kantas has the fewest

23  duties in the section.  A great amount of the

24  position's duties and action include answering

1  customer emails and forwarding them to different

2  sections.  With the hiring of a database

3  administrator earlier in the year, that increased

4  staffing levels.  The section can absorb these

5  duties internally with minimal operational

6  support.  Do you see that?

7      A.   Yes.

8      Q.   Okay.  So we talked about the database

9  administrator position earlier.  Correct?

10     A.   Correct.

11     Q.   And you would agree that this document,

12 John Mirkovic is indicating he spoke with Director

13 Kantas.  Correct?

14     A.   That's what the document says, yes.

15     Q.   And Director Kantas was your supervisor.

16 Correct?

17     A.   Correct.

18     Q.   Okay.  And then both the first page and

19 the second page have the same language with

20 respect to all jobs under the jurisdiction of the

21 Cook County Recorder of Deeds that are not exempt

22 under the Shakman Decree; I certify that I am

23 aware that I am strictly prohibited from

24 conditioning, basing, or knowingly prejudicing or

1    affecting any term or aspect of recorder

2    employment or hiring or because of any political

3    reason or factor, or knowingly inducing, aiding,

4    abetting, participating in, cooperating with, or

5    joining in any act which is prescribed above.  Do

6    you see that?

7         A.   Yes.

8         Q.   And then it says also: I certify under

9    penalty of perjury, as provided by the law, that

10   to the best of my knowledge political reasons or

11   factors did not enter into any order/employment

12   actions taken with respect to the above

13   applicant/employee with the employment or hiring

14   process.  Do you see that?

15        A.   Yes.

16        Q.   And then I understand that failure to

17   comply with the above prohibitions may result in

18   sanctions including disciplinary action up to and

19   including termination and may subject me to

20   criminal prosecution.  Do you see that?

21        A.   Yes.

22        Q.   And John Mirkovic signed that right

23   underneath that.  Do you see that?

24        A.   Yes.

1    Q.   Okay.  And if you go up to the first

2   page, it looks like he signed right under that on

3   the first page as well.  Do you see that?

4    A.   Yes.

5    Q.   Okay.  I'm done with this document.  If

6   you can look at Defendants' Exhibit No. 7, which

7   is Bates marked Pillows and Wilson 0000014.  This

8   is a letter from Erwin Acox to you, Khesi Pillows.

9   Have you seen this document before?

10    A.   Yes.

11    Q.   Okay.  Is this the document that you

12   received when you were being informed that you

13   were being laid off?

14    A.   Yes.

15    Q.   Did you receive this -- Did he hand it

16   to you or did he mail it to you.  Do you recall?

17    A.   I believe he handed it to me.

18    Q.   Okay.  And you see that Alex Kantas,

19   Director of Manager of Information, is copied on

20   this email.  Correct?

21    A.   Yes.

22    Q.   Okay.

23    A.   I said he found out that day.

24    Q.   Okay.  If we can turn Exhibit 8, which

1    is Pillows and Wilson 11.  Have you seen this

2    document before?

3        A.   I believe so.

4        Q.   Okay.  And if you scroll down a little

5    farther, it looks like your signature is at the

6    bottom?

7        A.   So that means yes.

8        Q.   Okay.  Is that your signature?  I've

9    never seen you signature before.

10       A.   Yes, that's my signature.

11       Q.   Okay.  And it says that as of December

12    1, 2016, your last day of being paid is December

13    2, 2016, and that your position is being

14    eliminated due to budget cuts.  Do you see that

15    written down?

16       A.   Yes.

17       Q.   Okay.  And it looks like Erwin Acox

18    signed that.  Is that his signature?

19       A.   I believe so.

20       Q.   Okay.  And then it looks you signed that

21    as well.  Correct?

22       A.   Yes.

23       Q.   Okay.  And you didn't on this document

24    state that you were being laid off for any other

1    reason.  Correct?

2       A.   No.

3       Q.   Okay.  I'm done with this document.  If

4    we can look at Exhibit 9, which is the OIIG report

5    that we've talked about.  It's Pillows and Wilson

6    000604 to 609.  Is this the OIIG report that

7    you've been referring to?

8       A.   This is just one page.

9       Q.   It's four pages or it's eight, I guess.

10      A.   Yes.

11      Q.   Okay.

12      A.   I believe it is.  I'm like that went

13    quick, but that's okay.

14      Q.   No, no, I don't -- I don't want to rush

15    you.  Jaylaan, can you --

16      A.   No, it's okay.  No, yes, this is the

17    document.

18      Q.   Okay.  How did you receive it?  How did

19    this -- Do you know how this document came to be?

20    Did you file a report with the OIIG?

21      A.   I don't believe so.  Honestly, I don't

22    remember.  I'm just going to be honest, I don't

23    remember.

24      Q.   Okay.  So how did they -- So you don't

1  know how they came to investigate you're being

2  laid off?

3      A.   I don't -- I don't remember.  I feel

4  like I may have filed something, but, again, this

5  was like almost five years ago, so I don't a

6  hundred percent remember.

7      Q.   Okay.  If you can scroll a little bit,

8  it looks this report, which you've reviewed in the

9  past, right, Ms. Pillows?

10      A.   Yes.

11      Q.   Okay.  It looks like they interviewed

12  the chief deputy recorder, the -- if you scroll a

13  little bit more, the interview of complainant,

14  that would be you.  Correct?

15      A.   Correct.

16      Q.   Okay.  The interview of chief deputy

17  recorder, that would have been Cedric Giles?

18      A.   I'm guessing.  It depends on when it

19  was.  So, yes, I would say it was Cedric Giles.

20      Q.   Okay.  And then if you go -- It says the

21  interview of deputy recorder of communications.

22  Do you see that?

23      A.   Yes.

24      Q.   That would have been John Mirkovic?

1     A.    Correct.

2     Q.    Okay.  And then if you go to the OIIG

3  [inaudible].

4          THE REPORTER:  Sorry, can you repeat

5  that, Counsel?

6  BY MS. ORI:

7     Q.    If you go -- You can go down to the OIIG

8  conclusion.  It's on Bates stamp 608.  It says:

9  Pursuant to sections VA, paragraph 9 of the SRO,

10  we had determined that the evidence fails to

11  demonstrate that impermissible political factors

12  were considered with respect to the employment

13  decisions involving Ms. Pillows' employment.  Do

14  you see that?

15     A.    Yes.

16     Q.    Okay.  Do you remember when you received

17  this report?

18     A.    No.

19     Q.    Okay.  Do you remember what you did

20  after you read it?

21     A.    No.

22     Q.    Did you reach out to Patrick Blanchard,

23  on the last page, it's from -- it's written by him

24  the independent inspector general, he signed it,

1    did you reach out to him to say that his

2    conclusions were incorrect?

3          A.    I don't recall.

4          Q.    Okay.  You don't recall one way or

5    another?

6          A.    Right, no, I don't.

7          Q.    Okay.  Did anything happen after you

8    received this report?

9          A.    Anything like what?

10          Q.    Did you submit additional evidence to

11    him to reconsider his conclusion?

12          A.    I don't remember.

13          Q.    Did you tell him to speak to Alex

14    Kantas, your supervisor, about the decision to lay

15    you off?

16          A.    I might have, but, again, I don't really

17    remember.

18          Q.    Okay.  We're done with this document.

19    If we can look at Exhibit 10, it's Bates stamped

20    Pillows and Wilson 660.  Have you seen this

21    document before?

22          A.    Possibly.

23          Q.    Do you know who wrote it?

24          A.    I don't remember.

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1     Q.   Who is Sandra Ivy and Quintin Woods?

2     A.   Sandra Ivy was in HR and Quintin Woods

3   was -- he was in the fraud department.  Did you

4   hear me?

5     Q.   Yes, I did.

6     A.   Oh, okay.  I'm like --

7     Q.   But you don't -- You don't know where

8   this document is -- who it was written by?

9     A.   I don't remember, no.

10     Q.   Okay.  Can we scroll down just a little

11   bit?  I don't see anything about the IT

12   department.  Would you agree with that?

13     A.   Oh, I wasn't looking.  I'm sorry.  Can

14   we scroll back?  I didn't know that's what I was

15   looking for.

16     Q.   So if you look at south hallway changes,

17   were you in the -- were you in the south hallway?

18     A.   At what point?

19     Q.   I don't know when this document was

20   written, so this is the document that your

21   attorney provided to us.

22     A.   Right, but you're asking the question,

23   so --

24     Q.   I guess when I see it says move all IT

1   personnel to conversion room or IT service area

2   after servers move.  Do you see that?

3        A.   Yes.

4        Q.   Do you know what that means?

5        A.   They wanted all of us to move, I'm

6   guessing, from the room we were in to a totally

7   different spot in the office.  Well, outside of

8   the office, but --

9        Q.   So when it says move all IT personnel to

10  conversion room or IT service area after servers

11  move, did this happen?

12       A.   Yes.  I believe so, if the rooms that

13  I'm thinking they're saying is what this is.

14       Q.   Okay.  Would this have changed your job

15  much or no?

16       A.   What, them moving us?

17       Q.   Yes.

18       A.   I mean, did it change what I did or --

19       Q.   The environment, like did you go from a

20  room with a view of --

21       A.   Oh, absolutely, it did change.  Yes, it

22  changed.  We went to a room with no windows.

23       Q.   Okay.  Was it a small room?

24       A.   Yes.

1     Q.   Okay.  When did this happen?

2     A.   I don't remember.

3     Q.   Okay.  Did you ever complain about it?

4     A.   I'm sure, yes.

5     Q.   Who did you complain about it to?

6     A.   That's the real question because

7 probably just to the coworkers around me, to my

8 colleagues.

9     Q.   So no supervisor.  Is that correct?

10    A.   No.

11    Q.   You didn't --

12    A.   Honestly, I don't think we had a

13 supervisor when this happened.  That's something

14 that's triggering my mind, but, yeah, I don't know

15 that we had a supervisor.

16    Q.   And I guess I'm trying to understand

17 when this happened.

18    A.   Well, it was definitely when Karen

19 Yarbrough came.  I know that's for sure, because

20 we were in the administrative offices when Eugene

21 Moore left.  All of the IT department was in the

22 administrative offices and we had two -- we had a

23 large -- one large room with all four of our desks

24 and then we also had another room right across the

1  hall where we were able to stage stuff, so then

2  after we moved, we were in a room that was --

3  yeah, it was just a small room, but, yeah, so I

4  can't tell you exactly when this happened.

5       Q.   Did you feel like it was punishment?

6       A.   I feel like it was we do not want you

7  all over here in the administrative offices.

8       Q.   And by you all, who do you mean by who

9  all?

10      A.   Anyone that is not Karen Yarbrough, with

11 her.

12      Q.   Okay.  So when you say -- And the IT

13 personnel at that time, if you can guess, would it

14 be Kevin Hayes, Paul Silic, Joe Ruiz, and the

15 other woman, TT?

16      A.   Tondalaya was not there yet.

17      Q.   So these four people?  Are you talking

18 about you four when you say you all, is that who

19 you mean?

20      A.   Well, I'm saying everybody.  As you can

21 see, everybody had moved, so everybody that was

22 not a part of administration, they did not want

23 anyone that was not a part of Karen Yarbrough's

24 administration in the admin offices.

1     Q.   Okay.  And so -- And forgive me, I don't

2     know the layout of --

3     A.   That's okay.

4     Q.   So when you say south hallway changes,

5     are you changing floors?  Are you on the same

6     floor?

7     A.   No, we were on the same floor.  We were

8     just not -- So, let me see if I can give you a

9     like visual, so when you get off the elevator,

10    there's a big like grand hallway.  You can go to

11    the left, which was a small little room which we

12    moved to.  You can go to the right, you walk down

13    the hallway, and you -- before you get to the main

14    office, to the left of it was where our accounting

15    department and some of the deputies sat.  Let me

16    see, one, two, three -- Yeah, it was the three of

17    them sat there.  Then you walked into the office.

18    You had the admin area and then you can go into

19    the door, you have to go through another set of

20    doors, that side was all administration.  So from

21    our office, you could get to the administration

22    side from just walking straight around, like you

23    didn't need to buzz in or anything, you could just

24    walk through and get to the administration.  Us

1   being in the other area, we didn't have like, I'm

2   guessing, access like that, but yes, so we

3   definitely were taken from the better side and put

4   into -- crammed into a little office.

5        Q.   Okay.  To your knowledge, was Kevin

6   Hayes politically affiliated with Eugene Moore?

7        A.   I don't know.

8        Q.   Was Paul Silic politically affiliated

9   with Eugene Moore?

10       A.   No.

11       Q.   Was Joe Ruiz politically affiliated with

12  Eugene Moore?

13       A.   I don't know.

14       Q.   Okay.  And so it's moving -- It's the

15  four of you.  Is that correct?

16       A.   Yes.

17       Q..  Okay.  You would have been the only one

18  of the four to be politically affiliated with

19  Eugene Moore?

20       A.   Possibly.

21       Q.   Okay.  I'm finished with this document.

22  If we can go to Exhibit No. 11, which is what I

23  believe was the layoff chart.  It's Pillows and

24  Wilson 618 and 619.  Yeah.  Can you see that, Ms.

1    Pillows?

2         A.    Yes.

3         Q.    Okay.  As you look at this document now,

4    can you tell me who was politically affiliated

5    with Eugene Moore and who was not?

6         A.    Okay, where are the names?  Thank you.

7    I'm squinting.  I believe Foster Slaughter --

8         Q.    You know what, it would be easier for my

9    purposes if we go one by one.  So the first one is

10   L'Tanya Pegues-Harrison.  Do you see that?

11        A.    Yes.  I'm not a hundred percent sure.

12        Q.    Okay.

13        A.    Nicole.  Do you want me to go to the

14   next one?

15        Q.    Yes.

16        A.    Okay.  Nicole, yes.

17        Q.    I'm sorry, when you say yes, you mean

18   politically affiliated with Eugene Moore or with

19   Karen Yarbrough?  I want to make sure we're on the

20   same page, so when you say --

21        A.    Okay.  So what was your ask of me.  I

22   thought you asked for Eugene Moore.

23        Q.    Okay.  So Nicole was politically

24   affiliated with Eugene Moore?

1      A.   Correct.

2      Q.   Okay.  And then what about Christopher

3  Donald?

4      A.   I'm not a hundred percent sure.

5      Q.   Okay.  What about Alphonso Young?

6      A.   Yes.

7      Q.   Yes, he was politically affiliated with

8  Eugene Moore?

9      A.   Yes.

10     Q.   Freida Robinson?

11     A.   I'm not a hundred percent.  I think yes,

12  but I'm not a hundred percent.

13     Q.   Foster Slaughter?

14     A.   Yes.

15     Q.   Alexander Vargas?

16     A.   No.

17     Q.   No affiliation or with Karen Yarbrough?

18     A.   Well, I don't know what he has with

19  Karen Yarbrough.

20     Q.   Okay.

21     A.   Are we talking about Karen Yarbrough or

22  Eugene Moore?

23     A.   My question is were they politically

24  affiliated with Eugene Moore.

1      A.   Okay.

2      Q.   And so then when you said no, I said was

3   he affiliated with Karen Yarbrough and you said

4   you don't know.

5      A.   Okay.

6      Q.   Is that all accurate?

7      A.   Yes.

8      Q.   Okay.  Diane Tripp?

9      A.   I don't even remember who that is, so

10   I'm going to say I don't know.

11      Q.   Okay.  Leslie Perkins?

12      A.   Yes.

13      Q.   Bernadette Pascente?

14      A.   I'm not a hundred percent sure.

15      Q.   Is that Bearling Robinson?

16      A.   Bearling, yes.

17      Q.   Yes, he was --

18      A.   Yes, he was.

19      Q.   Okay.  Malik --

20      A.   Malik.

21      Q.   Malik Strowhorn, just so that --

22      A.   I don't remember about Malik.

23      Q.   Dolores Sartorio?

24      A.   And I don't remember about her either.

1    Q.   That's okay.  And what about Alecia

2    Williams?

3    A.   Yes.

4    Q.   And Diana Aliasi?

5    A.   Diana Aliasi, I'm trying to remember who

6    that is.  I don't remember.

7    Q.   Okay.  And then on the next page, it's

8    you and Tiffany Wilson because you guys are the

9    nonunion members.  So let's go back up to who you

10   think are affiliated with Eugene Moore.  I think I

11   counted nine, nine people.  How do you know who

12   was affiliated with Eugene Moore?

13   A.   They would be at the campaign office.

14   Q.   Okay.  Do you know if they donated

15   money?

16   A.   I don't know.

17   Q.   Okay.  And do you know if Karen

18   Yarbrough would have knowledge about them having

19   campaigned for Eugene Moore?

20   A.   I would think so, yes.

21   Q.   And what would be the basis for you

22   thinking that, other than from being from Maywood

23   and it being a small town?

24   A.   Well, I mean, you see -- As an elected

1   official, you are out on election day and you're

2   going around to the different polling places and

3   so you see people's faces that are handing out

4   literature other than yours.

5        Q.   Okay.  I just lost my train of thought.

6        A.   I'm sorry.

7        Q.   That's okay.  I lost my train of thought

8   for a second, so I'm trying to remember.  By my

9   count, I think I have nine of these who you're not

10  sure or you don't think were affiliated with

11  Eugene Moore.  Is that correct?

12       A.   You said you counted nine that are not?

13       Q.   Yes.

14       A.   I mean, I didn't count, so I --

15       Q.   Okay, but it's fair to say that everyone

16  on this list was proposed for being laid off.

17  Correct?

18       A.   Again, I can't say that either.

19       Q.   Do you know if these individuals got

20  laid off?

21       A.   I don't remember.  I'm sorry, I don't.

22  I don't remember who all got laid off, like

23  actually got laid off because a lot of stuff

24  happened where people got bumped and people did

1   this, so I don't know what the last final -- like

2   the final list was.

3       Q.   When you say people got bumped, what do

4   you mean by that?

5       A.   That was within, what is it called, the

6   union.

7       Q.   Okay.  I'm finished with this document.

8   If we can pull up Exhibit 12, which is Bates stamp

9   640 to 641.  Have you seen this document before,

10  Ms. Pillows?

11      A.   Possibly.

12      Q.   Okay, you know what, Jaylaan, if it's

13  possible, if you can scroll up a little bit.  I

14  want you to have a chance to read it.

15      A.   Okay.  Just one more paragraph, I'm

16  thinking.

17      Q.    A little bit more, Jaylaan.

18      A.   Okay.

19      Q.   Okay.  So I have a couple of questions.

20  Is there anything, before I go into the questions,

21  that you want to correct in your statement?

22      A.   I don't think so.

23      Q.   Okay.  Let's start at the bottom only

24  because that's where we are.  It states that

1    immediately after Ms. Yarbrough was elected she

2    and her staff began targeting people who were not

3    affiliated with her political organization by

4    writing them up erroneously and threatening their

5    jobs.  Do you see that?

6         A.   Yes.

7         Q.   Were you ever written up?

8         A.   No.

9         Q.   Okay.  Was your job ever threatened?

10        A.   I think by what's his name, the chief

11   deputy at the time --

12        Q.   William Valazquez?

13        A.   Yes.

14        Q.   Okay.  Other than that -- other than

15   what you believe -- So, I'm sorry.  I'm going to

16   start again.

17        A.   Okay.

18        Q.   You say that William Valazquez

19   threatened your job?

20        A.   Would I say that he did?

21        Q.   Yes.

22        A.   Yes.

23        Q.   Okay.  And can you describe the -- Is it

24   the instance we talked about earlier with the

1  letterhead?

2      A.   Yes.  I mean, that's the instance that

3  is on a piece of paper, but his whole -- the way

4  he communicated with us on a daily basis was very

5  threatening.

6      Q.   Okay.  And you do not remember when he

7  was terminated.  Is that correct?

8      A.   Correct.

9      Q.   Okay.  Other than your contact with Mr.

10  Valazquez, no one else threatened your job.  Is

11  that correct?

12     A.   I don't recall anything right now.

13     Q.   Okay.

14     A.   I wont say that that is a hundred

15  percent, though.

16     Q.   Okay.  If we can scroll up a little bit.

17     A.   Thank you.  When you say that you were

18  never told that you were an at-will employee, what

19  do you mean by that?

20     A.   Like I never knew that I was an at-will

21  -- So basically I didn't know that -- And this was

22  -- I would say this was during like when I

23  initially got hired, I didn't know about the --

24  how the government worked.  I didn't know like,

1   oh, if you were a -- if you're in the union, then

2   you won't necessarily get fired.  If you're not in

3   the union, you're at-will.  Like I didn't know

4   that that it is how it went.

5        Q.   Okay, but you knew you were not in a

6   union.  Correct?

7        A.   Correct.

8        Q.   Okay.  When you state that in the later

9   months of 201, you and another employee were

10  looking at the ROD budget and noticed that their

11  positions had not been funded for 2017.  Do you

12  see that?

13       A.   I'm trying to figure out where -- Which

14  paragraph?

15       Q.   It's like under investigation.  It's the

16  first paragraph.  It's the third paragraph, Ms.

17  Pillows stated that in the later months of 2016.

18       A.   Yes.

19       Q.   Okay.  Who is the other employee?

20       A.   Tiffany Wilson.

21       Q.   Okay.  And how were you looking at the

22  ROD budget?

23       A.   What do you mean how?

24       Q.   It says you were looking at the ROD

1    budget.

2         A.    Right.

3         Q.    Where were you looking?

4         A.    Where?

5         Q.    Yes.

6         A.    We were in the hallway.

7         Q.    But I'm saying like how do you have the

8    budget?

9         A.    How did -- Oh, how did we get the

10   budget, is that what you're asking?

11        Q.    Yes.

12        A.    Okay, I don't know.  I didn't have it.

13   I didn't receive it.

14        Q.    So what -- But you were looking at the

15   budget?

16        A.    Yes.

17        Q.    Okay.  Do you know -- It says in the

18   later months of 2016, do you know what month?

19        A.    I don't.

20        Q.    Okay.  I'm finished with that document.

21   If we can pull up Exhibit 13.  It's Pillows and

22   Wilson 642 to 643.  Ms. Pillows, have you see this

23   report of interview -- interview of John Mirkovic

24   before?

1          A.    I mean, initially I would say possibly,

2     but I would have to read it to see if it jogs

3     anything.

4          Q.    Okay.  We can scroll through a little

5     bit.

6          A.    Okay.

7          Q.    Can you scroll down -- That's perfect.

8     Thanks, Jaylaan.  I think it goes onto the next

9     page a little bit.  Let me know, Ms. Pillows, when

10    you're done reading this.

11         A.    Okay.

12         Q.    Okay.  So I just have a few questions.

13    If you can scroll up a little bit to that first

14    page.  As you sit here today, you don't know one

15    way or other what Mr. Mirkovic did to decide which

16    positions to be laid off.  Correct?

17         A.    Say that one more time.

18         Q.    As you sit here right now, today, you

19    don't know what Mr. Mirkovic did in reaching his

20    decision to lay off two positions.  Correct?

21         A.    Do I know a hundred percent or can I

22    assume?  I guess I don't understand.

23         Q.    Do you know Mr. Mirkovic states that he

24    chose two positions that have the least amount of

1    responsibility and require the least amount of

2    skill and that as you can't dispute that that's

3    what Mr. Mirkovic said.  Correct?

4        A.   That's what he says on this paper,

5    correct.

6        Q.   And you can't dispute that he spoke with

7    Alex Kantas.  Correct?

8        A.   That's what he says on this paper.

9        Q.   And that chart that we looked at

10   earlier, you don't know who created that chart.

11   Correct?

12       A.   Correct.

13       Q.   And if Alex Kantas said that he created

14   that chart, you couldn't dispute that.  Correct?

15       A.   Correct.

16       Q.   Okay.  Earlier you said that you never

17   told Mr. Mirkovic that you were related to -- that

18   Eugene Moore was your godfather.  Correct?

19       A.   Correct.

20       Q.   And you also said that you never told

21   them that you were politically affiliated with

22   Eugene Moore.  Correct?

23       A.   Correct.

24       Q.   And so you can't dispute that Mr.

1   Mirkovic was unaware that you were -- had a

2   relationship with Eugene Moore.  Correct?

3       A.   I can dispute that because I didn't have

4   to tell him.  Someone else could have told him.

5       Q.   But you don't know anyone who did tell

6   him.  Correct?

7       A.   Right, but that still doesn't make what

8   you said correct.

9       Q.   Okay, but you have nothing to disprove

10  this statement.  Correct?

11          MS. DIAZ:  Could you identify which

12  statement?

13          THE WITNESS:  I was just about to ask

14  that.

15          MS. DIAZ:  Mr. Mirkovic -- The reporting

16  investigator asked Mr. Mirkovic if he was aware of

17  any relationship between Khesi Pillows and the

18  former Recorder of Deeds, Eugene Moore.  Mr.

19  Mirkovic stated he did not know anything about the

20  previous administration because he's not a native

21  of Chicago or Cook County.

22          THE WITNESS:  And so your question --

23  BY MS. ORI:

24      Q.   Is you cannot dispute that Mr. Mirkovic

1    did not know anything about the previous

2    administration?

3         MS. DIAZ:  I'm going to object.  That

4    calls for speculation.  She doesn't know what Mr.

5    Mirkovic knew and didn't know.

6    BY MS. ORI:

7         Q.   You have no evidence that Mr. Mirkovic

8    knew you were politically affiliated with Eugene

9    Moore.  Correct?

10        A.   Evidence?  I do not have any evidence,

11   correct.

12        Q.   And you have no evidence that Mr.

13   Mirkovic had any information about the previous

14   administration's political affiliations.  Correct?

15        A.   I don't know.

16        Q.   Okay.  We're done with this document.

17   What is your current job?

18        A.   My title or where do I work?

19        Q.   Yes, yes to both.  What is your job

20   title?

21        A.   Client relations coordinator and I work

22   for Viva USA.

23        Q.   Okay.  What do you do in your current

24   job?

1     A.   Basically I work in the supplier

2  diversity area.  We -- we have a tool that manages

3  supplier diversity for other companies.

4     Q.   What do you mean by supplier diversity?

5     A.   To make sure you have diverse suppliers

6  that work within your company, and if you do,

7  you're able to report like spend and different

8  things on those specific companies to show that

9  you work with diverse people.

10    Q.   How long have you had this position?

11    A.   Since October 2019.

12    Q.   Okay.  How long have you been with the

13 company?

14    A.   Since October of 2019.

15    Q.   Okay.  Are you using your IT background?

16    A.   A little.

17    Q.   Are you looking for a different job

18 right now?

19    A.   No.

20    Q.   Okay.  Do you have any knowledge about

21 the Bureau of Finances' decision to tell the

22 Recorder of Deeds that they needed to lay off

23 people?

24    A.   What -- Do I have any knowledge, meaning

1  like prior to or?

2      Q.   Prior to the Bureau of Technology --

3  Prior to the Bureau of Finance reaching out to the

4  Recorder of Deeds, in or around September 2016 --

5  If you were not part -- You were not making the

6  decision about budgets.  Correct?

7      A.   No.

8      Q.   Okay.  If I can take about 8 minutes to

9  go off the record just to make sure I got

10  everything?

11          MS. DIAZ:  Sounds good.

12          THE REPORTER:  Going off the record.

13  The time is 1:44 p.m.

14                          (WHEREUPON, a brief

15                          recess was taken.)

16          THE REPORTER:  Back on the record.  The

17  time is 1:53 p.m.

18  BY MS. ORI:

19      Q.   When I was trying to minimize my

20  internet, I exited out of a document that I was

21  hoping to keep up, so just bear with me one

22  second.  That's what happens when you try to --

23          I just have a few more things that I

24  want to wrap up with you.  Do you know what

1  political party Karen Yarbrough is affiliated

2  with?

3     A.   I believe Democrat.

4     Q.   Okay.  Do you remember approximately how

5  long she was Recorder of Deeds before you got laid

6  off?

7     A.   I don't because I don't remember when

8  she came.

9     Q.   Do you believe you got any special

10  favors working for the Recorder of Deeds when

11  Eugene Moore was in charge, any favoritism?

12     A.   No.

13     Q.   Someone's hungry.  Sorry about that.

14  Almost done.

15     A.   I didn't know you could hear my stomach

16  growl.  That's funny.

17     Q.   The sound quality is good.

18     A.   I'm going to have to turn something

19  down.

20     Q.   Sorry, bear with me 1 second.  Don't you

21  hate when you get out of something before you need

22  to?  I believe that's all the questions I have and

23  so after this over, there will be a transcript

24  and --

1          MS. DIAZ:  I'm going to have some

2    follow-up.

3          MS. ORI:  Okay, go ahead.

4          MS. DIAZ:  But can I have a quick 5

5    minute break?

6          MS. ORI:  Sure.

7          MS. DIAZ:  Thank you.

8          THE REPORTER:  Going off the record.

9    The time is 1:57 p.m.

10                        (WHEREUPON, a brief

11                        recess was taken.)

12          THE REPORTER:  Back on the record.  The

13    time is 2:08 p.m.

14                E-X-A-M-I-N-A-T-I-O-N

15    BY MS. DIAZ:

16    Q.   Okay.  Khesi, I'm going to ask you some

17    follow-up questions.

18    A.   Okay.

19    Q.   So I want to draw your attention to your

20    previous testimony about Deputy Mirkovic.

21    A.   Okay.

22    Q.   So he was the deputy recorder who

23    oversaw your position.  Is that correct?

24    A.   Correct.

1    Q.    And where was Deputy Mirkovic's office

2    located?

3    A.    In comparison to mine?

4    Q.    Was it a different office?

5    A.    Yes.

6    Q.    So he was -- When you testified about

7    the four individuals that were in a small room,

8    Deputy Mirkovic was not one of those individuals.

9    Correct?

10    A.    Correct.

11    Q.    And so would Mr. Mirkovic have an

12    opportunity to observe your job duties on a

13    day-to-day basis?

14    A.    No.

15    Q.    And did Deputy Mirkovic assign your work

16    assignments?

17    A.    No.

18    Q.    And did Deputy Mirkovic ever talk to you

19    about what your job duties were?

20    A.    No.

21    Q.    And how often would you have

22    conversations related to work with Deputy

23    Mirkovic?

24    A.    Maybe a couple of times a month.

1      Q.   So is it fair to say that you mostly

2   dealt with Alex Kantas with regards to your

3   day-to-day work assignments and your job duties?

4      A.   Correct.

5      Q.   And then I wanted to briefly ask you

6   about Jose Ruiz, the individual who was hired as

7   the database administrator.

8      A.   Okay.

9      Q.   So when Jose Ruiz was hired as the

10  database administrator for the Recorder of Deeds,

11  did any of his job responsibilities change, if you

12  know?

13     A.   I don't think so.

14     Q.   And is it fair to say that the only

15  thing you're aware of changing was which entity

16  paid his salary?

17     A.   Correct.

18     Q.   So when he became database

19  administrator, his salary changed from being paid

20  by the Bureau of Technology to the Recorder of

21  Deeds.  Right?

22     A.   Correct.

23     Q.   But he still was doing the same work he

24  was doing when he worked for the Bureau of

1   Technology?

2        A.   Correct.

3        Q.   And then, Khesi, I also wanted to talk

4   about back when you were hired at the Recorder of

5   Deeds Office, you had to apply for the position.

6   Is that correct?

7        A.   Yes.

8        Q.   And do you believe you were qualified

9   for the position of System Analyst III?

10       A.   Yes.

11       Q.   And is it fair to say you were hired

12   because you qualified for an open position at the

13   Recorder of Deeds Office?

14       A.   Yes.

15       Q.   And then briefly, you testified that

16   you're from Maywood.  Correct?

17       A.   Correct.

18       Q.   And is it fair to say that Karen and

19   Henderson Yarbrough are politically active in the

20   Maywood community?

21       A.   Yes.

22       Q.   And you were also at one point

23   politically active in the Maywood community

24   campaigning for Eugene Moore.  Correct?

1      A.    Correct.

2      Q.    So prior to Karen Yarbrough coming into

3    the office as the recorder, there were instances

4    where you had opportunities to be in the same

5    places as her?

6      A.    Correct.

7      Q.    And you testified -- I'm sorry, you

8    testified that, I think, Mirkovic asked you if you

9    were related to your father -- which individual

10   was that?

11     A.    That was Tim Curry.

12     Q.    So he asked you if you were the daughter

13   of --

14     A.    Eric King, yes.

15     Q.    And Mr. Curry was familiar with your

16   family in Maywood.  Is that correct?

17     A.    It appears, so I guess I should say

18   correct.

19     Q.    And although you didn't directly tell

20   Karen Yarbrough or Mirkovic that you were

21   politically affiliated with Moore, it's your

22   belief that they would know that?

23     A.    Correct.

24     Q.    Okay.  I have nothing further.

1        MS. ORI:  I don't have anything either.

2   So as I was going to say earlier, we're going to

3   get a transcript and you can either read the

4   transcript and correct any typos or waive

5   signature and presume --

6        MS. DIAZ:  We're going to reserve

7   signature.

8        THE WITNESS:  What was that second --

9        MS. DIAZ:  We're going to reserve.

10       THE WITNESS:  Okay.

11       THE REPORTER:  Signature reserved.  This

12   is the end of the deposition.  The time is 2:13

13   p.m.  The total length of today's recording is

14   approximately 3 hours, 37 minutes, and 40 seconds.

15

16

17

18

19

20

21

22

23

24

1  STATE OF ILLINOIS    )

2                       )   SS:

3  COUNTY OF C O O K    )

4              I, SAM KOHLHAAS, a Notary Public

5  within and for the County of Cook and State of

6  Illinois, do hereby certify that KHESI PILLOWS,

7  the deponent, was by me first duly sworn to

8  testify the truth, the whole truth and nothing

9  but the truth in the cause aforesaid; that the

10  deposition of the said KHESI PILLOWS was taken

11  before me by video conference within the state of

12  Illinois, whereupon the deponent was located in

13  Flossmoor, Illinois, commencing at the hour of

14  10:00 a.m. on the 25th day of September, A.D.

15  2020, and was concluded at the hour of 2:13 p.m.

16  on that date.

17              I further certify that the

18  testimony given at said deposition by said

19  witness was recorded by an audio/visual recording

20  device, by me in the presence of said witness and

21  thereafter transcribed into typewriting under my

22  direction and control.

23              I further certify that the

24  foregoing transcript of said deposition is a

1    true, complete and correct report of the entire

2    testimony so given by said witness, together with

3    such other matters and things as counsel for the

4    parties present at the taking of said deposition

5    desire to have appear of record.

6                    I further certify that I am not

7    counsel for, nor attorney for any of the parties

8    to the aforesaid cause, nor am I related to any

9    of the parties to the aforesaid cause, nor am I

10   interested in any manner in the said cause or in

11   its outcome.

12                   I further certify that the

13   deponent has reserved the right to review and

14   certify this transcript.

15                   IN WITNESS WHEREOF, I have

16   hereunto set my hand and affix my seal of office,

17   at Chicago, Illinois this 13th day of October,

18   A.D. 2020.

19

20

21

22                   NOTARY PUBLIC

23   My commission expires:

24   May 13, 2023.

**A**

**A.D** 170:14 171:18
**a.m** 1:22 4:24 70:14
  70:18 75:10,18
  170:14
**abetting** 134:4
**able** 90:7,8 99:17
  99:19 106:1,8
  107:23 144:1
  161:7
**absolutely** 17:5,6
  45:16 142:21
**absorb** 133:4
**access** 146:2
**Accountant** 117:1
  117:7,11
**accounting** 145:14
**accounts** 24:7,20
  24:20
**accurate** 51:12
  55:3 149:6
**Acox** 36:15 37:7
  38:2 40:9 95:16
  100:18 101:5,8
  126:22 127:13,18
  128:4 130:23
  135:8 136:17
**act** 134:5
**acted** 63:1
**action** 132:24
  134:18
**actions** 116:10
  134:12
**active** 24:21 67:1
  69:1 76:12 167:19
  167:23
**actual** 108:18
**Adams** 2:18
**adapted** 77:7
**add** 115:20 118:22
**addition** 90:3,4
**additional** 112:1
  114:10 140:10
**additionally** 115:1
  115:5
**address** 4:4 9:1
**adjust** 51:7
**admin** 144:24
  145:18

**administration**
  144:22,24 145:20
  145:21,24 159:20
  160:2
**administration's**
  160:14
**administrative**
  52:8 55:14 64:3
  143:20,22 144:7
**administrator**
  31:24 88:5,24
  89:3 90:11,12,24
  94:4,15 95:3
  100:19 133:3,9
  166:7,10,19
**adverse** 18:6
**adversely** 116:20
**affairs** 88:4 115:4
**affect** 47:16,20
**affidavits** 18:6
**affiliated** 21:16
  37:2,8,12,20 38:3
  38:9,17,20 39:18
  39:22 40:6,10
  43:5 44:12 51:19
  54:16 55:10 94:11
  98:23 102:22
  106:13 112:15
  146:6,8,11,18
  147:4,18,24 148:7
  148:24 149:3
  150:10,12 151:10
  153:3 158:21
  160:8 163:1
  168:21
**affiliation** 48:23
  52:10 56:8,12,16
  65:12 76:11
  101:15 102:16,20
  148:17
**affiliations** 160:14
**affix** 171:16
**aforesaid** 170:9
  171:8,9
**afternoon** 123:17
**ago** 10:2,3 121:3
  138:5
**agree** 23:18 67:8
  68:5,9,23 69:3,7

126:17 133:11
  141:12
**agreement** 23:2,5,8
  23:13,20 62:21
  66:15 116:6
**ahead** 164:3
**aiding** 134:3
**al** 4:19
**Alecia** 150:1
**Alex** 34:19,21 35:2
  36:6,23 37:5 38:1
  38:8,12,19,21
  39:2,6,10,14 41:6
  41:14 80:9,15,17
  80:22 88:17 89:15
  95:18 121:19,24
  135:18 140:13
  158:7,13 166:2
**Alexander** 148:15
**Aliasi** 150:4,5
**alive** 19:6
**allegation** 76:18
  79:17 81:15
**allege** 51:17,24
  69:6 101:13
**alleged** 55:8
**alleging** 87:13
**allocated** 86:12
**allowed** 71:18
  99:12
**Alphonso** 148:5
**amended** 13:8,12
  51:3
**America** 9:15
**amount** 132:23
  157:24 158:1
**analyst** 19:15,17
  22:12,15 23:23
  25:1,6,13 29:20
  33:8,12 48:2
  50:12 65:21 77:11
  78:4 81:10,11
  82:3 119:14
  121:15 130:4
  132:3,13,17 167:9
**ands** 117:16
**angry** 96:1
**answer** 6:14,18
  7:14,20 12:5,11

32:18 33:9 102:4
  111:20,24 112:2,5
  114:22,24 116:12
  116:15,21 118:22
  119:3
**answering** 6:19,20
  8:2 11:20 25:24
  132:24
**answers** 6:16,24
  13:9 108:20,23
  111:13
**Anthony** 123:7
  126:23 127:14,18
  128:4
**anybody** 99:8
  119:15
**anymore** 122:7
**anyone's** 100:3
**anyway** 105:10
**apologize** 30:1
  46:17 81:3
**appear** 78:13 171:5
**Appeared** 2:13,23
**appears** 168:17
**applicable** 4:9
**applicant/emplo...**
  134:13
**applied** 19:14 20:3
  21:18 94:6
**apply** 23:20 167:5
**applying** 106:1
**approval** 123:16
**approximately**
  163:4 169:14
**April** 10:8 14:14
  105:17
**area** 142:1,10
  145:18 146:1
  161:2
**aren't** 108:20
**article** 104:12
**aside** 128:9
**asked** 7:20 15:12
  16:24 45:3,6
  52:21,24 54:2
  64:12 66:19 67:18
  98:7,10 147:22
  159:16 168:8,12
**asking** 7:15 8:3

10:23 12:2 59:9
  66:8 69:18,19
  71:13 79:5 109:7
  109:8 125:19
  127:22 141:22
  156:10
**aspect** 134:1
**assertion** 73:2
  76:23 77:4
**assign** 165:15
**assignments**
  165:16 166:3
**assist** 24:22 54:2,3
  107:9
**assistance** 54:6
**assistant** 2:6 50:21
  88:4 115:3
**assisted** 24:17
**assisting** 53:22
**ASSOCIATES**
  2:17
**assume** 31:1 157:22
**assumed** 30:23
**Assuming** 129:4
**at-will** 154:18,20
  155:3
**attached** 111:8
  127:2
**attempt** 62:22
  63:16 66:6,16
  78:11 100:20
**attempts** 102:14
**attention** 29:17
  103:20 164:19
**attorney** 2:6 10:24
  13:8 15:4,21 16:8
  16:18 18:9 20:13
  70:23 114:12
  141:21 171:7
**attorney-client**
  11:22 71:4,20
**Audain** 88:3,21
  113:17 115:2
**Audain's** 88:9
  115:11
**audio/visual**
  170:19
**August** 88:2 91:12
  92:1 93:2 95:5

**authenticity** 131:6
**available** 94:5
119:11
**avoid** 100:20
**aware** 21:19 23:1
55:16 56:6 86:24
116:1,5 121:5
124:4 125:16
126:6 133:23
159:16 166:15

**B**

**back** 45:18 47:4
55:7 58:3 66:5
70:17 72:1 74:20
75:4,14,16,17,20
84:17 91:10 98:17
101:21 103:3
104:4,4 105:23
106:3,22 107:9,18
110:14 119:11
120:11 141:14
150:9 162:16
164:12 167:4
**background**
161:15
**bad** 48:21 93:8
**bankruptcy** 10:16
**Baptist** 29:4
**bargaining** 23:2,5
23:8,12,19 116:6
**based** 47:2 50:13
56:19 57:1 58:15
58:23,24 65:11
71:4 76:10 86:2
87:4 132:20
**basically** 42:11
106:5 154:21
161:1
**basing** 58:10
133:24
**basis** 19:22 44:23
55:19 61:6 62:4
62:24 63:23 70:10
73:1,11 76:17,22
77:3 79:16,18
81:14,22 96:21
97:12 98:10,20
101:2,3 112:11

113:5 115:7
150:21 154:4
165:13
**Bates** 120:15
128:10 130:20
135:7 139:8
140:19 152:8
**bathroom** 69:22
**bear** 162:21 163:20
**Bearling** 149:15,16
**began** 153:2
**behalf** 2:13,23 5:1
5:5,8,11
**belief** 19:23 51:18
51:24 55:9,19
56:19 57:2 58:15
58:24 59:8 62:4
76:8 81:7 96:22
112:11 168:22
**beliefs** 98:11
**believe** 18:19 21:24
25:14 29:18 35:4
38:16,20 40:14
42:4 43:2,12 46:1
46:7,7 47:4 48:17
48:19,20 51:11
52:19 54:23 55:13
57:10 61:2,4,8,10
63:14,21 64:17
65:8,19,22,24
73:10 77:5,16,20
82:8 85:5,8,9
86:21 87:2 89:8,8
95:17,18 98:20
100:13 103:2,3
104:18,21 105:17
105:18 110:17
111:8 112:3,7,14
112:21,22 116:10
119:7,16 122:9
130:2,4 135:17
136:3,19 137:12
137:21 142:12
146:23 147:7
153:15 163:3,9,22
167:8
**believed** 19:21
112:6,12
**Bellamy** 108:4

**Bernadette** 149:13
**best** 6:19 7:11 15:7
59:21 134:10
**better** 72:6 91:9
146:3
**big** 52:17 68:5 72:5
145:10
**bigger** 120:24
**birth** 8:14
**bit** 56:5 62:19
67:24 91:9 93:6
93:18 94:1 98:4
99:24 111:19
123:5 129:22
131:17 138:7,13
141:11 152:13,17
154:16 157:5,9,13
**Blanchard** 139:22
**bless** 29:6 101:18
**blog** 17:24
**bodyguard** 55:2
**born** 29:3
**BOT** 92:21 94:2,7
94:14
**bottom** 122:21
131:10,19 136:6
152:23
**breadwinner**
106:16
**break** 7:18,21 43:8
63:3 65:13 68:15
70:11,22 109:4,14
109:17 164:5
**brief** 70:15 75:11
110:12 162:14
164:10
**briefly** 166:5
167:15
**brought** 29:16
103:20
**budget** 56:21,22
57:15 58:5,6,17
59:6,7,11 60:18
60:22 61:2,5,9,11
61:14,15,16,19,23
62:2,5,10,14,15
62:21 66:16 67:4
67:5,9,10,13 68:1
72:15 76:10 77:7

77:16 81:9,18
85:13,17,17,18
86:1,3,4,5,8,17,18
86:20,24 97:3
123:15 127:4
136:14 155:10,22
156:1,8,10,15
**budgetary** 50:2,5
56:1 87:5
**budgets** 81:20,20
162:6
**building** 27:19
28:14,17
**built** 25:9
**bumped** 151:24
152:3
**Bureau** 47:5 90:14
90:15,19,20 91:3
91:6,13,14,18,23
92:10,14 93:10,13
93:15 94:19
161:21 162:2,3
166:20,24
**business** 4:4
**buzz** 145:23

**C**

**C** 2:3 170:3
**call** 6:7 24:5 84:5
84:13
**called** 24:11 95:15
152:5
**calls** 25:24 32:17
43:24 160:4
**camp** 44:22
**campaign** 21:6,10
32:11 101:16
150:13
**campaigned** 53:12
84:22 150:19
**campaigning**
167:24
**campaigns** 21:1,4
38:22 39:3,7,11
39:15,19,23 40:7
40:11 43:15 44:6
52:16 84:23
**can't** 11:10 22:3
33:9 37:14 51:1

66:4 76:24 84:15
89:20 99:13,14
104:3 111:6 117:5
118:4 144:4
151:18 158:2,6,24
**career** 19:18 106:6
**Carolyn** 35:14,20
35:23 36:24 37:6
38:2 39:21 72:14
73:8 74:4,8,16
76:5,8 77:18 97:2
122:22 123:6,10
125:23 126:1,16
126:21 127:17
128:3 130:23
**carry** 12:22
**case** 4:19 5:19 11:7
11:7 13:4 14:4
15:18,23 16:4,4
17:12,17,21 18:3
18:6,10 71:11
105:22
**Cash** 9:15
**cashier** 130:2
**cashiering** 130:3
**cause** 31:22 170:9
171:8,9,10
**causes** 8:8
**CCR** 24:1
**CCRD** 24:7,8
127:3
**Cedric** 32:24 33:3
33:4,5 36:9,24
37:6 38:3 40:2,3,4
40:5 42:5,5,6 46:5
62:20 63:1,14
66:15 67:17 68:6
69:16 70:3 72:13
73:7 74:3,8,16
76:4,8 77:18 97:3
122:22 123:7
125:23 126:22
127:13,17 128:3
138:17,19
**cell** 84:5,6
**ceremonies** 29:5
**certain** 24:22
**certified** 107:20
**certify** 133:22

134:8 170:6,17,23
171:6,12,14
**chain** 118:13
122:13,21
**chance** 152:14
**change** 40:16 71:22
94:13,17 142:18
142:21 166:11
**changed** 92:13
142:14,22 166:19
**changes** 141:16
145:4
**changing** 145:5
166:15
**charge** 163:11
**chart** 132:22
146:23 158:9,10
158:14
**check** 50:6
**Chicago** 2:9,20 4:5
159:21 171:17
**chief** 41:19,21 42:3
42:5,22 54:23
55:1 62:20 66:14
68:6 72:4,13
79:13 123:16
124:6 138:12,16
153:10
**child** 107:2,3
**choose** 86:11
**chose** 157:24
**chosen** 112:24
**Christopher** 148:2
**church** 29:4
**Civil** 1:19 5:22
**claim** 111:17
**claims** 111:15
**Clark** 28:15
**clean** 14:6
**clear** 7:8 10:22
11:9 38:11 56:6
64:19 72:9 80:13
87:12 91:2
**Clerk** 132:3,6
**client** 71:19 160:21
**CLK/ROD/SHE...**
132:3,7
**closer** 34:1
**colleagues** 143:8

**collective** 23:2,4,8
23:12,19 116:5
**college** 106:5
**come** 31:24 41:5,15
84:4 92:17 103:24
**COMEXUS** 14:11
**coming** 45:18 168:2
**command** 118:13
**commencing**
170:13
**commission** 171:23
**communicated**
154:4
**communications**
12:2 77:23 125:17
126:11 138:21
**community** 88:4
115:4 167:20,23
**companies** 161:3,8
**company** 161:6,13
**comparable** 116:18
**comparison** 165:3
**competitors** 14:11
**complain** 96:18
143:3,5
**complainant**
138:13
**complaint** 13:9,12
50:20 51:3,3,12
60:14 68:5 70:21
72:1 98:9
**complaints** 100:19
**complete** 116:15
171:1
**completely** 8:2
83:22
**compliance** 62:22
63:5,9,17,22 65:2
65:4 66:6,17
78:12 100:21
**compliant** 65:14
**complies** 68:10
**comply** 63:7 67:22
96:23 123:14
127:4 134:17
**complying** 63:13
63:20
**computer** 12:19
14:3 24:19,20

53:22 54:3 82:23
84:1
**concern** 31:23
**concerned** 31:11,19
**concerns** 31:4,6
**concluded** 170:15
**conclusion** 139:8
140:11
**conclusions** 140:2
**concrete** 97:11
**conditioning**
133:24
**conducted** 5:21
**confer** 71:18
**conference** 1:23
2:13,23 170:11
**confused** 29:24
69:15 70:2 90:17
**connected** 37:23
38:24
**connections** 30:14
**consider** 37:12
**considered** 139:12
**consulted** 123:22
123:24 127:7,9
**contact** 154:9
**contained** 24:15
**contend** 111:16
**control** 114:20
170:22
**controlled** 14:10
**conversation** 10:23
34:2 38:21 39:5,9
53:2 56:7,15
58:10,24 59:19
71:5 74:7,11
101:11
**conversations** 35:8
35:17 36:15 39:2
53:14,17,20 55:16
71:14,17 74:3
79:23 96:19 124:5
124:11 128:4
165:22
**conversion** 142:1
142:10
**Cook** 1:7,8,21 4:19
61:17,18,19,20
128:11 133:21

159:21 170:5
**cool** 100:10
**cooperating** 134:4
**coordinating** 24:17
**coordinator** 160:21
**copied** 135:19
**copy** 5:23 89:12
**copying** 123:6
126:22 127:13
**core** 66:9,21 67:20
68:9 76:15
**correct** 8:9,23
15:15 19:1 23:20
23:21 38:14,15
46:6 47:10,14,15
47:24 48:3,6,9
55:11 56:8,9,12
56:13,16,17 58:5
58:21 61:21,22
62:8,11,16,17
65:21 67:6,14,21
68:10 73:18 74:5
74:10,16 78:22
80:1,2,5 82:4,5
87:2,14,15 89:1
91:4 92:3,24 93:3
94:23 95:5,8,9
97:5,6,9,14 98:13
98:15,16,21
101:18 102:4
104:20 105:12
111:10,11 112:9
112:10 113:5,6,7
113:8,15,16,18,19
113:20,24 115:8
115:12,15,18
116:3,4,8 117:2,3
117:21 118:13,20
120:5,6 121:12,13
121:15,17 122:1
124:20 125:1,14
125:15,18 126:4,5
126:9,10,13,14,17
126:20,24 127:8
127:18 128:6,7
129:7,14 131:7,14
131:15,20,22
132:18,19 133:9
133:10,13,16,17

135:20 136:21
137:1 138:14,15
139:1 143:9
146:15 148:1
151:11,17 152:21
154:7,8,11 155:6
155:7 157:16,20
158:3,5,7,11,12
158:14,15,18,19
158:22,23 159:2,6
159:8,10 160:9,11
160:14 162:6
164:23,24 165:9
165:10 166:4,17
166:22 167:2,6,16
167:17,24 168:1,6
168:16,18,23
169:4 171:1
**correcting** 33:11
**cost** 49:22
**could've** 103:24,24
**couldn't** 42:12,12
45:14 72:6 78:20
82:17 105:10
121:1 158:14
**counsel** 83:2
122:15 139:5
171:3,7
**count** 151:9,14
**counted** 150:11
151:12
**county** 1:7,8,21
4:19 9:16 45:9
61:17,18,19,20
99:13 106:17
128:12 133:21
159:21 170:3,5
**countywide** 49:21
56:21 59:6 60:22
62:5,10,15 67:5
67:10
**couple** 51:14 84:9
96:8 111:13 112:4
120:14 152:19
165:24
**course** 106:4
**court** 1:1 4:20 6:15
**courtesy** 99:10
**cousin** 43:12,13,18

**covered** 40:13
**coworkers** 143:7
**crammed** 146:4
**crazy** 45:16
**created** 24:6,12,19
    87:7 128:17
    132:22 158:10,13
**creating** 25:23 26:3
**criminal** 134:20
**curious** 63:5
**current** 9:1 51:21
    160:17,23
**currently** 37:15
**Curry** 52:4,21 54:9
    54:10,15,18 55:11
    56:7,11,15 168:11
    168:15
**Curry's** 54:21
**Curtis** 33:20,21
**custody** 114:20
**customer** 133:1
**cut** 56:2 59:11
    85:20 86:1,17,20
    86:24
**cuts** 56:22 59:7
    60:22 61:2,5,9,12
    62:6,15 67:5,10
    86:5,8,18 136:14
**CV** 1:6 4:20

**D**

**dad** 29:11
**daily** 70:10 154:4
**damages** 105:21
**database** 88:5,24
    89:2 90:10,12,24
    94:4,15 95:3
    133:2,8 166:7,10
    166:18
**date** 4:23 8:14
    60:17 63:1 78:10
    86:22 104:17
    112:18 123:1
    170:16
**dated** 126:16
    130:22 131:23,24
**dates** 9:21
**daughter** 52:22
    168:12

**day** 1:22 28:22
    45:17 52:21 60:6
    91:19 100:1
    126:17,18 135:23
    136:12 151:1
    170:14 171:17
**day-to-day** 24:1
    165:13 166:3
**days** 52:18 60:7
    96:7,8 99:16
    100:6
**dealt** 166:2
**December** 14:15
    25:5 104:18
    136:11,12
**decide** 157:15
**decided** 31:3 91:7
    91:20
**decision** 97:8
    140:14 157:20
    161:21 162:6
**decisions** 139:13
**decreased** 48:5
**Decree** 66:1 133:22
**deeds** 1:7 4:19
    18:16,24 19:9,14
    20:22 21:19 22:18
    22:21 23:5,9 25:8
    26:1 30:17 31:16
    35:1 40:17,20
    41:8,18 47:14
    49:5 50:17 51:20
    57:6 61:17,20
    64:4 67:14 88:14
    90:21 91:7,17,20
    91:24 92:9,14,16
    92:20,23 93:5,12
    93:16,21,23,24
    94:3,5,15,20 95:2
    102:17 103:5
    128:12 129:5
    130:14 133:21
    159:18 161:22
    162:4 163:5,10
    166:10,21 167:5
    167:13
**defendant** 5:1,2
    116:11
**defendant's** 87:3

**defendants** 1:10,17
    2:14 3:8,9,10,11
    3:12,13,14,15,16
    3:18,20,22,24 5:9
    5:11 108:13 109:1
    110:20 111:4
    113:11 114:3,10
    114:20 128:10
    130:18 135:6
**definitely** 143:18
    146:3
**degree** 20:1
**delay** 127:2
**deleted** 16:22
**deliver** 21:7
**Democrat** 21:14,17
    163:3
**demonstrate**
    139:11
**department** 20:1
    23:24 25:21 27:2
    28:5 45:15,20
    66:7,18 67:2 69:2
    80:23 81:8,10
    85:16,24 87:8,8
    88:5 91:1 128:12
    129:22 130:3,6
    141:3,12 143:21
    145:15
**departments** 81:8
    81:18 82:1 85:13
    85:20,21 132:15
**depend** 50:4
**depends** 138:18
**deponent** 1:24
    170:7,12 171:13
**deposed** 6:9
**deposition** 1:13,17
    3:8,9,10,11,12,13
    3:14,15,16,18,20
    3:22,24 4:4,6,17
    4:24 5:20,23
    10:18 15:5 16:10
    16:17 22:1 71:16
    71:19 110:22
    169:12 170:10,18
    170:24 171:4
**depositions** 1:20
**deputies** 145:15

**deputy** 41:20,21
    42:3,22 62:20
    66:14,17,23 67:18
    68:3,6,7,23 69:11
    69:13,17 70:4,7
    72:4,4,13,13,14
    72:21 73:3 74:4,9
    74:15 75:24 77:23
    79:14 96:22 97:5
    113:1 124:6,7,12
    125:12 126:7
    138:12,16,21
    153:11 164:20,22
    165:1,8,15,18,22
**describe** 11:4
    153:23
**description** 87:20
    89:12 120:18
    121:1,2,5
**desire** 171:5
**desks** 143:23
**Desktop** 24:14
**determined** 78:10
    139:10
**device** 4:3 170:20
**devices** 83:14
**Diana** 150:4,5
**Diane** 149:8
**diary** 15:23 16:2
**Diaz** 2:21 3:5 5:5,5
    11:21 12:5 13:19
    16:14 32:16 43:23
    68:13,20 71:3,12
    71:18,22 84:3
    98:1 108:20,24
    110:2 111:1
    114:18 121:7
    159:11,15 160:3
    162:11 164:1,4,7
    164:15 169:6,9
**didn't** 13:17,21
    21:5 23:16 27:9
    30:2,7 32:10
    36:10 37:11 38:12
    54:18 63:4 66:11
    82:15,21 96:4,23
    97:8,16 98:14
    99:6 104:14 106:2
    106:12 107:24

119:7 125:3,9,10
    131:8 136:23
    141:14 143:11
    145:23 146:1
    151:14 154:21,23
    154:24 155:3
    156:12,13 159:3
    160:5 163:15
    168:19
**difference** 82:24
**different** 24:13,22
    40:24 41:5 56:5
    64:10,11,15,15
    67:13 81:8,18
    84:10 85:12 88:21
    104:1 115:11,14
    117:7 131:17
    132:12,14 133:1
    142:7 151:2 161:7
    161:17 165:4
**differently** 86:6
**difficult** 51:1 93:18
**difficulties** 29:16
**difficulty** 74:23
    75:3
**digits** 8:16
**direction** 170:22
**directives** 44:20
**directly** 70:9
    168:19
**director** 87:7
    100:16 102:9
    132:22 133:12,15
    135:19
**directory** 24:21
**disciplinary** 134:18
**discipline** 40:24
    102:15
**disciplined** 40:19
    40:21 46:10
**discrimination**
    115:2
**discussed** 11:22
    55:13 115:10
**discussion** 104:2,6
    104:15
**discussions** 31:17
    87:10 92:8 125:13
**disprove** 159:9

**dispute** 62:13 158:2
158:6,14,24 159:3
159:24
**disruption** 66:9,21
67:20 68:8 76:14
**distracted** 15:1,2,3
**District** 1:1,1 4:20
4:21
**diverse** 161:5,9
**diversity** 161:2,3,4
**divided** 81:7 85:12
**Division** 1:2 4:22
**doctor** 107:15,21
107:23
**doctor/patient**
108:7
**document** 101:23
101:23 102:5
109:13 110:4,8
122:20 128:11,15
128:18,21 130:17
131:2,14 133:11
133:14 135:5,9,11
136:2,23 137:3,17
137:19 140:18,21
141:8,19,20
146:21 147:3
152:7,9 156:20
160:16 162:20
**documents** 10:21
10:24 11:5,8,13
11:14 15:20 18:8
24:12 26:4,4
39:13 56:10
120:14 121:7
**doesn't** 159:7 160:4
**doing** 18:20 24:22
26:2,3 34:11
41:16 45:9 90:2,3
103:18 166:23,24
**Dolores** 149:23
**don't** 7:7 9:20 12:4
12:8,8,9,10 13:20
16:2 20:7,9,12
23:12,16 25:14
27:8 29:18 32:5
34:4,16 37:16,18
40:22 46:15,15
47:18 48:12 50:2

50:18,21 53:19
55:4,5 56:2 60:6
60:11,23 62:9,12
65:16 69:7,7
75:23 77:14,15
80:3,24 82:18
85:5,8,9,15 86:22
88:1 95:1 96:17
98:9 100:13 103:2
103:3 104:4
106:22 107:23
109:9,10 112:3,17
112:18 114:1,5,13
117:15 118:18
119:15 120:9
122:7,9 124:18,19
124:23 125:12
127:16 128:2
130:8,11,16
131:19 132:8
137:14,14,21,24
138:3,5 140:4,6
140:16 141:7,7,11
141:19 143:12,14
145:1 148:18
149:4,9,24 151:10
151:21,22 152:1
152:22 154:12
156:12,19 157:14
157:19,22 158:10
159:5 163:7,7,20
166:13 169:1
**Donald** 148:3
**donate** 21:10
**donated** 150:14
**door** 145:19
**doors** 145:20
**doubt** 62:3 131:6
**downtown** 24:2
**draw** 164:19
**due** 78:10 136:14
**duly** 5:15 170:7
**duties** 40:16 47:8
47:13 48:8 80:22
82:11 87:23 88:21
89:11,23 90:2,6,7
92:5 94:13,17,22
95:4,6 115:11
117:8,11 132:23

132:24 133:5
165:12,19 166:3

---

**E**

**E** 2:3,3
**E-X-A-M-I-N-A-...**
5:16 164:14
**earlier** 65:19 67:12
96:21 97:2,12
98:7,10 112:7
113:4 115:10
116:1 121:14
133:3,9 153:24
158:10,16 169:2
**easier** 147:8
**Eastern** 1:2 4:21
**easy** 15:3
**eat** 107:1 109:14,23
**ED** 2:17
**effort** 26:6,8
**efforts** 25:20
**eight** 137:9
**either** 24:5 100:10
109:24 114:5,13
118:6,13 149:24
151:18 169:1,3
**elected** 150:24
153:1
**election** 52:18
151:1
**elevator** 145:9
**eliminated** 66:9,20
67:19 68:8 76:10
76:14 78:3 89:18
95:12,13 98:19
123:14 124:2,8,13
126:4,9,12 136:14
**email** 17:11 24:5,9
42:10,15 44:11,14
122:13,21 123:2,5
123:8,10 125:22
126:16,21 127:1
127:12,20 131:5
135:20
**emailed** 24:9 66:17
**emails** 25:24 133:1
**emotional** 106:3
**employed** 47:23
**employee** 70:7

99:10 102:15
154:18 155:9,19
**employees** 23:8
24:13 28:5 57:6,8
101:14 113:12
114:3,4,11 116:18
116:18 117:13
**employment** 18:12
31:4 87:1 134:2
134:13 139:12,13
**ended** 82:8,10
**entailed** 87:24
88:10,11
**enter** 134:11
**entire** 19:17 171:1
**entities** 61:21
**entity** 166:15
**environment**
142:19
**Ephesians** 13:1
**Eric** 52:22,24
168:14
**erroneously** 153:4
**Erwin** 36:15 37:7
38:2 40:9 95:16
101:4,8 126:22
127:13,18 128:4
130:23 135:8
136:17
**estate** 24:10,11
**et** 4:19
**ethernet** 84:1
**Eugene** 19:2,21
20:15,19,22 21:12
26:23 27:2,10,13
27:20 28:4,7,16
29:7,9,17,21 30:2
30:7,16 31:20
32:15,22 33:1,16
33:22 34:15,22
35:12,21 36:10,17
37:13 38:4,9,13
38:17,20 39:3,6
39:11,15,19,23
40:7,10 43:5,11
43:15,18,21 44:3
44:6,12 49:2
51:19 52:10,14
53:3,6,12 54:11

54:16 55:10 65:20
82:14 84:20,23
86:21 94:1,11
98:23 102:22
103:5 112:6,8,12
112:15 143:20
146:6,9,12,19
147:5,18,22,24
148:8,22,24
150:10,12,19
151:11 158:18,22
159:2,18 160:8
163:11 167:24
**everybody** 99:16
103:23 144:20,21
144:21
**everyone's** 40:14
**evidence** 97:11
111:17 139:10
140:10 160:7,10
160:10,12
**exact** 9:20 11:2
86:22
**exactly** 144:4
**Examination** 3:3,5
**example** 124:20
**exempt** 21:20,22
22:7,9,12 133:21
**exhibit** 3:8,9,10,11
3:12,13,14,15,16
3:18,20,22,24
51:2 108:12 109:5
109:19 110:19,20
110:21 120:15,17
121:11 122:7,11
122:16,17 128:8
128:10 130:18,19
135:6,24 137:4
140:19 146:22
152:8 156:21
**exhibits** 3:7 110:20
110:23
**exited** 162:20
**experience** 130:13
**expires** 171:23
**explain** 6:12 29:2
**extra** 86:13

---

**F**

**Facebook** 17:14,17
**faces** 151:3
**fact** 56:14
**factor** 134:3
**factors** 134:11
  139:11
**facts** 15:18 71:10
  111:14
**fail** 14:16
**fails** 139:10
**failure** 134:16
**fair** 6:21 7:16 20:9
  23:11 32:10,13
  58:4 74:2 79:22
  88:20 94:24 95:1
  99:7 117:6 118:9
  121:11 123:21
  151:15 166:1,14
  167:11,18
**familiar** 52:13
  168:15
**familiarity** 67:1
  69:1
**family** 82:20 84:21
  168:16
**far** 60:8 107:17
**farther** 136:5
**fast** 94:3
**father** 53:1 168:9
**favorably** 116:20
**favoritism** 163:11
**favors** 163:10
**fear** 14:9
**Federal** 1:19 4:8
  5:22
**feel** 27:7 52:7 55:24
  93:6 95:22,24
  125:19 138:3
  144:5,6
**feeling** 55:20,23
  97:10
**feign** 62:22 63:5,9
  63:10,16 65:1
  66:6,16 78:11
**felt** 64:12 95:24
  96:1,1,1,1 98:22
  99:5,24 100:1
**fewest** 132:22
**figure** 12:8 51:23

104:7 106:24
  155:13
**file** 137:20
**filed** 10:16 51:4
  138:4
**filing** 11:6
**fill** 87:6
**filled** 120:8
**final** 152:1,2
**finalized** 77:9
  78:10
**finalizing** 123:13
  126:2
**finance** 72:14 124:7
  162:3
**Finances** 161:21
**find** 104:9 121:1
**fine** 7:19 43:23
  83:22
**finicky** 83:20
**finish** 6:20 68:17
  69:22 110:23
**finished** 65:5
  120:10 146:21
  152:7 156:20
**fire** 65:11 66:5
**fired** 16:6 22:9 42:4
  46:1,3 47:24
  48:12,14,16,20
  80:18 102:10
  103:8,13 155:2
**firing** 64:5 102:11
**first** 4:14 13:8,12
  14:13 25:10 51:3
  81:2 108:17
  130:21 131:10
  133:18 135:1,3
  147:9 155:16
  157:13 170:7
**firsthand** 74:14
  80:21 85:6 92:12
  103:7,9 124:10,14
**fiscal** 56:22 59:7
  60:22 62:10
**five** 10:3 110:6
  138:5
**flag** 103:17
**flags** 100:21
**floor** 28:19 145:6,7

**floors** 145:5
**Flossmoor** 1:24
  4:12 9:2 170:13
**fluctuate** 50:4
**flyers** 21:9
**follow** 16:12
**follow-up** 164:2,17
**food** 21:7
**force** 72:17 77:9
  78:9 79:11 113:1
**foregoing** 170:24
**Forest** 9:17,18,23
**forever** 109:11
**forgive** 145:1
**forgot** 129:21
**formal** 61:15
**former** 159:18
**forward** 94:4
**forwarding** 133:1
**Foster** 147:7
  148:13
**found** 102:13 115:1
  116:24 135:23
**four** 8:16 26:9 61:8
  61:24 113:11,12
  122:8 137:9
  143:23 144:17,18
  146:15,18 165:7
**four-day** 100:5
**fourth** 14:15
  113:21,24 117:1
**FOX** 2:17
**frame** 60:17
**fraud** 117:19 118:2
  141:3
**Freida** 148:10
**Friday** 100:6
**friend** 57:18 82:15
  82:20 84:21
  107:19 108:2,6,9
**friend's** 108:3
**friends** 15:8 29:11
  29:13
**front** 11:13,14
  12:16 13:5,10
  14:1 50:20
**full** 120:11
**full-time** 105:20
**fully** 8:2

**functions** 24:1
  76:13,15 78:14
  79:12
**funded** 155:11
**funny** 163:16
**further** 67:24
  130:16 168:24
  170:17,23 171:6
  171:12
**furthermore**
  100:15 113:10
**FY27** 127:4

**G**

**Gateway** 14:12
**gather** 16:17
**gears** 57:16
**general** 64:12
  102:12 139:24
**generally** 121:15
**generated** 24:9
**gentle** 12:23
**George** 42:17,19
  43:10,18 47:4
**getting** 10:11 19:22
  72:5 91:13,14,17
  93:15 94:18,19
  96:24 97:4 107:8
**Giles** 32:24 33:3
  36:9,24 37:6 38:3
  40:5 46:5 62:21
  63:1,14 66:15
  67:17 68:6 69:16
  70:3 72:14 73:7
  74:4,8,16 76:4,8
  77:18 97:3 122:22
  123:7 125:23
  126:22 127:13,17
  128:3 138:17,19
**give** 11:2 18:9
  68:16 74:23 75:4
  79:19 99:10 100:4
  100:8 106:22
  145:8
**given** 14:8 99:15
  170:18 171:2
**giving** 11:18 61:11
  64:11,13 68:3
**go** 8:11 17:4 21:6

27:22 28:4 33:14
  38:6 46:18 51:1
  51:14 56:18 65:18
  67:24 68:4 69:22
  75:7 79:9 81:1,2,3
  95:10 96:6 98:17
  100:14 101:22,22
  102:7 107:2
  109:21 111:12,13
  119:19 120:11,13
  122:13 131:16
  135:1 138:20
  139:2,7,7 142:19
  145:10,12,18,19
  146:22 147:9,13
  150:9 152:20
  162:9 164:3
**God** 12:22 14:8,15
  14:20 101:18
**goddaughter** 112:6
  112:9,13,16
**godfather** 19:4
  26:23 27:2 29:1
  32:15,22 33:1,17
  33:22 34:15,22
  35:12,21 36:11,18
  38:13 43:21 44:3
  53:6 54:12 158:18
**godparents** 29:7,8
**goes** 78:7 84:7
  157:8
**going** 6:12 11:21
  12:20 15:10 32:16
  33:14,23,24 43:24
  45:2,3 46:18
  50:21 51:7,14
  55:7 57:16 58:3
  65:13,14 66:5
  68:4 70:13,20
  71:3,12 74:18
  75:9,13 91:9,21
  91:24 93:17,19
  96:6 99:21 100:4
  100:5,8 105:24
  107:1,2,7,24
  109:21 110:10,18
  110:22 120:13
  124:5 125:8 128:9
  128:20 130:19

137:22 149:10
151:2 153:15
160:3 162:12
163:18 164:1,8,16
169:2,2,6,9
**good** 75:5 109:4
110:9 111:1
162:11 163:17
**gotten** 29:20 30:3,6
99:20
**government** 106:8
154:24
**gradually** 25:9
**graduated** 18:21
**grand** 145:10
**granted** 105:4,5
**great** 23:17 33:10
106:8,10 131:9
132:23
**grew** 8:20 29:14
**group** 128:22
**grow** 8:19
**growl** 163:16
**guess** 20:12 37:11
43:7 63:3 125:24
129:5 137:9
141:24 143:16
144:13 157:22
168:17
**guessing** 92:15
129:9 138:18
142:6 146:2
**guidance** 71:7
**guy's** 52:4
**guys** 150:8

**H**

**habit** 7:5
**half** 109:15
**hall** 144:1
**hallway** 141:16,17
145:4,10,13 156:6
**hand** 5:13 135:15
171:16
**handed** 135:17
**handing** 151:3
**handle** 25:16,22
**handled** 25:19
**handling** 25:23

**happen** 34:5 86:18
140:7 142:11
143:1
**happened** 16:5
55:21 56:3,3 58:9
82:24 86:8,20,21
92:1 143:13,17
144:4 151:24
**happens** 162:22
**hard** 40:5 84:14
**hard-coated** 45:13
**hardware** 24:3,15
**hate** 93:18 163:21
**haven't** 83:12,13
120:22
**Hayes** 26:14 42:15
122:4 129:11
144:14 146:6
**hazy** 8:8
**he's** 29:1 43:12
52:23 55:1 91:21
159:20
**head** 7:3 66:7
**headed** 66:18
**hear** 46:17 76:24
82:17,21 83:2,3,4
103:10,15 111:6
125:9 141:4
163:15
**heard** 23:14 97:19
103:14,15,22
**heart** 14:17
**held** 51:20
**help** 19:8 21:7
99:24 101:24
**helped** 65:20
**Henderson** 167:19
**hereunto** 171:16
**hey** 38:19 99:21
**high-ranking** 52:15
**hire** 65:11 66:4
119:11
**hired** 61:7 62:6
65:20,24 87:6
88:3 89:7,10,16
90:10 93:20,22
95:2 100:16 102:9
103:4 113:11
114:10 119:13,15

119:17 154:23
166:6,9 167:4,11
**hires** 114:19
**hiring** 61:12 64:4
87:10 133:2 134:2
134:13
**hirings** 61:24
**history** 18:13
**honest** 137:22
**Honestly** 137:21
143:12
**hopefully** 80:14
84:2
**hopes** 123:17
**hoping** 50:19
162:21
**hour** 1:22 109:15
170:13,15
**hours** 109:16
169:14
**house** 106:15
**household** 106:21
**HR** 123:16 124:6
141:2
**hug** 28:7
**hugged** 28:10
**human** 87:7,22
100:17 102:9
**humble** 12:23
**hundred** 10:9 20:6
22:10 27:8 41:12
46:2,16 48:17
57:11 60:17 63:11
89:9,19 95:17
104:3 112:22
117:24 118:5,14
122:10 138:6
147:11 148:4,11
148:12 149:14
154:14 157:21
**hungry** 163:13
**hurt** 46:22 96:1
**hurtful** 106:13
**husband** 9:5,8
106:14
**husband's** 46:21

**I**

**I'll** 6:17,19 7:11

16:17 48:21 55:5
57:10 68:17 72:8
84:7,11 101:22
106:8 109:10
110:21 118:5
**I'm** 4:2 6:12 8:3
10:9,22 11:21
12:2,20 19:5,6
20:6,23 22:5,5,10
27:8,12 32:16
33:23 34:8,8,11
34:11 38:18,19
40:1 41:12 46:1
46:16 47:22 48:17
50:21 51:7,14,23
52:12 54:8 57:11
57:16 58:13 60:16
61:16 63:5,11,18
64:13,19 65:5,6
65:13,13 66:11,12
66:13 69:15,19
70:2,5,6 71:3,12
74:18 75:2,2,13
76:21 78:21 80:12
80:12 81:2 82:17
82:22 89:9,19
90:17 91:1,2,5,8,9
92:15 93:19 95:17
97:1,17 99:9,21
104:3,7 105:24
106:7 109:8,9,21
109:22,23 110:2
110:22 111:6
114:16,21 117:24
118:5,14 120:10
120:12 122:9
125:8 127:22
128:9,20 129:9,17
135:5 137:3,12,22
138:18 141:6,13
142:5,13 143:4,16
144:20 146:1,21
147:7,11,17 148:4
148:11,12 149:10
149:14 150:5
151:6,8,21 152:7
152:15 153:15,15
155:13 156:7,20
160:3 163:18

164:1,16 168:7
**I've** 7:20 16:3
23:14 84:4 136:8
**identified** 77:13
89:17 112:2
**identify** 66:8,19
67:18 111:14
116:17 159:11
**identifying** 114:14
**II** 117:19 118:3
**IIG17-0163** 102:13
**III** 19:15,17 22:12
22:15 23:23 25:1
25:7,13 29:20
33:8,12 48:3
50:12 65:21 77:11
78:4 81:10,11
82:3 119:14
121:16 132:3,13
132:18 167:9
**illegal** 96:13,17
98:21
**Illinois** 1:1,21,23
1:24 2:9,20 4:5,12
4:21 8:21,22 9:2
170:1,6,12,13
171:17
**imaging** 24:15
**immediately** 153:1
**impact** 19:21 47:8
79:13
**impermissible**
139:11
**implying** 43:3
**important** 6:23
45:19
**impression** 30:10
30:13
**inaudible** 139:3
**include** 132:24
**included** 78:3
**including** 134:18
134:19
**income** 106:21
**incorrect** 140:2
**increased** 133:3
**incurred** 107:10
**independent** 73:14
102:12 139:24

**INDEX** 3:1,7
**indicating** 133:12
**individual** 114:3,10
  166:6 168:9
**individuals** 25:17
  26:11,11 101:20
  113:11,13 116:2
  151:19 165:7,8
**inducing** 134:3
**information** 12:12
  16:7,18 56:19
  57:1,3,12,13,14
  58:15,23 59:8
  73:4,6,8,14 74:15
  76:8 81:6 114:18
  135:19 160:13
**informed** 135:12
**initially** 154:23
  157:1
**input** 72:3,12,20
  73:3 76:12 78:13
  79:12 96:24 97:4
  113:2
**inspector** 102:12
  102:12 139:24
**installation** 24:16
  24:18,18
**instance** 5:2 153:24
  154:2
**instances** 168:3
**Instanter** 4:2
**instructed** 100:17
**instructions** 11:19
**intend** 111:15
**interested** 171:10
**internal** 114:19
**internally** 133:5
**internet** 80:10,11
  82:18,23 97:22
  98:3 162:20
**interrogatories**
  13:9,13 108:13
  109:2 111:4
**interrupt** 65:17
**interview** 20:15,16
  138:13,16,21
  156:23,23
**interviewed** 20:5
  94:6 138:11

**interviewing** 89:20
**intimate** 66:24
  68:24
**introduce** 5:4
**investigate** 138:1
**investigation**
  102:10,13 155:15
**investigator** 117:19
  118:3 159:16
**involved** 10:13
  86:17,19
**involvement** 10:10
**involving** 139:13
**IO** 14:11
**isn't** 45:18,19
**issue** 46:10,11,14
  46:14 102:15
**issues** 24:4 107:10
**it's** 6:23 8:6 11:17
  11:18 12:6,7,7
  15:3 17:1 20:8,9
  32:13 40:5 59:4
  71:20 72:5,9 74:2
  75:5,6 79:22
  83:19,20,21,21
  84:14,15 85:12
  88:8 93:17 94:24
  95:1 96:2 99:11
  103:14 106:8
  107:8 108:24
  109:23 111:8
  121:11 123:5
  125:24 130:19
  131:17,18,23,24
  132:1 137:5,9,9
  137:16 139:8,23
  139:23 140:19
  146:14,14,23
  150:7 151:15
  152:12 155:15,15
  155:16 156:21
  168:21
**italics** 72:23,23
**items** 25:19,20
**IV** 117:1,7,11
**IV-CNTY** 132:3,6
**Ivy** 141:1,2

_____
**J**

**Jaclyn** 2:21 5:5
  13:17 16:11 32:20
  69:14,18,20,21
  84:8 97:23 110:1
  110:21 120:12,13
  121:4
**Jaclyn's** 11:17 12:7
**Jamica** 118:4
**January** 14:13
**Jaylaan** 2:11 5:10
  50:22 98:10
  111:18 120:12,14
  122:6,13 137:15
  152:12,17 157:8
**Jeanette** 87:6,10,14
  87:16 95:15
  100:17 101:4
  102:10,19 103:4,8
  103:12,16 113:14
**Jimmy** 122:21
  123:6,11,12
  125:23 126:1,22
**job** 19:22 25:2
  26:20 29:20 30:3
  30:11 40:16 47:8
  47:12,17 48:8
  50:11 55:4,5
  65:23,23 78:14
  79:12 80:22 82:3
  82:11 86:14 87:19
  87:20,23 88:10,21
  89:11,12,22 92:5
  94:13,17,22 95:3
  95:6 105:14,19
  106:2,8,8,9,10
  107:5 115:10
  117:10,17,20,23
  118:24 119:5,6,9
  120:18 121:1,1,2
  121:5,6,12 142:14
  153:9,19 154:10
  160:17,19,24
  161:17 165:12,19
  166:3,11
**jobs** 106:1 133:20
  153:5
**Joe** 26:12,14,16,22
  49:8 89:6,16,22
  90:2,8,8,18 91:3,5

  91:19 92:13,22
  93:20 94:1,6,10
  94:13,17 95:7
  113:19 122:4
  129:8 144:14
  146:11
**jogs** 157:2
**John** 34:12,14 35:3
  35:5,6,8,11 36:3
  36:23 37:5 38:2
  39:17 41:8,11,14
  76:2,3 77:24
  78:16,24 79:18,23
  80:15,21 95:16,18
  97:4 118:12
  130:22 131:18,21
  133:12 134:22
  138:24 156:23
**joining** 134:5
**joint** 25:20 26:6,8
**Jose** 166:6,9
**journal** 15:22
**JR** 129:1,8
**July** 14:14 51:4
**June** 14:14
**jurisdiction** 133:20

_____
**K**

**K** 170:3
**K-H-E-S-I** 6:5
**Kant** 80:15,16
**Kantas** 34:19,21
  35:2 36:6,23 37:5
  38:1,8,13 39:2,6
  39:10,14 41:6,14
  80:4,9,16,17,17
  80:22 88:18 89:15
  95:18 121:19,24
  132:22 133:13,15
  135:18 140:14
  158:7,13 166:2
**Karen** 31:8,12,15
  32:4,6,11,14,21
  33:9 35:24 36:4,7
  36:12,21 37:2,8
  40:17,20 41:7,16
  41:17 44:22 47:9
  47:13 50:15 51:21
  52:3,9,14 53:3,5,8

  53:11,15 54:19
  55:2,11 56:7,11
  56:15 85:4 112:5
  112:7 143:18
  144:10,23 147:19
  148:17,19,21
  149:3 150:17
  163:1 167:18
  168:2,20
**Kathleen** 2:10 5:8
  5:20
**Katie** 68:13 84:3
**keep** 86:14 125:19
  162:21
**kept** 45:18
**Kevin** 26:12,14,16
  26:22 42:15 49:8
  122:3 129:11
  144:14 146:5
**KH** 129:1,11
**Khesi** 1:4,17 3:2
  4:15,16,18,18 5:7
  5:12 6:5 8:12
  135:8 159:17
  164:16 167:3
  170:6,10
**kids** 29:5,6 46:20
  107:1,1
**kind** 20:7 27:7 32:1
  34:8 37:23 45:13
  49:23,24,24 52:17
  55:2 81:3 96:3
  100:2
**King** 52:24 168:14
**King's** 52:22
**knew** 29:9 31:20
  43:18,21 52:8,10
  52:20 80:18
  107:22 129:23
  154:20 155:5
  160:5,8
**know** 9:20,20,22
  10:2 12:9 13:7,20
  14:5 17:3 19:11
  20:21 21:12,22
  22:11,13,14 23:12
  23:16 25:1 26:10
  26:13,16,19 28:6
  29:9,12 30:2,7,8

30:16 32:3,14
35:1,2,6,14 38:22
40:4 41:4,21 43:7
43:14,16,17,19,20
43:22 44:13 46:3
48:12,14,16,22
49:11,13 50:11
51:2,22 52:9,23
54:24 55:4,5 57:9
57:13,17,24 60:13
60:21,23,23 61:14
61:23 62:9 64:22
66:11 68:16 73:7
75:6,23 76:3
77:12,17 78:16,24
79:5 80:3,6,13,14
80:18,20,24 81:17
82:6,13,18 83:21
84:10,22 85:19
86:7,19 87:16,18
87:19,21,23 88:1
88:7,9,16,17 89:2
89:7,11,14,16
90:2 93:4,12
94:12 96:5,17
97:8 99:6,11
100:4 101:19
102:3,19 103:22
103:23 104:1,7,8
106:9,10,22,24
107:4,4,5,8 109:3
109:9 110:20
114:6,13 116:13
116:22 117:4,9,10
117:15,23 118:19
118:24 119:5,7,13
119:15,17 120:7,9
124:18,19,21,23
125:10,12 127:16
127:23,24 128:2
128:17 130:7,9,12
132:7,9 137:19
138:1 140:23
141:7,14,19 142:4
143:14,19 145:2
146:7,13 147:8
148:18 149:4,10
150:11,14,16,17
151:19 152:1,12

154:21,23,24
155:3 156:12,17
156:18 157:9,14
157:19,21,23
158:10 159:5,19
160:1,4,5,15
162:24 163:15
166:12 168:22
**knowing** 52:6
**knowingly** 133:24
134:3
**knowledge** 46:9
47:2 55:13 61:3
66:24 68:24 69:12
74:14 79:3,23
80:21 85:7 92:12
100:23 101:1,2,3
101:10 103:7,9,12
124:11,14 134:10
146:5 150:18
161:20,24
**known** 132:15
**knows** 112:14,15
**Kohlhaas** 1:20 4:2
170:4
**KP** 129:1,6

**L**
**L'Tanya** 147:10
**laid** 25:4 49:14
56:1 74:9 77:13
79:24 80:5,19
98:15,20,22 99:9
100:5 101:14,20
104:16,20,24
105:8,8,15 116:2
116:7 120:2,5
121:19,20 122:1
125:14,18 127:8
128:5 135:13
136:24 138:2
151:16,20,22,23
157:16 163:5
**Lane** 9:2
**language** 133:19
**large** 143:23,23
**LaSalle** 4:5
**law** 134:9
**lawsuits** 10:14

**lawyer** 10:20
**lay** 97:4 140:14
157:20 161:22
**laying** 124:24
**layoff** 77:9 78:11
93:7 96:13 99:8
99:11,18 100:1
104:17 107:11,13
107:16 113:11
117:14 146:23
**layoffs** 87:4 100:15
102:8 125:7,8
127:4,19
**layout** 145:2
**leaning** 34:8
**learned** 104:19
**leave** 28:1 55:6
105:4,6
**left** 25:11 30:16
45:24 90:1 94:1
103:5 143:21
145:11,14
**legal** 11:5
**length** 169:13
**Leslie** 149:11
**let's** 62:18 65:18
72:1 102:7 110:7
150:9 152:23
**letter** 135:8
**letterhead** 42:13,14
42:17 45:11,13
46:10,11,14 154:1
**letting** 99:10
**level** 129:23
**levels** 64:11 133:4
**Lindsey** 34:13,14
41:8,11,14
**list** 24:11 25:19
26:2 68:1,3 76:9
77:12,14 78:9
79:10 112:24
123:13,17 126:3
128:22 151:16
152:2
**literally** 83:13
106:14
**literature** 151:4
**little** 27:17 45:5
50:24 56:5 62:19

67:24 90:13 91:9
93:6,18 94:1 98:4
99:24 111:18
123:5 129:22
131:17 136:4
138:7,13 141:10
145:11 146:4
152:13,17 154:16
157:4,9,13 161:16
**lives** 9:4
**living** 49:22
**LLC** 14:12
**local** 4:9
**located** 1:24 165:2
170:12
**location** 4:10 83:6
83:10
**locations** 24:3
**long** 9:12,22 10:2
18:18 20:21,22
41:12 121:3
161:10,12 163:5
**longer** 130:15
**look** 16:21 62:18
72:1,2 76:7 81:20
111:21 116:9,11
116:21 119:3
122:11 130:20
132:17 135:6
137:4 140:19
141:16 147:3
**looked** 23:4,7 158:9
**looking** 45:20
120:24 141:13,15
155:10,21,24
156:3,14 161:17
**looks** 108:17,19
120:21 128:20
130:21 131:17
132:1 135:2 136:5
136:17,20 138:8
138:11
**Lord** 14:17,18
**lost** 72:16 151:5,7
**lot** 14:2 27:17,18
95:24 97:1 99:15
106:23 107:4,8
117:16 151:23
**loud** 6:24 12:21,21

**love** 12:24
**loving** 14:9
**lunch** 27:22 109:5
**Lurry** 54:8

**M**
**mail** 117:14,16,22
135:16
**main** 145:13
**maintained** 24:3,6
**maintenance** 24:16
**making** 162:5
**maliciously** 100:2
**Malik** 149:19,20,21
149:22
**man** 42:1
**Manager** 135:19
**manages** 161:2
**manner** 171:10
**Map** 128:13
**March** 14:13
**mark** 110:18
**marked** 108:12
130:20 135:7
**matter** 4:18 123:18
**matters** 171:3
**Maywood** 8:21
29:14 52:13,13,15
52:17,23 150:22
167:16,20,23
168:16
**mean** 11:15 12:18
14:2 16:1 30:22
40:23 41:4 45:7
52:2,3,23 55:24
57:2,5 60:4,14
61:12 63:6,10
64:1,10,14,16,24
73:16 77:14 81:16
81:24 82:15 83:20
85:14,14 90:4
97:12 104:7,11
107:22,24 115:4
125:2,5 142:18
144:8,19 147:17
150:24 151:14
152:4 154:2,19
155:23 157:1
161:4

meaning 44:11
61:10 85:22
124:15 161:24
meaningful 79:12
means 4:7 29:2
37:20 85:16 136:7
142:4
meant 119:21
medication 8:7
108:1
meet 57:19,21
meeting 95:14,16
96:10,15,20 97:7
98:24 100:12
123:15 124:21
127:17
meetings 124:19,24
125:3,11,16 126:6
member 23:18
members 23:1,13
23:14 26:17 150:9
memo 130:22 131:5
memory 8:8 59:22
mentality 107:6
mention 100:18
messages 18:2
met 72:15
mid 123:17
middle 71:19
mind 98:2,9 100:3
107:7 143:14
mine 165:3
minimal 133:5
minimize 162:19
minute 109:12
164:5
minutes 68:17
84:13 109:6 110:6
110:7 162:8
169:14
Mirkovic 35:3,5,6
35:9,11 36:3,24
37:5 38:2 39:17
76:2,3 77:24
78:17,24 79:18,24
80:15,21 95:16,18
97:5 118:12
130:23 131:18,21
133:12 134:22

138:24 156:23
157:15,19,23
158:3,17 159:1,15
159:16,19,24
160:5,7,13 164:20
165:8,11,15,18,23
168:8,20
Mirkovic's 165:1
missed 97:19
Mm-hmm 12:15
42:20 58:19 67:7
73:19
moment 74:24 75:4
83:22,22
momentarily 46:19
Monday 104:21
money 61:11 85:14
86:11,12,13,13
92:17,19 106:18
106:22 119:10
150:15
month 60:2,14,16
156:18 165:24
months 29:6
105:17 155:9,17
156:18
Moore 19:3,21
20:15,19,22 21:13
26:23 27:2,11,13
27:20 28:4,7,16
29:7,10,21 30:2,7
30:16 32:15,22
33:1,17,22 34:15
34:22 35:12,21
36:10,17 37:13
38:4,9,13,17,20
43:5,11,21 44:3,7
44:12 49:2 51:20
52:11,14 53:3,6
53:12 54:11,16
55:10 65:20 82:14
84:20 86:21 94:1
94:11 98:23
100:20 102:23
103:5 112:16
143:21 146:6,9,12
146:19 147:5,18
147:22,24 148:8
148:22,24 150:10

150:12,19 151:11
158:18,22 159:2
159:18 160:9
163:11 167:24
168:21
Moore's 40:7,11
Moore's 29:17 39:3
39:6,11,15,19,23
43:15,18 52:16
84:23 101:16
112:6,8,12
morning 123:12,16
Moss 42:17,19
43:10,18 47:4
mother 15:7 107:5
motivated 102:8
mouth 60:12 95:1
move 68:13,18 81:4
83:10 86:11,14
130:18 141:24
142:2,5,9,11
moved 83:12,13
130:5 144:2,21
145:12
moving 142:16
146:14
multiple 83:14
mute 84:5
muted 111:5

N

N 2:3,21
name 4:1,14 5:19
5:20 6:3,5 11:3
40:14 41:19,24,24
42:8,21 45:11,12
52:4 108:3 117:5
129:17 131:20
153:10
names 8:12 26:10
26:13 37:4 104:3
114:5,15 147:6
nap 46:19
native 159:20
nearby 14:22
necessarily 15:24
16:1 30:21,22,24
60:24 107:21
155:2

need 11:19 16:12
60:21 61:2,4 62:5
62:15 67:10,24
68:14 99:23 110:4
122:7 145:23
163:21
needed 161:22
needs 45:21 53:23
54:3
never 14:17 34:24
46:10 48:5 56:14
96:4 98:2 112:7
131:14 136:9
154:18,20 158:16
158:20
new 68:18 69:12
88:5,23 90:24
95:3
newly 87:7 100:16
newspaper 104:11
104:12
nice 99:22
Nicole 147:13,16
147:23
nights 106:21
nine 150:11,11
151:9,12
nonessential 76:13
78:13
nonstenographic
4:7
nonunion 150:9
Nordstrom 18:17
North 4:4 28:15
Northbound 14:12
Northern 1:1 4:21
Notary 1:20 170:4
171:22
notepad 11:15
notes 11:24 12:18
15:22 17:7,9
notice 1:18 5:21,23
80:11 99:7,21,24
100:5 116:1,6
noticed 155:10
notified 56:20
58:17,21 59:5
62:14 95:11,12,20
95:23 98:18

104:23 105:7
November 95:11
95:21,23 97:7
99:1 104:20
105:18
number 8:17 11:7
11:17,18 12:7,11
79:21 110:23,24
111:14,24 116:9
116:17 118:22
119:3

O

O 170:3,3
Oak 8:21
oath 17:3
object 11:21 32:16
71:3,12 160:3
objection 16:13
43:23
objections 6:1
observe 165:12
occurred 55:17
October 14:15
77:22 78:17 79:1
87:5 88:2 89:8
91:12 92:2 93:2
95:5 105:20
161:11,14 171:17
odd 52:24
offered 92:19
office 1:8 4:19 9:11
21:7 28:13 31:18
31:18 45:10,24
51:18,20,22,24
52:1 55:8,15
56:20,21 57:7,20
58:1,5,6,16,17,20
59:5,6 60:19 61:7
61:14,15,16,19,23
62:2,6,14,15,21
63:24 64:4 65:4
65:10 66:16,19
67:4,4,9,9,13 68:1
72:15 76:10 77:7
77:16 81:7 82:1
86:3,3,4,6,9,10
87:6 88:3,14 90:5
90:15,16,22 91:7

91:17,18,20,22
92:16,20,23 93:21
93:23,24 94:3,6
95:19 97:3 100:16
102:11 106:19
123:15 125:7
130:5 142:7,8
145:14,17,21
146:4 150:13
165:1,4 167:5,13
168:3 171:16
**officer** 4:3
**offices** 143:20,22
144:7,24
**official** 151:1
**officials** 15:1
**oh** 12:6 22:3 33:4,6
33:10 65:6 66:11
69:20,24 72:5,24
78:21 80:12 84:18
100:4,6 119:6,21
122:2 123:11
141:6,13 142:21
155:1 156:9
**OIG** 73:10,12,17
73:21,23 76:19,20
76:22 77:3 79:6,8
97:13 115:6
**OIIG** 78:22 98:12
98:14 102:12
103:11 113:5
115:1 137:4,6,20
139:2,7
**okay** 6:3,7,9,13,22
7:2,5,6,10,13,18
7:22,23 8:11,14
9:1,6,8,12,14,18
10:4,10,13,22
11:9 12:6,16,20
13:16,24 14:8,21
14:24 15:9,12,15
15:20 16:16,20,23
17:11 18:14,18,23
19:5,8,13,16,20
20:4,9,14,18,24
21:3,15,18,22
22:10,14,17 23:1
23:4,11,22 24:24
25:4,6,12,15,22

26:7,10,22 27:1,4
27:13,16,18,19,22
28:1,10,13,16,21
28:24 29:12,15
30:9,13,16 31:3
31:10,17,22 32:3
32:6,10,14 33:6,9
33:14,15,19,21,24
34:3,10,12,14,20
34:24 35:5,11,14
35:20,23 36:9,14
36:23 37:14 38:1
38:6,7,11,16 39:1
39:17 40:13,16,19
40:23 41:10,14,21
42:1,3,7,21,24
43:9,14,17,20
44:9,14,23 45:23
46:3,9,13,17 47:7
47:16,19 48:2,11
48:16 49:4,13,20
50:8,15,19,23
51:4,5,9,14,16
52:5 53:2,20 54:8
54:14,21 56:4,18
57:1,13,16,19,21
57:24 58:3,8,12
58:14,20 59:2,3,7
59:9,12 60:1,11
60:18,21 61:1,6
61:19,23 62:4,9
62:13 63:12 64:8
64:19,21 65:13,15
66:12 67:2,8,12
67:16 68:4,12,21
69:6,14,20,24,24
69:24 70:11,12,20
71:10 72:5,8,10
72:19,24 73:1,23
74:2,21 75:1,13
75:21,24 76:3,7
76:17 77:2,22
78:2,7,16,22 79:9
80:14 81:14 82:2
82:6,9,13 84:12
84:17,22 85:3,9,9
86:16,23 87:3,12
87:19 88:20,23
89:11,14,16 90:10

90:17,23 91:8,15
92:1,5,8 93:4,8,9
93:17 94:10,13,24
95:10,20 96:9
98:2,14,17,24
99:3 100:11
101:13 102:1,7,19
102:22 103:1,14
103:15 104:16,19
104:22 105:4,11
105:14,21 106:7
107:17 108:11
109:3,21 110:3,8
111:8,12,23,24
112:4,20,23
113:21,23 114:2,6
114:9,15,16 115:7
115:10,14,24
116:14,15,17,23
116:24 117:4,6,10
117:13 118:6,16
118:21,24 119:4
119:13,17 120:7
120:10 121:9,18
121:22 122:3,11
123:4,10 124:4,10
124:18 125:12,22
126:6,15,21 127:1
127:7 128:2,8,8,9
128:17,20 129:11
129:19,24 130:1,7
130:16 131:2,5,9
131:13,16,23
132:6,9,17 133:8
133:18 135:1,5,11
135:18,22,24
136:4,8,11,17,20
136:23 137:3,11
137:13,16,18,24
138:7,11,16,20
139:2,16,19 140:4
140:7,18 141:6,10
142:14,23 143:1,3
144:12 145:1,3
146:5,14,17,21
147:3,6,12,16,21
147:23 148:2,5,20
149:1,5,8,11,19
150:1,7,14,17

151:5,7,15 152:7
152:12,15,18,19
152:23 153:9,14
153:17,23 154:6,9
154:13,16 155:5,8
155:19,21 156:12
156:17,20 157:4,6
157:11,12 158:16
159:9 160:16,23
161:12,15,20
162:8 163:4 164:3
164:16,18,21
166:8 168:24
169:10
**old** 9:6 120:21
**once** 6:16 16:5 90:8
**one's** 46:22
**ones** 17:8 90:3
**online** 18:2
**open** 109:24 110:2
167:12
**operational** 79:13
133:5
**operations** 66:10
66:21 67:20 68:9
**operator** 4:3
**opinion** 45:14,19
47:3 64:16 70:8
100:9 119:10
**opportunities**
168:4
**opportunity** 165:12
**order** 6:15 46:8
75:8 81:3 123:14
**order/employment**
134:11
**organization** 153:3
**Ori** 2:10 3:3 5:8,8
5:17,20 11:24
12:13 13:17,23
16:15 32:19 44:1
68:16,21,22 70:19
71:6,15,21 75:5
75:19 83:4,8,12
83:18,24 84:7,12
84:16 97:22 98:5
98:6 108:21 109:3
109:8,12 110:1,3
110:7,16 111:2

114:21,23 121:4,9
121:10 122:17,19
139:6 159:23
160:6 162:18
164:3,6 169:1
**originally** 93:20
**outcome** 171:11
**outreaches** 88:13
**outside** 21:8 142:7
**overall** 64:12,14
86:9
**overlap** 41:9
**overlapped** 90:6
**oversaw** 164:23

**P**

**P** 2:3,3
**P-I-L-L-O-W-S** 6:6
**p.m** 110:11,15
162:13,17 164:9
164:13 169:13
170:15
**page** 3:1 122:14
130:21 131:10,17
133:18,19 135:2,3
137:8 139:23
147:20 150:7
157:9,14
**pages** 137:9
**paid** 90:20 91:3,6
91:13,14,17 92:13
93:15 94:9,18,20
99:14 136:12
166:16,19
**paper** 154:3 158:4
158:8
**papers** 48:18
**paragraph** 51:17
55:7 56:18,23
58:3,13 61:1,1
62:18 63:4 65:1
67:2,3,16 68:6,17
68:19 69:15,23
72:2,11,19 76:7
77:6,8,22 78:7
79:9 81:1,2,6
84:18 85:11 87:3
88:2 90:23 95:10
98:18 100:14,24

101:13 102:7
139:9 152:15
155:14,16,16
**paragraphs** 51:15
98:8,11
**parentheses** 72:20
72:22
**parents** 29:3,7,9
**Park** 8:21
**part** 20:16 22:15,16
22:17,20,23 26:7
59:18 61:16,17
67:23 74:3,7,11
83:10 87:9 92:8
97:20 106:3 116:3
120:8 144:22,23
162:5
**participating** 134:4
**parties** 5:3 171:4,7
171:9
**party** 21:12,13,15
32:3 163:1
**Pascente** 149:13
**pass** 21:8
**passed** 19:7
**patience** 123:18
**patient** 12:23
**Patrick** 139:22
**Paul** 26:12,14,16
26:22 49:8 122:4
129:13 144:14
146:8
**pause** 11:19 12:10
**pay** 91:7,21,24 92:9
92:13 105:23,23
106:3 107:9
**paying** 90:16 91:23
**Pegues-Harrison**
147:10
**penalty** 134:9
**people** 21:8 26:7
28:1 30:10,14
31:18 42:14 43:4
44:11 45:5 61:8
61:10 62:7,7 68:3
96:6 100:7 104:1
132:12 144:17
150:11 151:24,24
152:3 153:2 161:9

161:23
**people's** 104:2
151:3
**perceived** 41:17
**percent** 10:9 20:6
22:10 27:8 41:12
46:2,16 48:17
49:22 57:11 60:17
63:11 89:9,19
95:17 106:20
112:22 117:24
118:5,14 122:10
138:6 147:11
148:4,11,12
149:14 154:15
157:21
**perfect** 62:19
111:20 157:7
**performance** 50:8
50:13
**performed** 95:4,7
**perjury** 134:9
**Perkins** 149:11
**permanent** 77:10
105:20
**permitted** 105:6,9
**person** 37:24 51:23
79:19 95:8 96:10
96:12,14,19 99:22
99:22 103:18
117:6 120:4
**personal** 79:23
85:7 101:10
**personally** 104:14
**personnel** 142:1,9
144:13
**pertaining** 1:19
**phone** 14:22 15:3
16:3,21 18:9 24:9
84:5,6
**pick** 21:7 86:10
**piece** 154:3
**Pillows** 1:4,17 3:2
4:9,18,18 5:6,7,18
6:5,6,7 8:11 12:5
32:17 70:20 77:11
78:4 81:11 88:6
95:11 108:12,14
110:17 111:3,4,19

114:21 120:16,17
121:6 122:21
130:21 135:7,8
136:1 137:5 138:9
139:13 140:20
146:23 147:1
152:10 155:17
156:21,22 157:9
159:17 170:6,10
**Pinehurst** 9:2
**place** 124:12 126:7
**placed** 79:10
**places** 8:20 61:21
151:2 168:5
**plaintiff** 2:24 5:6
108:12 111:3
**Plaintiff's** 108:22
113:10
**plaintiffs** 1:5 51:17
51:19 55:9 79:10
87:4 101:13 102:8
109:1
**plan** 78:11
**plans** 77:9
**play** 74:19 75:4,8
75:13
**played** 75:16
**please** 4:10 5:3,12
6:3 14:6 74:24
111:20 114:11,14
116:9,11,12,21,22
**plugging** 84:1
**point** 141:18
167:22
**political** 21:13,15
32:3,11 44:6
48:23 52:10,15
56:8,12,16 65:11
66:5 76:11 84:23
101:15,16 102:16
102:20 111:16
115:2 134:2,10
139:11 153:3
160:14 163:1
**politically** 37:1,8
37:12,20,24 38:3
38:9,17,19,23
39:18,22 40:6,10
43:4 44:12 51:19

54:15 55:9 94:10
102:8 146:6,8,11
146:18 147:4,18
147:23 148:7,23
158:21 160:8
167:19,23 168:21
**politics** 53:24
**polling** 151:2
**position** 10:1,7,11
19:8,13,16,24
20:2,18 21:18,20
21:23 22:9 30:4
54:22 66:3 77:11
78:4 81:10,11
87:7 94:5 95:12
95:13 98:19
105:20 115:3
117:1 120:7 127:3
132:10,18,20
133:9 136:13
161:10 164:23
167:5,9,12
**position's** 132:24
**positions** 66:8,20
67:1,19 69:1
72:16 76:9,13
77:8,11,12 78:3
85:20 89:17 114:6
118:6,24 123:13
124:1,7,12 125:1
126:3,8,12 127:8
128:5 132:2
155:11 157:16,20
157:24
**possible** 81:5
152:13
**possibly** 38:5 89:13
132:11 140:22
146:20 152:11
157:1
**post** 9:11 17:16
18:2 106:19
**potential** 56:21
59:6 67:5 127:3
**potentially** 123:14
126:3
**power** 109:16,18
**powerful** 14:9
**powering** 109:20

109:22 110:2
**pray** 15:8,13
**prejudicing** 133:24
**preparation** 17:7,9
**prepare** 10:18
**prescribed** 134:5
**presence** 170:20
**present** 5:3 171:4
**Preserve** 9:17,19
9:23
**presume** 7:15
16:12 169:5
**prevent** 8:2
**previous** 67:3 77:8
127:20 159:20
160:1,13 164:20
**previously** 38:12
47:12 90:12
**primary** 106:15,16
**print** 13:18,22
**printed** 13:20
**printing** 13:8
**prior** 18:15 42:6
51:20 60:5 68:2
72:3,12,20 73:2
79:1 86:8 91:11
91:16 93:1 95:4
96:24 113:1
117:14 122:2
132:21 162:1,2,3
168:2
**private** 107:3
**privilege** 11:23
12:4 71:4
**privileged** 71:5,13
71:20
**probably** 19:10
60:10 109:22
121:3 143:7
**problem** 46:23
83:15 107:22
**Procedure** 1:19
5:22
**process** 19:11
20:16 117:15,16
123:12 126:2
134:14
**processes** 86:17
**processing** 117:22

program 75:3
programs 24:14
prohibited 133:23
prohibitions
134:17
promised 20:18
promoted 61:10
62:7 113:12 114:3
114:4,7,11 117:14
promotion 61:13
promotions 62:1
114:19
pronounce 4:14
properly 64:6
Property 117:19
118:2
proposal 77:7
proposed 72:16
78:9 79:11 113:1
151:16
prosecution 134:20
prospective 116:18
Proverbs 14:20
provide 16:18,19
17:2 23:13 71:7
provided 15:21
16:7 24:7,12
72:15 73:3 74:15
76:4,9 78:2,13,17
78:24 96:23 116:6
134:9 141:21
provider 14:20
providing 113:2
provisions 1:18
Proximo 14:12
PS 129:1,13
Psalms 14:16
public 1:20 107:3
170:4 171:22
pull 11:2 120:15
122:6 152:8
156:21
punishment 144:5
purchased 106:15
purposes 147:9
pursuant 1:18 4:8
5:21 139:9
put 16:3 60:11 94:4
95:1 146:3

**Q**

qualified 30:4,11
66:2 167:8,12
quality 163:17
quarters 14:13
question 6:18,20
7:12,14,20 8:6,7
22:3 23:17 33:11
34:21 37:11,15,17
40:22 56:4,6
58:12 59:8 70:1
75:8,14,20,22
93:8 98:4 120:24
121:23 131:9
141:22 143:6
148:23 159:22
question's 7:8
questions 6:14 8:3
31:9 43:8 51:15
91:10 112:4
130:17 152:19,20
157:12 163:22
164:17
quick 137:13 164:4
quicker 109:21
quickly 81:4
Quintin 141:1,2
quote 102:14

**R**

R 2:3
R-A-Y-A-N 122:22
raise 5:13 49:23
50:13
raises 49:20,21
50:9
raising 103:17
ran 63:24
Ray 33:13,16
Rayan 122:22
123:6 125:23
126:22
RCA 100:19
re-ask 121:22
reach 80:6 114:12
139:22 140:1
reached 58:5,7
67:17 69:10,16
70:3,9 80:3,21

86:3
reaching 66:7 68:7
157:19 162:3
read 12:19,20,21
13:2 14:3,6 23:16
40:4 59:2 63:4
66:12 67:17 73:17
75:20 97:13
104:12 111:19,20
139:20 152:14
157:2 169:3
reading 66:12 72:8
111:21 157:10
real 24:10,11 143:6
realize 30:1
really 91:2 95:3
140:16
reason 11:6 52:20
98:21 131:6 134:3
137:1
reasons 50:2 66:5
87:4,5 111:17
112:1 134:10
recall 23:10 27:10
39:5,9 41:9 74:1
75:24 77:15
113:22 114:5,14
135:16 140:3,4
154:12
recalled 119:1
recalls 114:22
119:5,6,9
receive 5:23 40:23
41:4 44:17 50:12
73:23 76:12 99:7
135:15 137:18
156:13
received 15:20
44:19 73:8 135:12
139:16 140:8
receiving 72:3,12
72:20 73:2 115:24
recess 70:16 75:12
110:13 162:15
164:11
recognize 108:14
131:11,19
recollection 27:5
recommendation

78:2,8 79:1,20
127:3
recommendations
76:4 77:18,21
78:17 96:24
recommending
132:2
reconsider 140:11
record 4:1,11 5:4
6:4 14:6 70:13,17
72:9 75:8,9,10,15
75:17 84:3 110:10
110:14,19 121:4
162:9,12,16 164:8
164:12 171:5
recorded 4:6,17 5:2
75:6 170:19
recorder 1:7 4:19
18:15,23 19:9,14
20:22 21:19 22:18
22:21 23:5,9 25:8
26:1 30:17 31:7
31:12,16 35:1
40:17,20 41:8,18
44:20 47:10,14
49:2,5,7 50:17
51:20,21 57:6
61:17,20 62:20
64:4 66:15 67:13
68:3,6 72:4,13,14
76:1 77:23 79:14
86:22 88:13 90:21
91:7,17,20,24
92:9,14,16,20,23
93:5,11,16,21,23
93:24 94:3,5,8,8,9
94:15,20 95:2
100:18 102:17
103:5 124:7
128:12 129:5
130:14 133:21
134:1 138:12,17
138:21 159:18
161:22 162:4
163:5,10 164:22
166:10,20 167:4
167:13 168:3
recorder's 45:10
45:24 51:18,22,24

52:1 55:8,14
56:20 57:20 58:1
58:16,20 59:5
61:7 62:6,14 65:3
65:10 67:9 81:7
82:1 86:3,6,9,10
87:6 125:7
recorders 66:18,19
66:24 67:4,18
68:7,24 69:11,13
69:17 70:4,8 72:4
72:13,21 73:3
74:4,9,15 88:3
96:22 97:5 100:16
124:6,12 125:13
126:7
recording 4:3
117:14,16,22
169:13 170:19
red 100:21 103:17
reduce 77:8
reduction 72:16
78:9 79:11 113:1
refer 102:4
referencing 77:7
referring 102:2
114:22 137:7
refresh 27:5
regarding 18:6
76:12 79:12,24
80:4,22 107:12
124:1,11 126:8,12
regards 166:2
rehired 119:18
rehires 120:8
related 100:20
158:17 165:22
168:9 171:8
relating 13:4 15:23
115:2
relations 160:21
relationship 19:2
20:19 27:11 29:21
43:11 82:13,16
84:19 108:7 159:2
159:17
rely 14:17 111:15
111:15
remained 19:17

47:9,13,23 48:2,8
**remember** 12:8,10
14:18 19:13 20:4
20:10,11 26:24
27:3,12 32:9
33:18 34:16 39:1
46:13,15 49:4
50:3,16 53:19
57:22 59:12,15,20
59:24 60:6 86:22
89:20 104:4 114:8
114:9 124:9
137:22,23 138:3,6
139:16,19 140:12
140:17,24 141:9
143:2 149:9,22,24
150:5,6 151:8,21
151:22 154:6
163:4,7
**remote** 4:17
**repeat** 7:9 22:22
23:6 29:22 37:3
39:8 43:6 74:6,17
82:19 94:16 98:4
119:2 139:4
**rephrase** 32:20
**replaced** 46:5
**replacing** 90:11
**report** 73:10,12,18
73:21,24 76:19,20
76:22 77:3 78:19
78:21,22 79:6,8
88:15 97:13,17
98:12,15 103:11
113:5 115:6
118:10 137:4,6,20
138:8 139:17
140:8 156:23
161:7 171:1
**reported** 35:3
88:17 89:14
115:14 121:18,19
**REPORTER** 4:1
4:13,16 5:12
70:13,17 74:22
75:2,7,13,17 83:2
83:5,9,16,19 84:9
97:19,23 98:2
110:10,14 122:15

122:18 139:4
162:12,16 164:8
164:12 169:11
**reporting** 159:15
**reports** 64:18
**request** 123:15
127:4
**requested** 72:3,12
72:20 73:2 77:9
79:13
**require** 64:24
65:10 86:5 158:1
**requires** 64:23 65:9
**reserve** 169:6,9
**reserved** 169:11
171:13
**resort** 83:24 84:2
**resources** 87:8,22
100:17 102:9
**respect** 133:20
134:12 139:12
**respond** 24:6
**responses** 13:13
108:13,22 109:1
111:3
**responsibilities**
132:21 166:11
**responsibility**
158:1
**rest** 45:9,10
**result** 134:17
**retaliation** 102:14
**retire** 30:20 31:3
**retired** 30:18,23
**retirement** 106:9
**retro** 50:6
**review** 11:1 51:9
108:16 132:21
171:13
**reviewed** 10:20
17:8 23:7 138:8
**rid** 42:11,15 44:21
45:5 47:1
**right** 5:13 8:22
10:6 11:9,11,12
12:1 13:2 14:19
16:14 17:3,4 20:8
20:11 22:4 34:12
34:17 41:1 45:18

45:19 48:11 58:22
62:23 63:18,21
64:17 65:3 71:15
75:5 79:8 83:14
85:10 91:19,22
92:3 93:1 102:2
104:21 108:8,23
109:5,13,18 110:4
110:4,8,17 117:24
118:18 120:2
134:22 135:2
138:9 140:6
141:22 143:24
145:12 154:12
156:2 157:18
159:7 161:18
166:21 171:13
**rights** 23:13
**Robinson** 148:10
149:15
**ROD** 102:15
155:10,22,24
**ROD00000658**
130:20
**ROD00000660**
128:11
**ROD000011**
122:12
**role** 21:4,5 22:11
22:14 23:22 24:24
25:6 54:24 87:14
117:4
**roles** 132:21
**room** 61:12 84:11
124:16 142:1,6,10
142:20,22,23
143:23,24 144:2,3
145:11 165:7
**rooms** 11:10
142:12
**roughly** 70:21
**Ruiz** 26:15 89:6,16
89:22 90:2,18
91:3 92:13,22
94:10 95:7 113:19
122:4 129:8
144:14 146:11
166:6,9
**Ruiz's** 94:13,17

**Rule** 4:8
**rules** 1:19 4:9 5:22
**running** 31:15
110:23
**rush** 137:14

**S**

**S** 2:3
**sad** 96:1
**sadly** 50:19
**salaries** 49:11
**salary** 48:5 49:4,13
49:16 82:7,8
87:16 130:7
166:16,19
**Sam** 1:20 4:2 11:18
74:19 170:4
**Sam's** 12:11
**sanctions** 134:18
**Sandra** 141:1,2
**Sartorio** 149:23
**sat** 91:19 145:15,17
**satellite** 24:2
**satisfied** 54:5
**saw** 28:8 44:10,21
77:14 91:19
**saying** 38:19,21
58:8 59:4 61:9
64:20 67:24 69:15
70:2,5,6 73:17
80:11 83:16 90:18
91:2,5,11 97:11
99:19 103:19
108:8 114:21
125:8 126:2
142:13 144:20
156:7
**says** 64:7 65:1 66:4
66:23 85:12 113:9
123:11,11 128:22
129:1 133:14
134:8 136:11
138:20 139:8
141:24 142:9
155:24 156:17
158:4,8
**school** 18:20 106:7
107:2,3,3
**screaming** 46:18

**screen** 50:22 51:7
108:24 120:11
**scroll** 62:19 98:9
108:18 111:18
123:4 126:15
131:10 136:4
138:7,12 141:10
141:14 152:13
154:16 157:4,7,13
**seal** 171:16
**second** 14:14 57:17
59:2 68:15 114:17
117:20 123:11
133:19 151:8
162:22 163:20
169:8
**seconds** 169:14
**section** 132:23
133:4
**sections** 133:2
139:9
**security** 8:17 52:4
54:23 55:1
**see** 6:23 11:10,12
27:13,16 28:1,21
29:24 44:14,15
48:18 51:6 52:17
56:22 58:17 66:21
67:20 72:6,17,21
76:15 78:4,14
79:14 81:12 82:23
84:7,14 89:12
100:21 101:17
102:17 107:12,15
108:18 110:18
111:5 113:2 122:7
122:23 123:1,19
126:4,23 127:5,14
128:13,23 129:2
130:24 131:18,20
132:4 133:6 134:6
134:14,20,23
135:3,18 136:14
138:22 139:14
141:11,24 142:2
144:21 145:8,16
146:24 147:10
150:24 151:3
153:5 155:12

156:22 157:2
**seek** 22:20
**seeking** 105:22
**seen** 87:20 120:18
120:22 122:20
123:7 128:15
131:2,14 135:9
136:1,9 140:20
152:9
**selected** 29:4,7
95:22
**self** 14:10
**send** 13:19 123:17
**senior** 117:1,7,11
130:12,13
**sense** 7:12
**sent** 10:21 13:21
47:4 65:23 104:14
120:22 126:21
**sentence** 66:23
113:9 123:11
**separate** 11:10
61:20,21
**September** 1:22
4:23 10:8 14:15
56:19 57:4 58:9
58:16 59:4 60:1,2
60:3,5,12,15
62:20,24 66:14
72:2,11 77:6,10
86:2,4 91:11
123:1,5,22,23
125:22 126:1,16
126:18,19 130:22
162:4 170:14
**servers** 24:23 142:2
142:10
**service** 142:1,10
**services** 45:15
**set** 128:8 145:19
171:16
**setup** 83:7
**Shak** 64:17
**shaking** 7:3
**Shakman** 21:20,22
22:7,12 62:22
63:6,8,13,20,22
64:7,8,18,22 65:2
65:8 66:1,6,17

67:22 68:10 78:12
96:9,12,14,19,23
100:18,21 133:22
**Shakman's** 95:19
**Shani** 88:3,7,7,8,9
88:9,21 113:17
115:2,11
**share** 30:19 50:22
**shares** 102:16
**she's** 57:18 107:19
**sheet** 57:15
**shift** 45:2 57:16
**shifted** 45:14
**shocked** 96:2
**short** 60:8
**shortened** 60:10
**Shortly** 102:7
**shouldn't** 70:6
**show** 12:23 14:19
39:14 161:8
**sick** 31:2 99:14,15
99:18 104:22
105:2,4,6,11
115:17,21
**side** 145:20,22
146:3
**signature** 131:11
131:19 136:5,8,9
136:10,18 169:5,7
169:11
**signed** 111:9
134:22 135:2
136:18,20 139:24
**Silic** 26:14 122:4
129:13 144:14
146:8
**similar** 87:13,14
**similarly** 116:19
**single** 91:19
**sister** 15:7
**sit** 48:11 91:22
109:10 118:18
157:14,18
**Sitting** 93:1
**situated** 116:19
**situation** 84:4
**six** 29:5 105:17
**skill** 158:2
**skip** 81:3

**slashed** 106:21
**Slaughter** 2:11
5:10,10 50:22
147:7 148:13
**sleeping** 107:16,22
**sleepless** 106:21
**slipped** 98:3
**small** 52:13 142:23
144:3 145:11
150:23 165:7
**social** 8:17
**software** 24:3,16
24:19
**solely** 45:10
**solutions** 84:10
**someone's** 86:14
103:20 163:13
**sons** 9:5,6
**sorry** 9:15 19:6
22:5,5 33:5 34:9
34:11 40:1 54:8
61:16 65:6,17
66:11,12,13 69:14
69:21 74:22 75:2
76:21 78:21 81:2
82:17 93:9 97:1
120:12 127:2
129:17 139:4
141:13 147:17
151:6,21 153:15
163:13,20 168:7
**sort** 8:7 41:2 64:5
**Soto** 87:6,10,14
100:17 101:4
102:10,13 103:4,8
103:12,16 113:14
**Soto's** 87:16 102:19
**sound** 46:22 163:17
**sounds** 34:6 55:1
110:9 111:1
162:11
**south** 141:16,17
145:4
**speak** 19:5 70:22
140:13
**speaking** 64:3
**special** 43:11 88:4
115:3 163:9
**specific** 60:6 100:7

104:3 120:19
125:10 161:8
**specifically** 101:6
125:10
**specify** 116:10
**speculate** 20:13
**speculation** 32:17
43:24 160:4
**spell** 6:4
**spend** 14:13 161:7
**spirit** 14:8
**spoke** 10:20 108:2
133:12 158:6
**spot** 142:7
**spreadsheets** 24:10
**squinting** 147:7
**SRO** 139:9
**SS** 170:2
**staff** 24:2 42:12,16
42:16 43:3 44:10
47:1 48:21 52:7,8
55:14 64:3 153:2
**staffing** 133:4
**stage** 144:1
**stamp** 123:16 139:8
152:8
**stamped** 120:16
128:10 140:19
**stand** 21:8 74:22
**standard** 120:18
**start** 66:13 93:13
110:24 152:23
153:16
**started** 18:19 25:1
25:10 33:11 46:16
49:5,7,18 93:4,12
94:19 106:6,19
**state** 1:21,23 4:9,10
6:3 62:23 107:7
112:5,23 136:24
155:8 170:1,5,11
**STATE'S** 2:6
**stated** 44:10 87:4
155:17 159:19
**statement** 12:7
152:21 159:10,12
**statements** 18:5
**states** 1:1 4:20 9:11
51:17 127:1

132:20 152:24
157:23
**stay** 25:7
**stayed** 50:11 83:13
92:5 94:22
**stick** 57:10
**stickers** 14:2
**sticky** 12:18
**stomach** 163:15
**stop** 45:8 62:23
65:14 88:6
**stopped** 50:1,1,2,3
**straight** 145:22
**Street** 2:7,18 4:5
**streets** 52:18
**stressful** 47:21
106:24
**strictly** 133:23
**Strong** 33:20,21
**Strowhorn** 149:21
**stuff** 11:22 16:3,3,6
45:4,6 81:21
106:23 144:1
151:23
**subject** 134:19
**submit** 140:10
**submitted** 78:8
**substantive** 15:15
15:17
**sudden** 83:1
**Suite** 2:8,19 4:5
**summer** 9:24 10:5
18:19,20
**super** 72:5
**supervise** 122:8
**supervisor** 33:7,12
33:19 34:10,12,18
41:6,7 80:4,7,8
115:15 117:15,17
117:23 118:10
121:21,24 122:3
133:15 140:14
143:9,13,15
**supervisors** 70:9
**supplement** 114:14
**supplier** 14:11,12
161:1,3,4
**suppliers** 161:5
**support** 24:8,14

55:22 56:10 63:1
63:23 64:18 73:1
73:11,15 76:23
77:4 79:16 81:14
81:22 85:3 111:14
111:17 115:7
133:6
**supported** 24:1
**supposed** 71:16
79:19
**sure** 6:8 10:9 12:2,3
16:21 19:6 20:6
20:23 22:10 23:24
27:8 29:23 34:6
41:13 46:2,16
52:12 56:5 57:9
57:11 60:17 63:11
65:7,18 68:20
89:10 91:2,10
96:5 97:18 98:5
110:8 113:13
118:1,5,14 122:10
143:4,19 147:11
147:19 148:4
149:14 151:10
161:5 162:9 164:6
**surprised** 95:21
**swept** 5:18
**sworn** 5:15 170:7
**system** 23:23 25:1,6
25:12 29:20 33:8
33:12 48:2 50:12
65:20 77:11 78:4
81:10,11 82:2
119:14 121:15
130:4 132:2,13,17
167:9
**systems** 19:15,17
22:12,15 24:13,17
24:19 25:10

_____

**T**
**take** 6:16 7:18,20
15:21 17:7,9 59:3
70:11 86:13 103:2
104:22 105:6
109:6,12,13,17
110:5,7 162:8
**taken** 1:17 5:1 7:1

70:16 75:12
106:11 107:6
110:13 116:11
134:12 146:3
162:15 164:11
170:10
**talk** 15:5 18:12
23:15 28:24 41:15
53:24 71:1,10
80:15 107:18,20
107:21 115:24
125:6 165:18
167:3
**talked** 13:7 43:3
48:20 67:2 104:13
113:4,14,17,23
115:17 116:1
121:14 129:19
133:8 137:5
153:24
**talking** 6:17 15:4
27:10 55:10 65:7
80:12 84:15,17,18
98:8 103:23 108:5
108:9 127:21
144:17 148:21
**talkings** 96:3
**talks** 31:13,14
**Tanya** 123:6
126:23 127:13,18
128:4
**targeting** 153:2
**task** 128:22
**tasks** 128:22
**Tasks/Skills** 128:13
**team** 128:23 129:5
129:9
**technical** 24:8
45:15 74:23 75:3
**technology** 47:5
83:21 90:14,15,19
90:21 91:4,6,13
91:14,18,23 92:10
92:14 93:11,14,15
94:19 162:2
166:20 167:1
**telephone** 25:24
**tell** 8:20 15:9 21:24
23:22 26:22 27:1

30:24 32:21,24
33:16,21 34:14,20
34:21 35:5,11,20
35:23 36:3,6,10
36:11,17,20 37:1
37:4,7,10 38:1,8
38:12 39:17,21
40:1,5,9 44:2,5
53:5,8,11 54:11
54:14,15,18 59:22
59:23 71:22 93:19
96:12,14 100:10
101:4,6,8 111:21
140:13 144:4
147:4 159:4,5
161:21 168:19
**telling** 39:10 97:15
**temporarily** 105:16
**temporary** 9:24
10:6,11 105:19
**term** 61:15 63:5
134:1
**terminated** 47:2
111:16 112:24
154:7
**termination** 134:19
**terms** 130:13
**test** 75:5
**testified** 47:12
96:21 97:2 165:6
167:15 168:7,8
**testify** 71:8 170:8
**testimony** 15:10
71:23 164:20
170:18 171:2
**testing** 37:5
**thank** 4:13 14:21
27:18 32:20 33:10
84:8 101:19 110:9
113:9 122:18
123:18 147:6
154:17 164:7
**Thanks** 157:8
**that's** 12:20 19:16
31:9 32:1 33:6,10
43:23 45:19,21
46:21,21 47:21
55:20 58:21 62:6
69:9,9 71:4 72:6

73:11 99:4 107:17
108:8 115:7 119:6
119:11 125:8
129:16 133:14
136:10 137:13
141:14 143:6,13
143:14,19 145:3
150:1 151:7
152:24 154:2
157:7 158:2,4,8
162:22 163:16,22
**therapist** 107:12,19
107:20 108:3,10
**therapists** 107:18
**there's** 7:7 8:5 12:4
16:11 40:24 41:5
61:11,12 64:10,14
64:15,17 84:9
117:15 125:22
128:21 145:10
**they're** 52:18,19
100:5,8
**theys** 97:1
**thing** 12:16 99:8
125:20 132:11
166:15
**things** 12:8 24:22
35:2 40:4 41:20
45:2,2,5,21 56:2
64:2,15 89:24
95:24 132:12
161:8 162:23
171:3
**think** 9:15 12:4
20:7 29:19 30:1,3
30:6 40:14,15
41:23,23,24 42:8
44:11,24 56:2,4
63:12,19 80:10
88:8 91:9 98:7
99:6 100:3 101:23
107:23 109:20
114:1 116:24
117:5 118:4
130:16 143:12
148:11 150:10,10
150:20 151:9,10
152:22 153:10
157:8 166:13

168:8
**thinking** 106:7
142:13 150:22
152:16
**third** 14:14 155:16
**Thomas** 129:16,18
129:20 130:1
**thought** 30:10,14
45:16 64:13,14
96:13 119:21
147:22 151:5,7
**threatened** 153:9
153:19 154:10
**threatening** 153:4
154:5
**three** 26:11 68:17
81:8,17 85:12
86:10 145:16,16
**tied** 76:13
**Tiffany** 1:4 57:9,10
57:17 58:10 59:1
59:9 81:19,21,23
82:2 84:19 104:1
104:5,6 108:4
132:13 150:8
155:20
**Tiffany's** 120:21
**Tim** 52:4,21 54:8
54:10,15,18,21
55:11 56:7,11,15
168:11
**time** 4:24 7:19
13:11 19:17 22:9
47:11 50:10 59:3
60:8,9,17 61:8
70:14,18 74:17
75:10,18 76:1
98:19 99:13,14,15
99:18 100:15
104:22 105:2
106:18 109:4
110:11,15 113:10
115:18,21 121:3
125:21 144:13
153:11 157:17
162:13,17 164:9
164:13 169:12
**timekeeping**
103:17

**times** 27:16 84:4
165:24
**timesheet** 103:19
**Timothy** 14:10
**title** 21:5 50:11
82:4 128:11 130:4
160:18,20
**titles** 26:20 132:12
**today** 8:1 10:19
15:6 17:8 110:24
113:24 157:14,18
**today's** 4:23 169:13
**toddler** 46:18
**told** 15:7 19:24
20:2,13 27:6
38:16 39:14 42:14
56:11 59:10,12,16
67:4,9 81:21,23
90:5 96:4 97:3
99:11 101:5 105:9
106:4 112:7,17
154:18 158:17,20
159:4
**tolerant** 12:24
**Tondalaya** 129:16
129:18,20 130:1,2
144:16
**tons** 64:18
**tool** 161:2
**top** 128:23
**total** 26:9 169:13
**totally** 26:2,3 107:5
109:23 132:14
142:6
**town** 52:14 150:23
**track** 107:18
**train** 151:5,7
**trained** 89:24 90:9
**training** 24:12,12
26:3,4
**transcribed** 4:7
170:21
**transcriber** 6:16
**transcript** 163:23
169:3,4 170:24
171:14
**transfer** 24:11 26:2
**transfers** 24:10
**treated** 116:20,20

**trick** 90:13
**triggering** 143:14
**Tripp** 149:8
**trouble** 103:21
107:15
**true** 69:8 111:10
171:1
**Trust** 14:17
**trusty** 50:21
**truth** 17:4 93:20
170:8,8,9
**try** 12:8,9 41:23
84:8,12 104:22
162:22
**trying** 47:22 51:23
58:13 63:7 83:20
103:16 104:7
106:24 143:16
150:5 151:8
155:13 162:19
**TT** 129:1,15 144:15
**Tuesday** 110:22
**turn** 14:24 15:1,2
108:11 128:9
135:24 163:18
**turned** 121:8
**Tweet** 17:21
**Twitter** 17:19,22
**two** 6:16 9:5 11:7
31:9 45:17 49:24
61:10,20,21,24
62:7 100:7 109:16
113:12 114:3,4,11
117:13 132:2,14
143:22 145:16
157:20,24
**two-pager** 130:19
**type** 9:24
**types** 40:24
**typewriting** 170:21
**typical** 8:6
**typos** 169:4

**U**
**Uh-huh** 66:22
**umbrella** 92:20
94:2
**unaware** 159:1
**underneath** 134:23

**understand** 7:8
37:16 40:22,24
46:20 47:18,22
58:13 75:22 78:20
85:15 91:10 97:18
134:16 143:16
157:22
**understanding**
14:18 22:6 35:1
37:19,22 43:4
44:10 91:8 119:8
128:21
**understood** 7:15
**union** 22:15,16,17
22:20,23 23:2,13
23:14,19 26:17
96:6 99:9 100:9
116:3 130:9 152:6
155:1,3,6
**United** 1:1 4:20
9:11
**unlawful** 115:1
**unlock** 84:11
**unstable** 80:11
**unsuccessful** 63:19
**USA** 160:22
**use** 29:23 99:13,17
99:20 102:15
115:17
**user** 24:20,20
**users** 24:4,8

**V**
**VA** 139:9
**Valazquez** 42:21
43:2,17,20 44:2,5
44:9 45:8,23 46:6
47:1,6,7,16,24
48:12 153:12,18
154:10
**Valazquez's** 47:3
48:22
**Vargas** 148:15
**vast** 25:11
**verification** 111:9
**victim** 102:14
**video** 1:23 2:13,23
4:2,2,6,16 5:2
6:24 170:11

**video-conferenced**
4:17
**videographer**
74:19
**VIDEOTAPED**
1:13
**view** 142:20
**violated** 65:24
**visual** 145:9
**Viva** 160:22
**volunteer** 20:24
32:11 85:3
**volunteered** 43:14
44:6
**vote** 32:6,8 35:24
36:4,7,11,21 53:9
54:19
**vs** 1:6 4:18

**W**
**wait** 6:18,19 72:5
76:11
**waive** 169:4
**walk** 145:12,24
**walked** 145:17
**walking** 145:22
**want** 9:13 10:7
12:1,3 13:2 18:12
20:7,12,23 27:9
32:1 34:4 50:1
56:5 60:11 65:7
65:16 81:2 83:10
84:11 86:11 93:21
95:1,15,15 107:18
108:1 109:6,11,18
110:5 111:12
113:13 115:20
118:21 137:14
144:6,22 147:13
147:19 152:14,21
162:24 164:19
**wanted** 30:19 42:13
45:4,8,12,14 47:1
69:22 75:9 86:12
91:21 92:9 142:5
166:5 167:3
**wanting** 44:21
**wants** 69:21
**Washington** 2:7

**washroom** 68:14
**wasn't** 23:17 41:11
64:16 86:19 100:1
100:9 103:18
107:24 121:7
125:3 131:9
141:13
**way** 14:19 15:2
17:4 22:1 34:7
55:24,24 63:24
79:3 85:7 96:5
97:8 111:19
118:19 124:23
127:16 140:4
154:3 157:15
**we'll** 38:6 62:23
63:3 68:18 84:8
84:12 88:6 101:22
109:16,18
**we're** 6:17 11:10
15:1,2 33:14 65:7
68:4 80:14 84:17
100:4,7 109:10
120:13 123:12
140:18 147:19
160:16 169:2,6,9
**we've** 110:3 137:5
**weaker** 42:12,16,16
43:3 44:10 47:1
**website** 24:7,8
25:24 26:1
**week** 125:24
**weeks** 45:17
**weird** 8:6 45:4,7
**went** 18:23 40:14
45:17 46:7 94:1
106:7 132:12
137:12 142:22
155:4
**weren't** 25:10
119:20
**West** 2:7,18
**what's** 11:10 18:8
19:22 153:10
**WHEREOF**
171:15
**Wi-Fi** 83:6,17
**Wilhight** 35:14,21
35:24 36:24 37:6

38:2 39:21 72:14
73:8 74:4,8,16
76:5,9 77:19 97:3
122:23 123:6
125:24 126:1
128:3 130:23
**William** 42:21 43:2
43:17,20 44:2,5,9
45:8,23 46:5,24
47:3,5,7,16,23
48:12,22 153:12
153:18
**Williams** 150:2
**Wilson** 1:4 57:9,10
57:17 58:11 59:1
81:19,21 82:2
84:19 87:9 100:19
120:16 135:7
136:1 137:5
140:20 146:24
150:8 155:20
156:22
**Wilson's** 77:10
81:9
**windows** 142:22
**witness** 4:12,15 5:7
5:14 12:6 13:21
75:1 97:21 109:7
109:9,20 110:5,9
159:13,22 169:8
169:10 170:19,20
171:2,15
**witnesses** 3:1 18:6
**Wolverton** 33:13
33:16
**woman** 144:15
**won't** 7:4 106:16
155:2
**wonderful** 74:19
**wondering** 82:22
97:17
**wont** 154:14
**Woods** 141:1,2
**word** 63:9
**words** 38:18 60:11
95:1
**work** 7:4 9:10,14
9:18 12:19 14:11
18:16,18,20 25:16

25:18 27:11,14,19
28:8 29:16 35:2
38:22 45:9,10
59:17 60:18 70:7
92:17,18 106:1,9
119:5,9 160:18,21
161:1,6,9 165:15
165:22 166:3,23
**worked** 9:12,16,22
18:21 19:11 25:13
34:24 39:11,14,18
39:22 40:6,10
49:2 52:16 70:10
87:21,22 90:14,14
90:16,18,21 91:18
93:23 94:7,8
101:16 105:16
154:24 166:24
**working** 9:8 18:15
25:7 39:2,6 42:14
42:17 45:9 49:1
52:19,19 57:24
83:21 91:12,16
92:18,22 93:5,10
93:11,12,13,16
94:2,14,18 106:6
163:10
**works** 6:12 22:2
119:1
**worth** 83:19
**wouldn't** 17:5
23:15 38:23 125:2
125:4,9
**wrap** 162:22
**write** 15:22
**writeup** 41:2
**writing** 114:16
153:4
**written** 16:3 18:5
136:15 139:23
141:8,20 153:7
**wrong** 41:16,17
**wrote** 140:23

**X**

**Y**

**Yarbrough** 31:8,12
31:15 32:4,6,12
32:14,21 36:1,4,7

36:12,21 37:2,9
40:17,20 41:7,16
41:17 47:9,13
50:16 51:21 52:3
52:9,14 53:3,5,8
53:11,15 54:19
55:2,11 56:7,11
56:15 85:4 101:15
112:5,8 143:19
144:10 147:19
148:17,19,21
149:3 150:18
153:1 163:1
167:19 168:2,20
**Yarbrough's** 44:22
144:23
**yeah** 17:5,5 25:3
40:15 46:23 52:22
54:10 65:18,22
72:6 74:12 80:12
83:18 84:9,15
88:12 96:2,7
97:21 98:3 106:23
108:1,22 109:8
114:16 117:18
132:15 143:14
144:3,3 145:16
146:24
**year** 18:22 46:13
49:24 50:3 56:22
57:22 59:7 60:22
62:10 133:3
**yearly** 49:21
**years** 10:3 50:6
99:23 106:17
138:5
**You'd** 102:4
**you'll** 110:18
**you're** 8:5,7 22:8
55:10 56:6 69:15
70:2 71:13,16
73:17 87:13 91:11
111:5 125:16
126:6 166:15
**you've** 56:14
131:13 138:8
**Young** 148:5

**Z**

**0**

**0000014** 135:7
**000221** 120:16
**000604** 137:6

**1**

**1** 3:8 51:2 136:12
163:20
**1:44** 162:13
**1:53** 162:17
**1:57** 164:9
**1:7** 14:10
**10** 3:18 4:24 51:4
53:18 110:7 116:9
140:19
**10/19** 131:24
**10/19/2016** 131:23
**10:00** 1:22 170:14
**108** 3:9
**11** 3:20 116:17
118:22 136:1
146:22
**11:18** 70:14
**11:26** 70:18
**11:32** 75:10
**11:33** 75:18
**118** 28:15
**12** 3:22 152:8
**12:19** 110:11
**12:30** 110:15
**120** 3:10
**122** 3:11
**128** 3:12
**13** 3:24 123:23
156:21 171:24
**130** 3:13 81:8,10
85:16,22 86:14
87:8
**134** 4:4
**135** 3:14,15
**137** 3:16
**13th** 123:5 126:1
126:18 171:17
**14** 9:7 119:3 122:12
126:16
**140** 3:18
**1400** 4:5
**146** 3:20
**14th** 126:19

**15** 51:17 55:8 99:23
101:14
**152** 3:22
**156** 3:24
**164** 3:5
**1705** 9:2
**18** 1:6 4:20
**19** 77:22 78:18 79:1

**2**

**2** 3:9 14:10 104:18
108:12 110:19,20
110:21 136:13
**2/05/1978** 8:15
**2:08** 164:13
**2:13** 169:12 170:15
**2000** 18:21
**2001** 25:3 49:18
57:23 87:1
**2005** 93:21
**2006** 93:22
**201** 155:9
**2015** 9:13
**2016** 25:5,5 56:20
58:9,16 60:2
62:20,24 66:14
72:2,12 77:6,10
77:23 78:18 79:1
86:4 87:1,5 88:3
91:12 92:2 93:2
94:20 95:5,11,21
95:23 104:18
105:16 123:1,22
123:23 125:23
126:16 130:22
136:12,13 155:17
156:18 162:4
**2017** 56:22 60:22
62:10 105:16
155:11
**2018** 105:17,18
**2019** 51:4 105:20
161:11,14
**2020** 1:22 4:23
170:15 171:18
**2023** 171:24
**224** 120:16
**23** 56:18 58:3 61:1
67:3 77:6

**24** 62:18 65:1 68:6
68:14,18
**25** 4:23
**25th** 1:22 170:14
**26** 72:2,11 98:8,11
**27** 76:7 98:8,11
**28** 77:6 95:11,21,23
**28th** 99:1 104:20

### 3

**3** 3:10 49:22 120:15
120:17 121:11
169:14
**3:5-6** 14:20
**30** 77:10,22 96:7
99:16 100:6 109:6
**30-day** 99:7,20,23
116:1,6
**30-minute** 109:14
**30(b)** 4:8
**300** 2:18
**31** 79:9,21
**33** 81:2,6 84:18
**330** 2:19
**34** 81:1 87:3
**35** 88:2 90:23 91:5
**37** 169:14
**38** 95:10 98:18
**39** 100:14

### 4

**4** 3:11 122:11,16,17
128:9
**40** 169:14
**41** 101:13
**45** 102:7
**46:5** 14:16

### 5

**5** 3:3,12 128:10
164:4
**5-minute** 70:21
**50** 2:7
**50,000** 49:6
**500** 2:8
**51** 3:8
**527** 81:8,12 85:17
85:22 88:5 91:1
**570** 81:9 85:17,22
86:13

**5th** 60:2

### 6

**6** 3:13 56:19 58:9
58:16 60:2,3
62:20,24 66:14
86:2,4 123:1,22
125:22 130:18,19
**60** 106:20
**60422** 9:3
**60602** 2:9 4:6
**60606** 2:20
**608** 139:8
**609** 137:6
**618** 146:24
**619** 146:24
**640** 152:9
**641** 152:9
**642** 156:22
**643** 156:22
**659** 130:20
**660** 140:20
**6th** 57:4 59:5 60:5
60:12,15

### 7

**7** 3:14 135:6
**7497** 1:6 4:20
**7812** 8:18

### 8

**8** 3:15 130:22
135:24 162:8

### 9

**9** 3:16 9:7 101:14
111:14,24 137:4
139:9
**90** 87:18
**92,000** 49:17,18
**97** 18:19