UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KHESI PILLOWS and TIFFANY WILSON, | ) ) ) |
| Plaintiffs, | ) No. 1:18-CV-07497 ) |
| v. | ) ) ) Judge Edmond E. Chang |
| COOK COUNTY RECORDER OF DEEDS OFFICE and COOK COUNTY, | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Khesi Pillows and Tiffany Wilson brought this First Amendment political discrimination claim against their former employer, the Cook County Recorder of Deeds.[1] At all relevant times, Karen Yarbrough was the Cook County of Recorder of Deeds. R. 73, DSOF ¶ 13.[2] (For clarity's and convenience's sake, even though the Recorder of Deeds has been subsumed into the Cook County Clerk's Office, this Opinion will continue to refer to the primary Defendant as the Recorder.)

Pillows and Wilson argue that their layoffs were based on unlawful political discrimination, namely, their political affiliation with the previous Recorder of Deeds, Eugene Moore. R. 30, Am. Compl. ¶¶ 40–42. The Recorder and Cook County (which is in the case just as the indemnitor of the Recorder's Office) now move for summary

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331.
[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

judgment in their favor, arguing that no reasonable jury could find that political discrimination motivated the Plaintiffs' layoffs. R. 71, Def.'s Mot. Summ. Judgmt.; R. 72, Defs.' Br. at 7

## I. Background

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts below are undisputed unless otherwise noted.

In 2016, Pillows' role was a Systems Analyst III and (more to the point) her duties included information technology services supporting the everyday functions of the Recorder of Deeds. Am. Compl. ¶ 5; R. 80, PSOAF ¶ 7. Pillows' supervisor was Alex Kantas. PSOAF ¶ 5. Wilson's role also was as a Systems Analyst III, though she temporarily also held the position of Administrative Assistant V from August 2016 until she was laid off in late 2016. DSOF ¶ 20); PSOAF ¶ 10; R. 73-9, OIIG Investigation Letter (referencing Wilson's layoff date). In the permanent position of Systems Analyst III, Wilson was responsible for payroll and benefits, but in the temporary Administrative Assistant V, Wilson was a training coordinator. PSOAF ¶ 16.

Both Wilson and Pillows were politically affiliated[3] with the predecessor Recorder, Eugene Moore; indeed, Moore commonly referred to Wilson as his daughter

---

[3]The Plaintiffs are arguably collapsing the meaning of political affiliation with *familial* relation. Having said that, because the defense does not raise a distinction between those two types of affiliation, the Court will address the summary judgment motion as though the Plaintiffs were politically affiliated with Eugene Moore.

2

and Pillows was Moore's goddaughter. DSOF ¶ 6 (citing R. 80-1, Pillows Dep. 19:4, 20-24-21:2); *id.* ¶ 22 (citing Wilson Dep. 16:3-4). Wilson and Pillows had volunteered for Moore's campaigns in the past. PSOAF ¶ 1. Moore and Yarbrough were considered political rivals. *Id.* ¶ 4.

In 2016, looking ahead to fiscal year 2017, an overall budget deficit of $174 million was forecast for Cook County. DSOF ¶ 37. In early September 2016, a budget analyst from the Budget Office met with Carolyn Wilhight (the Deputy Recorder of Finance) and Cedric Giles (the Chief Deputy Recorder). *Id.* at ¶ 38. Despite making some budget cuts, the Recorder's Office was still $672,251 away from its FY 2017 target budget, so the budget analyst advised the Recorder's Office to "review non-essential positions for elimination." *Id.* at ¶ 41. Giles requested the heads of various departments to "identify positions that could be eliminated with the least disruption to core operations." *Id.* ¶ 42.

According to the Recorder, on October 12, 2016, Erwin Acox (the Chief of Human Resources) identified the position of Systems Analyst III in Human Resources—which was Wilson's position—as one of the positions to be eliminated. DSOF ¶¶ 45–46. The defense alleges that, on September 8, 2016, John Mirkovic (the Deputy Recorder of Communications) identified the position of Systems Analyst III in IT—which was Pillows' position—as one of the roles that could be eliminated. *Id.* ¶ 43. The defense also alleges that, one week later, Mirkovic provided a memo, dated October 19, 2016, explaining the justification for eliminating the Systems Analyst III position. *Id.* ¶ 44; PSOAF ¶ 28.

But the Plaintiffs dispute the timing of when their positions were identified for elimination. According to the Plaintiffs, on September 14, 2016—weeks before the defense's version of the layoff-decision timing—the Recorder's Office's finalized the layoff plans. PSOAF ¶ 21. The Plaintiffs allege that no meetings or discussions took place about which positions to terminate before this list of positions was finalized in September 2016. *Id.* ¶¶ 25, 28–29. The defense maintains that HR Chief Acox and Deputy Recorder of Communications Mirkovic did provide their input on the positions to eliminate before the proposed list for layoffs was sent to the Budget Office. Defs.' Resp. PSOAF ¶¶ 28–29. The defense also makes the distinction that Giles merely could not *remember* whether a meeting ever took place among the Deputy Recorders on the proposed list of layoffs rather than asserting that *no* such meeting occurred. Defs.' Resp. PSOAF ¶ 25.

Ultimately, the Recorder of Deeds identified a total of 17 positions to be eliminated. DSOF ¶ 51. Giles, Wilhight, Acox, and Mirkovic appear to be the main decisionmakers involved in eliminating Wilson and Pillows' positions. DSOF ¶¶ 42–47 (citing R. 73-6, Cedric Giles Decl. ¶¶ 6, 8, 12–13); R. 73-7, Carolyn Wilhight Decl. ¶¶ 7–9. Giles, Wilhight, and Mirkovic are politically affiliated with the Proviso Township Democratic Organization, along with Yarbrough. PSOF ¶ 23.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the

4

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

#### A. "Prima Facie" Standard

At the start, it is worth setting forth what the parties call the "prima facie" case sufficient to survive summary judgment in political-discrimination cases. The defense argues that a prima facie case of discrimination based on political affiliation requires that the plaintiff show that (1) the conduct was constitutionally protected and (2) the protected conduct was the motivating factor in the challenged employment

5

action. Defs.' Br. at 7 (citing *Cook v. Yarbrough*, 2021 WL 1784691, *3 (N.D. Ill. May 5, 2021)). The Plaintiffs actually adopt a similar formulation for a prima facie case of political discrimination, acknowledging that the Plaintiffs must show that (1) the conduct was constitutionally protected; (2) they suffered an actionable deprivation; and (3) the protected conduct was a but-for cause of the adverse employment action. Pls.' Resp. at 6 (citing *Gunville v. Walker*, 583 F.3d 979, 984 n.1 (7th Cir. 2009)).[4]

As those recitations reflect, both sides actually agree that the "prima facie" case of political discrimination requires that employees show (when the evidence is viewed in their favor) that their political affiliation *motivated* the employment action—whether the motivation was a motivating factor (in the defense's formulation) or a but-for cause (in the Plaintiffs' view, which actually is a higher hurdle to overcome that a mere motivating factor). For those familiar with what "prima facie" case means in employment discrimination cases, this is odd. In the more common realm of discrimination based on a particular classification, such as race and gender, a "prima facie" case does *not* require that the plaintiff establish the *ultimate* issue, that is, whether the employer was motivated by the prohibited motive. *See Igaski v. Ill. Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Instead, the prima facie case

---

[4]The defense also argues that a violation of the *Shakman* decree requires clear and convincing evidence. Def.'s Br. at 7. Although it is true that contempt violations do require clear and convincing evidence, the Plaintiffs here bring original First Amendment claims under 42 U.S.C. § 1983, so there is no need to analyze their evidence against a clear-and-convincing burden of proof.

6

in the run-mill employment discrimination case is a *way* to show that there is enough evidence to survive summary judgment on the ultimate issue. *McDonnell Douglas*, 411 U.S. at 802–05. In the usual employment discrimination case, to successfully establish a prima facie case, plaintiff-employees must show that (1) they belong to a protected class; (2) they met their employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) another similarly situated employee outside of the protected class received better treatment from their employer.). *Id*. at 802. It is *not* a required element of the usual prima facie case to outright show that the employer relied on the prohibited motive.

Indeed, the Plaintiffs here might very well have been able to argue to adapt the *McDonnell* framework under a "mini-reduction in force, which applies when a plaintiff's job is eliminated. *Lebel v. Insight Securities, Inc.*, 2020 WL 6746993, at *6 (N.D. Ill. 2020) (citing *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 845 (7th Cir. 2007)). In a mini-RIF case, the plaintiff's position is eliminated, but other employees who are not in the protected class absorb the laid-off employee's job responsibilities. *Id.* (citing *Griffin,* 489 F.3d at 845 ). To guard against the danger that the employer can hide a discriminatory motive for terminating the employee simply by stating that the job was eliminated" the plaintiff need not show similarly situated

employees were treated more favorably. *Id.* (cleaned up).[5] Rather, the employee need only show their duties were absorbed by employees not in the protected class. *Id.*

Having said all that, the Court should refrain from advancing arguments that the parties themselves did not make, especially given the uncertainty in this area of the law. Indeed, Seventh Circuit caselaw does use "prima facie" as the label to describe the elements for showing political discrimination. *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070 (7th Cir. 2016); *Gunville*, 583 F.3d at 983. Because the parties here have accepted that a prima facie case requires that they show political affiliation was a motivating factor, this Court will apply the test set forth by the parties.

### B. Political Discrimination

The Plaintiffs claim that the Cook County Recorder's Office politically discriminated against them due to their political affiliation with the former Recorder, Eugene Moore. R. 77, Pls.' Resp. at 6–7. The defense argues that (1) politics played no role throughout the entirety of Plaintiffs' employment; (2) the Plaintiffs' positions were 2 of the 17 positions eliminated due to a need to reduce the Recorder's budget; (3) the Office of the Independent Inspector General for Cook County found that the Plaintiffs' layoffs were not based on political affiliation; and (4) the observation of Judge Schenkier (who was the prior presiding judge over the *Shakman* decree) that the timing of when positions were proposed for elimination versus when the decisionmakers

---

[5] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

received input from department heads is "incorrect and/or inconsequential." Defs.' Br. at 2, 4–5.

As previously explained, the Court will apply what the parties call the prima facie case for political discrimination. To establish a prima facie case for a violation of the right to political association, the Plaintiffs must provide evidence that (1) their conduct was constitutionally protected and (2) their protected conduct was a motivating factor in the challenged employment action. *Bisluk v. Hamer*, 800 F.3d 928, 933 (7th Cir. 2015) (citing *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004)).

No one disputes that the Plaintiffs' conduct—that is, their political affiliation with Moore— is constitutionally protected by the First Amendment. The sole question is whether the Plaintiffs' political affiliation with Moore was a motivating factor in being laid off. The Court first addresses whether the pertinent decisionmakers even had knowledge of each of the Plaintiff's political affiliation and then looks to any evidence suggesting that political affiliation was a motivating factor for the layoff.

### 1. Khesi Pillows

Pillows has not offered enough evidence to get out of the gate: she has not shown, even when the evidence is viewed in her favor, that any of the decisionmakers involved in her layoff even knew of her political affiliation with Moore. Pillows is the goddaughter of former Recorder Eugene Moore. PSOAF ¶ 3. Pillows relies on the following facts as evidence that her layoff was politically motivated: (1) former Chief Deputy William Velazquez had sent an email to one of Pillows' co-workers stating "he should get rid of the weaker staff" and identified Pillows and George Moss, who is

9

also related to Moore, as the so-called weaker staff; and (2) the broad statement that "Karen Yarbrough, Tim Curry, and Recorder Yarbrough's administrative staff all knew that Plaintiffs were politically affiliated with Eugene Moore." PSOAF ¶¶ 3–4.

On the first point, Pillows is making too much of the fact that two individuals affiliated with Moore (Pillows and Moss) were identified to be gotten "rid of" when identifying "weaker staff." Pls.' Resp. at 7. It would be one thing if Pillows had offered evidence that she and Moss were two employees in a small governmental office of, say, four employees. There might be a suspicious inference on why Velazquez singled out those two. Instead, the Recorder's Office had—at the least—dozens and dozens of employees so far as this record shows. *See* R. 80-5, Exh. 4, Dep. of Carolyn Wilhight (position summary by business unit). So there is no probative value to be drawn from the identification of Pillows and Moss. Worse, Velazquez was not even involved in the decision to eliminate Pillows' position, because he was not even employed at the Recorder's Office when layoff decisions were being considered. Defs.' Resp. PSOAF ¶ 3.

On the second point, Pillows' proffered evidence that Yarbrough knew of Pillows' affiliation with Moore falls well short of admissible evidence—it is speculation. Specifically, Pillows relies on her own deposition testimony, but there she only said that the village of "Maywood is a small town." Pillows Dep. at 52:13–14; DSOF ¶ 15 (citing *id.* at 51:17–53:1, 55:7–15). Pillows testified that, when working on campaigns, "you see everyone kind of in the streets and on election days where they're working, who they're working with, so I believe that she knew that …." Pillows Dep. at 52:16–

10

20. That level of generality is not nearly enough to be relevant and admissible to show that Yarbrough knew of Pillows' political affiliation.

It is also guesswork to infer that Tim Curry (who was Yarbrough's security director and, in any event, appears to have had no involvement in the layoff decision-making) knew of Pillows' affiliation with Moore simply because he once asked whether she was Eric King's daughter. Pillows Dep. at 52:21–23. The final citation to Pillows' own deposition testimony actually highlights the speculative nature of this evidence: she testified that, as to the "administrative staff," they knew her political affiliation because "I believe it was discussed amongst" them. Pillows Dep at 55:7–15. That's it. In the subsequent lines of the deposition transcript, not cited by Pillows in the Statement of Additional Facts, she opines, "I just have a feeling that that's what happened." Pillows Dep. at 55:16–21. At bottom, there is insufficient evidence that the decisionmakers even knew of Pillows' affiliation with Moore, so that crucial element of her claim fails and her claim must be dismissed.

### 2. Tiffany Wilson

In contrast, Wilson has raised a genuine issue of fact on whether the decisionmakers were aware of her political affiliation to Moore. The relevant decisionmakers here are Deputy Recorder of Finance Carolyn Wilhight, Chief Deputy Recorder Cedric Giles, and HR Chief Erwin Acox. And there is sufficient evidence for a reasonable jury to find that Wilson's political affiliation was a motivating factor in her layoff.

### a. Knowledge of Political Affiliation

First, Wilhight outright admits to believing that Wilson was Moore's daughter. Defs.' Resp. PSOAF ¶ 14. With regard to Acox, Wilson relies on a report issued by the Office of the Independent Inspector General of Cook County (OIIG). Specifically, when the OIIG was investigating the firing of the former Director of Human Resources, Jeannette Soto, Soto reported to the OIIG that she was instructed by Acox to *not* mention that Wilson was Moore's daughter in front of the *Shakman* Compliance Administrator for the Recorder's Office. PSOAF ¶ 13 (citingWilson Dep. 56:13–20; R. 73-3, Acox Dep., 93:1–97:9). This instruction would necessarily suggest that Acox was aware of the relationship between Moore and Wilson. During his deposition, Acox could not remember whether he had instructed Soto to not mention Wilson's affiliation with Moore. PSOAF ¶ 13 (citing Acox Dep. 94:17-95:12). The only basis that Acox had to disagree with Soto's memory of the instruction is that because Soto was fired, she "might have an ax to grind." Acox Dep. 97:8–9. Acox also could not remember how Wilson's position was picked for elimination nor why the documents show that his recommendation came *after* the list of positions was finalized. PSOAF ¶ 17.

The defense's only argument challenging Soto's statement and the corresponding OIIG report is to object to these statements as inadmissible hearsay. Defs.' Resp. PSOAF ¶ 13. Naturally, the Court can only consider admissible evidence in evaluating a summary judgment motion, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009), or evidence that can be presented in a form that would be admissible, Fed. R.

12

Civ. P. 56(c)(2). Hearsay is an out-of-court statement offered "in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c), and generally is inadmissible, Fed. R. Evid. 802. It is true that there are two potential levels of hearsay to consider: (1) Soto's statement as to Acox's alleged instruction and (2) the corresponding OIIG report in which Soto's statement was reported. But it turns out that both statements are admissible.

The first statement is what Acox said to Soto: he allegedly instructed her not to tell the Compliance Administrator that Tiffany Wilson was related to the previous Recorder of Deeds. PSOAF ¶ 13. But Acox's statement to Soto is *not* hearsay, because it is not offered for the truth of whatever factual statement is embedded in it. Acox delivered an *instruction* to Soto, which is not a statement offered for its truth. Even if Acox's statement were some form of hearsay, as a supervisor in the Recorder's Office, he is considered a party-opponent and thus the statement would qualify as an admission by a party-opponent. Fed. R. Evid. 801(d)(2); *see Cole v. Ill. Tool Works, Inc.*, 924 F.Supp.2d 978, 989 (N.D. Ill. 2013) (explaining a supervisor's statements were not hearsay but admissions of a party opponent due to supervisor's management position and involvement in decision to discharge plaintiff). The Acox instruction to Soto is admissible over a hearsay objection.

Next, the OIIG report itself also overcomes the hearsay objection based on the investigative-report exception. Under Federal Rule of Evidence 803(8), as far as the record shows now, the report qualifies as a record or statement of public office that sets out "factual findings from a legally authorized investigation." Fed. R. Evid.

13

803(8)(A)(iii). The OIIG report, which carries a designation of No. IIG17-0163, was an investigation arising out of Jeanette Soto's complaint that she was laid off due to unlawful political discrimination. Pillows Dep**.** 102:7-18**;** R. 73-1**,**Exh. 1 at 16, IIG17-0163. So the OIIG's report of Soto's statement can fit within the investigative-report exception. To be sure, it might be that, during pretrial litigation, the defense will be able to "show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). But on the current record, the defense has not made that showing (on which it bears the burden, because it is an exception to Rule 803(8)), so the OIIG report is admissible for this purpose. (The parties would probably be well-served to subpoena Soto for trial rather than rely on the OIIG report of her statement, so that the jury can evaluate her credibility firsthand.)

With Acox's alleged instruction as a piece of admissible evidence, a jury could infer that Acox wanted to hide the fact of Wilson's political affiliation with Moore from the *Shakman* Compliance Administrator—who is responsible for, among other things, monitoring employment actions for unlawful political discrimination. At this summary judgment stage of the case, taking the facts in the light most favorable to Wilson, a reasonable jury could find that Acox knew (or at least believed) that Wilson was Moore's daughter. Worse for the Recorder's Office, the fact that Acox instructed Soto to conceal the relationship from the *Shakman* Compliance Administrator (if the jury credits that that happened) raises the reasonable inference that the Acox wanted to conceal potential political discrimination.

14

In sum, there is enough circumstantial evidence to show that two of the three decisionmakers were aware of Wilson's political affiliation with Moore.

### b. Timing of Layoff Recommendations

The additional piece of circumstantial evidence in Wilson's favor is the timing of when the positions were recommended for elimination versus when the list of positions for elimination was finalized. It is undisputed that, on September 14, 2016, the proposed list of positions for elimination was finalized. PSOAF ¶ 21. Acox, however, supposedly identified Wilson's position for elimination on October 12, 2016, a little under a month after the list of positions was already finalized.[6] *Id.* ¶ 17. The defense alleges that Acox did have communications about which positions to eliminate before the issuance of the October 12 memo. DSOF ¶ 46. Acox also testified that there probably was a meeting that took place on identifying which positions to eliminate and Acox identified an email in which Wilhight refers to a meeting to discuss position eliminations on the morning of September 13, 2016. DSOF ¶ 47. The defense witnesses, however, cannot remember the details surrounding any layoff-related meetings nor the process for determining what positions would be proposed for elimination. Put another way, there is a yawning gap in the defense's recitation on why exactly the Recorder's Office chose Wilson's job for elimination. Combined with the

---

[6]There are also suspicious circumstances on the timing of when Pillows' position was identified for elimination, as well as on Mirkovic's ability to accurately assess Pillows' job responsibilities. Again, however, there is insufficient evidence that any of the decisionmakers were aware of Pillows' affiliation with Moore, so the Court is only addressing the suspicious timing as it relates to Wilson.

15

disputed facts on the timing of the layoff recommendations, Wilson has offered enough evidence that her political affiliation was a motivating factor in the layoff.

### c. Alternative Budget Cuts

For the sake of completeness, and to head off a pretrial-litigation issue, the Plaintiffs also argue that the Recorder's Office had a number of alternatives, in lieu of their layoffs, that could have solved the 2017 budget deficit. Pls.' Resp. at 11. The Plaintiffs refer to the budget analyst's recommendations to layoff the entire security department or the elimination of satellite offices to address the budget deficit. *Id.* It would be one thing if the budget analyst had offered an easy solution to the budget deficit that the Recorder rejected in favor of laying off Wilson (and Pillows). On that premise—a rejected easy solution—there might very well be some probative value to add to the suspicion that political discrimination was at work. But the Plaintiffs have not offered that type of easy solution. Laying off an entire department or closing branch offices naturally are proposals that cause harm in their own right. And this Court is not (nor is a jury) a "superpersonnel department that will second guess an employer's business decision." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Plus, this type of evidence at trial would be an evidentiary quagmire, bogging down the trial as the Recorder introduced policy and other reasons for eschewing the laying off of the security department and the closing of branch offices. If and when Wilson's claim goes to trial, the possibility of laying off the security department or closing branch officers will not be part of the circumstantial evidence of discrimination.

## IV. Conclusion

The defense's motion for summary judgment is granted against Khesi Pillows but denied as to Tiffany Wilson. With the summary judgment decision in place, the parties shall (1) engage in settlement negotiations and (2) confer on the next of the litigation (including whether to ask for a settlement referral to the magistrate judge). The parties shall file a status repot on these two topics by April 20, 2022. The tracking status hearing of April 15, 2022, is reset to April 29, 2022 at 8:30 a.m., but to track the case only (no appearance is required). Instead, the Court will review the status report and decision how to proceed from there.

To clarify the docket, the Clerk's Office shall substitute the Office of the Cook County Clerk as the defendant in place of the Cook County Recorder of Deeds Office (Cook County remains in the case as the indemnity defendant).

ENTERED:

                                    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2022