## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TIFFANY WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:18-CV-07497 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| OFFICE OF THE COOK COUNTY | ) | |
| CLERK and COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

In November 2016, amid a budget deficit and layoffs across Cook County gov-ernment agencies, Tiffany Wilson was terminated from her position as Training Co-ordinator in the Office of the Cook County Recorder of Deeds (for clarity's and con-venience's sake, even though the Recorder of Deeds has been subsumed into the Cook County Clerk's Office, this Opinion will continue to refer to the primary Defendant as the Recorder). The Recorder at the time was Karen Yarbrough. Wilson had a po-litical and familial relationship with the previous Recorder, Eugene Moore.

Moore referred to Wilson as his "daughter" (though he was not a by-blood re-lation) and Wilson supported Moore in several local political campaigns. Some people in the Recorder's Office were aware of Wilson's familial relationship. Wilson filed suit, claiming that her position was selected for layoff because of her political affiliation

with Moore, in violation of the *Shakman* decree,[1] which forbids employment decisions based on political factors.[2] R. 1, Compl.; R. 77, Summ. J. Resp.[3]

In April 2023, the case proceeded to a four-day bench trial, during which seven fact witnesses testified. This Opinion sets forth the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. These findings are based on the exhibits allowed into evidence and the testimony provided at trial. The findings are also premised on the Court's credibility determinations after observing each of the witnesses testify in person or via live videoconference at trial. On review of the evidence, although the layoff was handled in a slipshod way, the Court finds that Wilson has failed to prove by clear and convincing evidence that the layoff was politically motivated.

## I. Factual Background

The following evidence was offered at trial and is generally not disputed except where noted. For better comprehensibility, other factual findings are explained in the Conclusions of Law section.

**Relationship Between Wilson and Moore.** Tiffany Wilson was an employee for the Cook County Recorder of Deeds from 1999 to 2016 (Stipulation 2, 3).[4] Wilson

---

[1]*See Shakman v. Dem. Org. of Cook Cty.*, 481 F. Supp. 1315, 1356–59 (1979) (consent decree)

[2]This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

[3]Citations to the record are "R." followed by the docket entry number and, where applicable, a page or paragraph number.

[4]The parties stipulated to certain facts before trial. *See* R. 118, Proposed Pretrial Order at 2-3. For convenience's sake, the rest of this Opinion will simply cite to stipulated facts as "Stipulation" followed by the stipulation number.

has a family-friend connection with Eugene Moore, a Chicago-area politician who served as the Cook County Recorder of Deeds from 1999 to 2016. Wilson's mother dated Moore in the 1990s; for around three years during that time, Wilson and her mother moved in with Moore. At times, Moore referred to Wilson as his "daughter."

Not surprisingly, Moore had political rivalries with other local officials. In particular, Moore was considered a political rival of Karen Yarbrough. When Moore ran against Alderman Ed Smith for the Recorder of Deeds in 2008, Yarbrough supported Smith in the race. And between 1997 through 2012, Moore endorsed Yarbrough's "opponent candidates"—those candidates running against the ones supported by Yarbrough—in various local community elections for mayor, trustee, and school board in Maywood, Melrose Park, and Bellwood (various villages near Chicago). Moore and Yarbrough's rivalry was known among the community.

Wilson supported Moore politically throughout his career. She worked for Moore in the Maywood committeeman election against Yarbrough in around 2004, as well as several elections for state representative and in the elections for Recorder of Deeds against Smith between 1997 and 2012. Wilson assisted with fundraising and election-day logistical support at polling sites. Wilson also worked for Moore on those elections in which he himself was not seeking a position, but was supporting a candidate running against the person supported by Yarbrough in Maywood, Bellwood, and Melrose Park.

**Wilson's Employment at the Recorder's Office.** Sometime in 1999, Moore became the Recorder of Deeds. Wilson started working in the Recorder's Office in

1999, Stipulation 2, after Moore assumed the role. Wilson interviewed with Felix Ba-
batunde, who was the Director of Human Resources at the time. She did not make
Babatunde or others in the office aware of her affiliation—neither familial nor polit-
ical—with Moore during her interview process.

At the start, Wilson was hired as an Administrative Assistant and performed
secretarial and operational tasks. Wilson moved on to a role in the purchasing de-
partment before eventually being promoted to payroll under the title "Systems Ana-
lyst" in April 2004. Pl. Exh. 48 at 1. When she started in this position, Wilson was
responsible for managing tasks related to employee benefits. For example, for each
new employee, Wilson would discuss and explain the various health benefits that the
employee would receive from Cook County, assist with new-hire paperwork, set up
direct deposits and exemptions, and orient the employee on breaks and other office
specifics.

Wilson initially worked with Pamela Collier and Darlene Connors in the pay-
roll department and reported to Felix Babatunde when she began this role. During
this time, Wilson was trained by Collier and Connors on how to enter employee pay-
roll into a secured platform. Between the three of them, they shared responsibility
for entering in the system the payroll information for all of the employees. This re-
sponsibility required a security access that Wilson was granted in order to enter in-
formation on the platform.

Sometime during Wilson's tenure with the Recorder's Office (while Moore was
still the Recorder of Deeds), compliance mechanisms for the *Shakman* consent decree

came into effect. Among other things, a Compliance Administrator, along with a staff of monitors, was appointed to monitor the hiring and firing of employees, and to ensure that employment decisions were not based on political reasons for non-exempt employees. At times Wilson would come into contact with *Shakman* monitors in her payroll capacity. If they had questions on timekeeping—such as whether an employee worked a certain set of hours on a given day or whether they had some form of compensated time—they would call and ask Wilson for confirmation.

Moore served as the Recorder until 2012, when he opted to retire and to not run in the 2012 election. Karen Yarbrough was then elected Recorder of Deeds and assumed office in 2012, Stipulation 1, and Wilson initially remained in her role in payroll under the new leadership.

Shortly after Yarbrough's tenure began, Wilson was transferred from her position in payroll to the role of Training Coordinator in 2013 (Stipulation 4). She retained the formal title of Systems Analyst III (Stipulation 3). At the time, Yarbrough told Wilson (in person) that the reason for the transfer was that Wilson had a rapport with the employees and overall knew the office well, so Wilson could help Yarbrough ensure that the office was up to speed with trainings. Wilson's position in payroll was not immediately backfilled.

In her new role, Wilson identified training programs for employees to participate in and coordinated with other departments in the County and the State to hold trainings. She researched and selected vendors to administer the trainings, tracked participation, arranged opportunities for satellite employees, and managed all other

operations surrounding training. Pl. Exh. 45 at 1–4. Around once a month, Deputy Recorder of Finance Carolyn Wilhight would make training-related requests of Wilson.

A few years later, in April 2016, Erwin Acox began working at the Recorder's Office as the Chief of the Human Resources department. Acox was politically affiliated with Yarbrough, and he attended multiple fundraisers for Yarbrough during the course of his employment. Being new to the Recorder's office, Acox requested a brief description from Wilson of her job duties as Training Coordinator. Def. Exh. 3 at 1. Keeping it brief because Acox was still orienting himself, Wilson described some of the duties she had been performing, including assisting employees with computers, booking training rooms, developing manuals, organizing trainings, *id.*, though she also continued to perform the other duties mentioned previously.

Wilson went on performing this role for the next couple months, until late July 2016. At that time, Wilson was temporarily assigned to be a payroll timekeeper at the behest of Acox. Pl. Exh. 44 at 1. Though she was not explicitly told why she was being transferred, Wilson's understanding was that she was helping fill an operational need in the department, because payroll employee Kimberly Johnson had left to take a job elsewhere. Wilson was of course familiar with this role, having performed it before and having trained Johnson for the role.

**The 2016 Budget Process.** Around this time, the Recorder's Office was going through its yearly budget process, during which formal budget requests are usually made in July and then further finalized over August and September. This was a year

where budget deficits in the County were leading to budget cuts across several County agencies. Pl. Exh. 74 at 2. Indeed, Tanya Anthony, the County Budget Director, sent a memorandum on September 2, 2016, to Cedric Giles (who was the Chief Deputy Recorder), explaining that there was a $174.3 million budget deficit in the general fund for fiscal year 2017. *Id.* This significant shortfall would impact all County agencies in the general fund, including the Recorder's Office, which would have (according to the memo) a $1.1 million gap.

Anthony's memorandum instructed the Office to "[p]lease formulate a plan that achieves your budget ceiling resulting in a leaner budget that reduces costs, improves efficiencies, and prioritizes the required core functions of your office." Pl. Exh. 74 at 2. An additional memorandum from Anthony on September 22 reiterated the deficit and urged elected officials to begin the required layoff protocols for unionized employees, underscoring a county-wide decision to move forward with layoffs. Def. Exh. 16 at 1–2.

Wilhight, together with Cedric Giles, submitted the Recorder's Office budget proposal sometime after August 11 that year. Pl. Exh. 17 at 1. They worked with Budget Analyst Jimmy Rayan, who worked for the Office of Budget and Management Services at Cook County. Pl. Exh. 29 at 1. As the assigned budget analyst to the Recorder's Office, Rayan would prepare an agenda summarizing the budget submittal, the Recorder's Office target, and recommendations to help the Recorder achieve this

target. *Id.* at 3–7. Wilhight and Giles met with Rayan at the start of the budget process, but Acox was not present for this initial meeting.

To memorialize the initial meeting's results, Rayan sent a note, on September 6, to Giles and Wilhight reflecting what they had collectively agreed on. Def. Exh. 12 at 3–4. Rayan's recap repeated the $1.1 million deficit figure, and then summarized non-personnel adjustments that could save the Recorder around $100,000 and a raise in fees that would increase revenue. Even with those agreed-on steps, however, there was still a $672,000 deficit that needed to be resolved to meet the target budget. *Id.* at 3. Rayan instructed Giles and Wilhight to direct the Recorder's management team to review several budget measures, including eliminating job positions. *Id.*

Anthony's deficit memorandum had requested a plan for the Office to achieve the budget ceiling by September 12. Pl. Exh. 74 at 2. On September 6, Giles emailed the Recorder's Office Executive Staff, including Wilhight, Acox, William Drobitsch (the Deputy Recorder of Operations), and John Mirkovic (the Deputy Recorder of Communications). In the email, Giles requested that "[i]n order to achieve the requested amount, I am asking each of you to reevaluate your respective sections to identify any non-essential functions tied to active positions which can be eliminated with the least disruption to core operations." *Id.* He instructed the Executive Staff to send "the details of your respective reductions to both HR Chief Acox and Deputy Recorder Wilhight by close of business Thursday, September 8." *Id.* Giles also copied

8

labor counsel, union representatives, and *Shakman* Compliance Administrator personnel. Pl. Exh. 70 at 1.

Wilhight (for Finance), Mirkovic (for Communications), and Drobitsch (for Operations) each responded on the September 8 deadline—Acox (for Human Resources) did not. Specifically, Wilhight responded with an email identifying eight positions, explaining that the recommendations were based on her understanding of the roles and responsibilities within her unit, and certifying that the decisions were not based on political factors. Pl. Exh. 71 at 1. She copied the Director of Compliance and the Compliance Administrator, which was her practice when communicating about employment matters. Drobitsch's response identified up to eight positions that could be eliminated and also copied the Compliance Administrator. Pl. Exh. 75 at 1.

Mirkovic's memorandum stated that he could only identify two positions "whose elimination would minimally affect operations." Pl. Exh. 73 at 1. Mirkovic copied the Compliance Administrator, Director of Compliance, Chief Counsel & Labor Counsel, and included a certification that political factors were not considered in making the recommendation. *Id*. Mirkovic was asked by the Compliance Administrator for additional explaining on the positions. In a follow-up memorandum, he explained the reasons for selecting the positions, including that those roles had the fewest responsibilities, many of which could be absorbed through other measures (such as new signage or by other team members). Pl. Exh. 72 at 1.

A few days later, on September 12, Wilhight sent Yarbrough and Giles a "staffing analysis" consisting of a chart with positions that would cause minimal impact to

operations if terminated. Pl. Exh. 76 at 1. The analysis reflected all the positions recommended by the department heads in their September 8 memoranda, but with the addition of Systems Analyst III–Human Resources Training Coordinator, which was Wilson's position. Wilhight sent a second analysis shortly after with a different combination of positions, which contained two fewer positions overall. *Id.* at 2. Though Wilhight does not remember the reason for the change, both lists contained Wilson's position of Systems Analyst III.

Wilhight updated budget analyst Rayan the next day, replying to Rayan's prior follow-up email from the budget meeting. Wilhight's reply email said that she was in the process of finalizing the list of positions that could be potentially eliminated in order to comply with the budget-office request. Def. Exh. 12 at 3. Wilhight stated that she would be meeting with Acox that morning for his approval and planned to send along the list of positions by mid-afternoon. *Id.* At trial, no one could remember what happened at that meeting, or if it even happened. The next day, Wilhight followed up with a list of recommendations for position terminations, *id.* at 2, and requested a meeting with Compliance Administrator personnel to discuss the staffing analysis, which was then planned to be rescheduled for the following day. Pl. Exh. 78 at 1–2.

Around two weeks later, Giles informed the Recorder's Office's leaders that "[u]nfortuantely the County's budget situation has not improved and the reduction in workforce must take place." Def. Exh. 17 at 1. Giles "urged that Erwin [Acox] establish[] a meeting between himself, Ed, and Carolyn on Monday to put the layoff plan

together and provide it to the County Budget Office by September 30th." *Id.* The email reminded the team to "provide notification to the DOC [Director of Compliance] and RCA [Recorder Compliance Administrator] before doing any employment actions or deliberating about employment actions." *Id*.

A few weeks later, on October 12, Acox finally submitted a written memorandum responding to Giles' September 6 request. At the trial, no one could remember why the memo came so late after the September 8 deadline or what sparked the memo to be written when it finally was. In the memo, Acox identified one position for layoff—System Analyst III, Wilson's position at the time. Pl. Exh. 60 at 1. Acox wrote that "the duties of this function would be part of those assigned to the newly hired Director of Human Resources." *Id*. Acox did not copy any *Shakman* compliance personnel. Neither Acox nor Wilhight remembers any discussion about the delay in submitting the memo or about the positions recommended for elimination. Despite the memo's reference to the Human Resources Director absorbing the training-coordination duties, the new Director of Human Resources, Jeanette Soto, did not (as far as she could remember at the trial) perform much training coordination work in her role, outside of one *Shakman* compliance training.

At the end of that week, on October 17, Rayan emailed Wilhight to ask whether the Recorder had issued layoff notices, given that union-notification requirements would delay the layoffs (and thus delay the potential cost savings). Wilhight responded that "per HR," they were starting the notification process that day. Pl. Exh.

11

25 at 1. Wilson was not a union member (her job was not in the collective bargaining unit), and was not informed of her layoff at that time.

Two weeks later, Soto joined the Recorder's Office as the HR Director. Upon starting with the office, Soto was informed that Wilson's position had been selected for layoff. Before the layoff was effectuated, Acox informed Soto that Wilson was related to someone political and that she should not bring up this fact to the Compliance Administrator because it was not the reason that Wilson was being let go. Soto could not remember if that person was perhaps Wilson's father or husband, nor could Soto remember the specific timing and even the general context of the conversation with Acox. According to Soto, Acox said that the reason not to mention Wilson's relation to the Compliance Administrator was because the Compliance Administrator would then believe that was the reason Wilson was being laid off. In any event, Soto does not remember having a conversation with the Compliance Administrator about the layoffs. Acox also mentioned to Soto that because Wilson's salary was higher than the Director of Human Resources, it was not appropriate to keep her on; when Soto suggested demoting Wilson into a lower-paying role, Acox said that such a move was not possible. Beyond this conversation with Acox, Soto had no other knowledge of Wilson's affiliation with Moore.

**Notice of the Layoff.** While unionized employees were entitled to a 60-day advance notification of their layoff, this was not required for nonunion employees. Wilson first learned that she was likely subject to a layoff in November, when she searched the County's publicly available proposed budget online. Upon reviewing the

budget, she noticed that there was no funding assigned to her System Analyst III position. Wilson sought out Acox to ask about her position and was told that it was being worked on. Soto asked Acox why some employees, like Wilson, were not being given a 30-day notice, and if there could be a time extension, but was told that the decision was already made not to give these employees further notice because as non-union staff, the Office was not required to do so.

On November 28, 2016, Wilson received a memo announcing that her temporary assignment to payroll concluded that very day and that she should report back to her permanent assignment the next day. Pl. Exh. 42 at 1. But on the same day, Wilson received a second memo declaring that her regular position was being eliminated. Pl. Exh. 43 at 1. Following this notification, Soto read to Wilson a document that was read aloud to all laid-off employees. Wilson received only four days' notice before the end of her job.

After some time, Wilson was able to secure a position at the Chicago Housing Authority in October of 2017. Starting as a project coordinator, she was promoted to administrative assistant in 2018. She still works there.

**Don Sloan.** One employee who was not laid off as a part of the 2016 layoffs was Don Sloan. Don Sloan worked in the Recorder's Office as the executive assistant to the Director of HR. But before Soto started as Director in October, there had been no Director for some time. When there was no HR Director, Sloan likely (as best as Acox could remember) assisted Acox, because Acox was the Chief Human Resources Officer. On Sloan's political affiliation, Giles did see Sloan at political functions for

13

Yarbrough. Soto testified that she did not initially know Sloan to be politically affiliated with the Recorder, but that she later learned that he had served on a school board. But Soto did not specify the connection between this board role and Yarbrough.

It appeared to multiple people in the office that Sloan did not do much work. Sotol saw Sloan drinking a lot of coffee or sitting at his desk, and often was missing. Soto did not remember Sloan completing most of the tasks in the executive-assistant job description and was unsatisfied by his performance when she did assign him projects. Within weeks of starting at the Recorder's Office, Soto raised these issues with Acox, who initially said that he was aware of the problems and had noticed these issues when Sloan had worked with him. Following the office layoffs, Acox told Soto to write up these issues.

Soto found that it was more work to have Sloan around than if she was working alone. At one point Soto attempted to transfer Sloan to a different office, but her efforts were unavailing—in part because the labor department to which she tried to send him also did not want Sloan. Soto posited that even if her assistant had been someone else other than Sloan, it was not clear how helpful they would have been; she was generally an independent worker.

## II. Conclusions of Law

### A. Legal Standard

Wilson argues that her position at the Recorder's Office was terminated due to her political affiliation with Eugene Moore in violation of the *Shakman* decree. The burden of proof is on Wilson to show a violation of the *Shakman* decree by clear and

convincing evidence, because the claim is one for civil contempt. *Houlihan v. City of Chicago*, 871 F.3d 540, 549 (7th Cir. 2017). As explained below, it might have been possible for Wilson to prove her case by a preponderance of the evidence—the burden of proof that would have applied had she simply brought a First Amendment political-discrimination claim and eschewed bringing her claim under the *Shakman* decree itself. But she did not, and ultimately the evidence does not clearly and convincingly show that political discrimination motivated the layoff.

### B. Knowledge of Political Affiliation

Wilson first must demonstrate that the pertinent decisionmaker was aware of her political affiliation with Moore. Wilson specifically argues that Acox, under the cover of mass layoffs, selected her for termination on the basis of her political affiliation with Moore, while another employee (Don Sloan) was less important to core operations but was safe from termination due to his affiliation with Yarbrough. But Wilson has not established by clear and convincing evidence that Acox, when he recommended Wilson's position for termination, even knew of her *political* affiliation to Moore as opposed to a mere *familial* affiliation.

Before digging into the specific facts of this case, it is worth noting that it might very well be reasonable to generally infer that someone who has a familial relationship with an elected official also has a *political* affiliation with that official. In broad strokes, family members tend (hopefully) to support one another's career pursuits. That general, common-sense observation extends to the family of politicians. Having said that, there is only so much mileage that can be drawn from that very general

15

proposition. Here, the evidence falls short of connecting, clearly and convincingly, any knowledge of Wilson's family-like affiliation with Moore to a political affiliation with him.

To start, Wilson testified that she herself never told Acox about her political affiliation with Moore. Without that most direct source of knowledge, much of the evidence that Wilson relies on is at a high level of generality and in the nature of office rumor or chatter around the office. At trial, Acox testified that he no longer remembered even what Wilson's family relationship was to Moore affiliation. Acox never saw Wilson campaign for Moore or even saw Wilson in the presence of Moore outside of the office. This is in line with the most probative evidence that Wilson could offer: Soto credibly testified that Acox "mentioned that [Wilson] was related to some-one, I don't recall if it was her father or husband, to someone political." But that statement does not itself specify that Wilson was *politically* affiliated with Moore; instead, the statement informed Soto of a family relationship of some kind.

According to Soto, however, Acox also instructed Soto not to bring up this fam-ily relationship with the Compliance Administrator because that was not the reason Wilson was being let go. Obviously, it was both suspicious and unwise for Acox to instruct Soto not to bring up the relationship with the Compliance Administrator. It should have been up to the Compliance Administrator to assess and to inquire into what relevance, if any, the family relationship had on the termination decision. At the same time, however, Acox did not go so far as to instruct Soto not to mention the

16

family relationship if asked about it; the only instruction was not to bring it up. In-deed, Soto could not remember the specific context of this conversation in which Acox "mentioned" the family relationship. What's more, it would be a rather clumsy way to hide knowledge of Wilson's political affiliation (or, ultimately, to hide political dis-crimination against her) by *alerting* Soto that Wilson had an affiliation with Moore. At trial, when Acox was asked the ultimate question of whether he considered Wil-son's political affiliation with Moore when he selected her position for elimination, Acox credibly responded that he did not. When asked if anyone from the Recorder's Office directed him to lay off Wilson because of her political affiliation with Moore, again he credibly answered that they did not. On this record, the general inference of political support for family members is insufficient to *clearly* establish Acox's knowledge of Wilson's political affiliation with Moore. As noted earlier, perhaps this (and other evidence combined with it) would have satisfied a preponderance stand-ard. But the evidence is not clear and convincing.

For completeness' sake, although Wilson no longer seems to argue that Wilhight was a decisionmaker for the layoff, at trial Wilhight testified that she was only aware of Wilson's familial relationship with Moore through so-called "water cooler talk" and "it was told to her" that Wilson was the goddaughter of Moore. Again, Wilhight's explicit awareness of Wilson's *political* connection with Moore was not es-tablished. The same lack of evidence applies to Yarbrough herself. Although Wilson testified that Wilson had seen Yarbrough in the course of doing political work for Moore, Wilson did not engage with Yarbrough at those times. There was no evidence

17

that *Yarbrough* would have seen Wilson at political events in order to make the connection of political affiliation with Moore. Mirkovic also credibly testified that he did not know that Wilson was politically affiliated with Moore. Rather, in around 2013, there was "a rumor that I had heard that she had some type of relationship to him, but I did not understand it any further than that."

The remaining evidence offered by Wilson on knowledge of political affiliation is too general to add enough to the circumstantial mix. Wilson generally testified that, after Yarbrough became Recorder, there were people in the office who knew that she was affiliated with Moore and that she had been referred to as his daughter. Moore's son, Eric Moore, worked at the Recorder's Office at the time and was aware that Moore called Wilson his daughter. In addition, an employee named Rosalyn Whitlock worked in the office and also worked on Moore's campaign staff, and Whitlock was aware of Wilson's affiliation and she too referred to Wilson's as Moore's daughter. Wilson also testified that around 10 other Recorder employees knew that she was considered Moore's daughter. But Wilson did not identify them. More importantly, Wilson did not connect Eric Moore's, Whitlock's, or anyone else's knowledge of political affiliation to Acox, who did not start working at the office until April 2016. In sum, the record does not clearly and convincingly establish that the relevant decisionmakers had knowledge of Wilson's *political* affiliation with Moore. That dooms the political-discrimination claim.

18

### C. Other Evidence

### 1. Lack of Ongoing Political Rivalry

Beyond the shortfall in evidence on knowledge of political affiliation, the bottom-line fact of termination on political grounds also was not proven by clear and convincing evidence. There was insufficient record evidence of any ongoing feud or rivalry between Yarbrough and Moore, who had retired four years ago. All of the rivalry examples testified to by Wilson predated Yarbrough's tenure as Recorder. Moore then retired in 2012, when Yarbrough ran for and secured the position of Recorder of Deeds. More to the point, Acox did not even join the Recorder's Office until 2016, four years after Moore's retirement. To be sure, no doubt that some elected officials, even in retirement, wield political power. Rivalries might continue on after formal retirement from office. Or, unfortunately, political payback might very well continue after an official retires. But there was no evidence of any of that in this specific trial record. Without evidence of ongoing proxy political battles between Yarbrough and Moore since 2012, the evidence is too thin to infer that a new supervisor like Acox was motivated to punish a retired politician by terminating Wilson's position.

### 2. Don Sloan versus Training Coordinator

Wilson also argues that Don Sloan is a relevant comparator, that is, an employee who was politically affiliated with Yarbrough and was not selected for layoff, even though he was an awful employee. To repeat, without knowledge of political affiliation, this argument is neither here nor there, and the comparative evidence

does not itself add to an inference of knowledge. But it is worth discussing because there is some probative force to Wilson's contention.

The trial testimony credibly established that Sloan was a poor-performing employee and held a position that was not central to core operations. Indeed, until Soto's arrival, there had not been a Director of HR for an extended period—yet Sloan's job was executive assistant to the vacant Director of HR position. At most, Acox posits that Sloan likely helped Acox during the vacancy period, but the testimony was more supposition than concrete fact. Even after Soto took on the Director role, some of the tasks in Sloan's job description were performed by Soto herself anyway. In part, she did that because she found it to be more work to have Sloan around than to do things herself. When she did assign Sloan projects, Soto found that he would not remain on task. Indeed, Soto was not convinced that even if someone else had been in this role instead of Sloan, that it would have been helpful; it was not clear to her that it was a necessary position. Sloan also was credibly described by Soto and Wilson as sitting around a lot, drinking coffee, or simply missing from his desk; indeed, Soto recounted that part of the reason she was unsuccessful at transferring him is because the other department did not want him either. In essence, Sloan's role was functionally an open position that could have been selected for layoff with little apparent interruption to the office's operations.

At the same time, this only serves as a wash with Wilson's Training Coordinator role. At the time of the layoff, no one had been performing the Training Coordinator duties for three months, because Wilson was on temporary assignment and no one

(as far as the record showed) was otherwise filling in. So there is nothing clear and convincing about Sloan's reprieve from the layoff when, at the same time, no one was performing the Training Coordinator duties. Indeed, Wilson has not (in this trial record) identified anyone else who *later* performed the Training Coordinator role, aside from Soto vaguely remembering a single training that she set up. This is *not* to say, it must be noted, that the Training Coordinator position was unimportant. It is only to say that the Recorder's Office already was not treating it as important.

It should be noted too that Sloan's political affiliation with Yarbrough was not established with any kind of detail. Soto testified that she had learned that Sloan was a board member of a school. But she did not specify which school or what connection there was between that board membership and Yarbrough. The only other tie is that Giles remembered seeing Sloan at political functions for Yarbrough. Again, this generalized evidence of political affiliation is not clearly supportive of a powerful motive to preserve Sloan's job over Wilson's. All in all, even when considered in combination, the circumstantial evidence does not support a finding of political discrimination against Wilson.

### III. Conclusion

It is worth noting, as a final point, that the process of picking Wilson's position for the layoff appears murky, which is disappointing given that the *human resources* chief was in charge of picking it. More than any other executive staff member, Acox ought to have known the importance of documenting a written rationale for the layoff. In the present day, he has no independent memory of the rationale—and filling that

21

gap is the very reason why a detailed contemporaneous record is important. Nor was there any explanation of why Acox's memo was generated over one month after the September 8 deadline. For something as important as ending someone's livelihood, the process bespeaks an unfortunate lack of professionalism in failing to create a clear record of the decision and in giving Wilson just four days' notice of the layoff. Ultimately, however, the sum total of the trial record does not show, by clear and convincing evidence, that Wilson was laid off based on her political affiliation.

Judgment will be entered against the Plaintiffs. The Court notes that Wilson's sanctions motion for the pretrial discovery failure is still under advisement.

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: July 6, 2023